IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | No. 1:25-bk-03341-HWV |
| SPIRITRUST LUTHERAN | : | |
| Debtor | : | Chapter 11 |
| | | |
| SPIRITRUST LUTHERAN HOME | : | No. 1:25-bk-03341-HWV |
| CARE & HOSPICE | : | |
| Debtor | : | Chapter 11 |
| | | |
| SPIRITRUST LUTHERAN LIFE | : | No. 1:25-bk-03341-HWV |
| Debtor | : | |
| | : | Chapter 11 |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING DEBTORS
(I) TO OBTAIN POST-PETITION FINANCING AND GRANTING SECURITY
INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS PURSUANT TO 11 U.S.C. § 364; (II) TO USE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363; (III) TO PROVIDE ADEQUATE PROTECTION
PURSUANT TO 11 U.S.C. § 361; AND (B) SCHEDULING A FINAL HEARING
AND ESTABLISHING RELATED NOTICE REQUIREMENTS**

SpiriTrust Lutheran ("SpiriTrust"), SpiriTrust Lutheran Home Care &

Hospice ("HCH") and SpiriTrust Lutheran Life ("Life") (the "Borrowers"), each as a debtor and

debtor-in-possession (collectively, the "Debtors") in the above-captioned cases (collectively with

any successor cases, the "Cases"), by and through their attorneys, Cunningham, Chernicoff &

Warshawsky, P.C., hereby move (the "DIP Motion"), pursuant to sections 105, 361, 362, 363,

364(c)(l), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§

101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 4001-3 of the Local Rules

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Middle

District of Pennsylvania (the "Local Rules"), for entry of interim and final orders, inter alia,

(i)　　approving a term sheet (the "<u>DIP Term Sheet</u>")[1] that outlines the principal terms for a senior secured superpriority debtor-in-possession credit facility on a superpriority and priming basis, which DIP Financing shall consist of the aggregate principal amount of Twelve Millions Two Hundred Thousand Dollars ($12,200,000.00), comprised of (a) loans up to $6.7 million to fund operations, pay the Carve-Out (as defined in the DIP Term Sheet) and other administrative expenses (the "<u>New Money DIP Loan</u>") and (b) a loan of up to $5.5 million to refinance the revolving portion of the Pre-Petition Obligations (as defined below) (the "<u>Replacement DIP Loan</u>" and together with the New Money DIP Loan, the "<u>DIP Loans</u>") (the DIP Term Sheet, as may be memorialized in a definitive credit agreement and related documents and instruments, as may be amended, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the Debtors and M&T Bank, also known as Manufacturers and Traders Trust Company (the "<u>DIP Lender</u>"), substantially in the form of **Exhibit "A"** annexed to the proposed interim order (the "<u>Interim Order</u>", a proposed form of which is attached hereto as **Exhibit A**;

(ii)　　authorizing the Debtors to execute and deliver the DIP Term Sheet and the other related credit documents (the "<u>DIP Documents</u>") by and among the Borrowers and the DIP Lender, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)　　allowing superpriority administrative expense claim status for all obligations owing under the DIP Documents to the DIP Lender (collectively, and including all "<u>Obligations</u>" as described in the DIP Term Sheet, the "<u>Post-Petition Obligations</u>"));

(iv)　　granting to the DIP Lender automatically perfected security interests in and liens upon all of the Collateral, including, without limitation, all property constituting "<u>Cash Collateral</u>," as defined in Section 363(a) of the Bankruptcy Code, as set forth herein;

(v)　　authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisers, accountants, and other consultants of the DIP Lender, all to the extent provided in and in accordance with the terms of the DIP Documents;

---

[1]　　Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the Interim Order or DIP Term Sheet. To the extent that there is any conflict between the definitions contained in either the Interim Order or the DIP Term Sheet, the definitions in the DIP Term Sheet shall control.

(vi)    authorizing the use of Cash Collateral and providing adequate protection to the Pre-Petition Lender (as defined below) for any diminution in value of its interests in the Prepetition Collateral (as defined in the DIP Term Sheet), including the Cash Collateral;

(vii)    vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order, as limited pursuant hereto; and

(viii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and a final order approving the relief requested in this Motion (the "Final Order") and approving the form of notice with respect to the Final Hearing.

In support of the DIP Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code.

## BACKGROUND

3.    On November 21, 2025 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in these cases. The Debtors are operating their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.    The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are as follows:

a.  SpiriTrust, HCH, and LIFE are each non-profit corporations.  Both HCH and LIFE are wholly-owned subsidiaries of SpiriTrust.  SpiriTrust, which has been in operation for approximately eighty (80) years, owns and operates six (6) Complete Care Retirement Communities ("CCRCs") in York, Adams, and Franklin Counties. HCH formerly operated a home health care business. In August 2025, HCH ceased operations. LIFE formerly operated a program for all-inclusive home care.  LIFE's assets were sold in 2023.  SpiriTrust has approximately six hundred (600) employees.  Neither HCH nor LIFE has any employees.

b.  For many years, and increasingly since 2022, the Debtors have struggled to pay their trade debt, insurance premiums, taxes, and debt service, and to make needed maintenance and capital improvements.  As of the Petition Date, the Debtors have outstanding unsecured trade debt in the amount of approximately $19,000,000.00.

c.  As a result of their financial issues, the Debtors are subject to multiple filed or threatened lawsuits and/or confessed judgments, in the approximate aggregate amount of $8,955,122.51.

d.  As of the Petition Date, the Debtors are indebted to their Pre-Petition Lender (defined below) in the aggregate amount of not less than $83,310,455.39 (comprised of principal in the amount of $81,740,100.17, accrued and unpaid interest in the amount of $235,564.31, and fees, costs, expenses and other charges in the amount of $1,515,553.09).

e.  The Debtors have determined that it is in their best interests, and in the best interests of their creditors and their residents, to conduct a sale of the CCRCs and the Debtors' remaining assets.

f.  In order to maximize the CCRCs/assets' value, the Debtors seek to maintain SpiriTrust's business and assets. The Debtors lack sufficient resources to continue operations and maintain their assets. In order to do so, and to allow the Debtors to maintain business relationships, pay their employees, and otherwise finance the Debtors' operations, and to pay the costs of these Chapter 11 cases, the Debtors need to secure additional financing.

g.  The Debtors' cash needs are set forth on the budget, which is attached hereto as **Exhibit B** (the "Budget"). The Budget should be a sufficient period of time for the Debtors to close on a sale of their assets. While the Debtors have some cash on hand and receivables, the amount which it generates on a regular basis at any given day may not be sufficient to allow the Debtors to continue to operate.

h.  As a result of their above-described cash needs, the Debtors have sought financing on an unsecured and secured basis. The only post-Petition financing which the Debtors have been able to secure is a Debtor-in-Possession loan from M&T Bank, the terms of which are described in the DIP Term Sheet.

## SUMMARY OF THE DEBTORS' PREPETITION SECURED INDEBTEDNESS

### Loan and Security Agreement

5.  The secured creditor of the Debtors is M&T Bank, also known as Manufacturers and Traders Trust Company (the "Pre-Petition Lender"). As of the Petition Date, the Debtors are indebted to the Pre-Petition Lender in the aggregate amount of not less than $83,310,455.39 (comprised of principal in the amount of $81,740,100.17, accrued and unpaid interest in the amount of $235,564.31, and fees, costs, expenses and other charges in the amount of $1,334,790.91) (the "Pre-Petition Obligations"), arising under and in respect of various credit facilities, comprised of: (i) a term loan in the original principal amount of $10,000,000 (the "2014

Term Loan"), (ii) an irrevocable letter of credit issued by the Pre-Petition Lender for the account of SpiriTrust in the principal amount of $67,642,465.75 (the "LC"), payable to the bond trustee in respect of certain Variable Rate Demand Revenue Bonds (SpiriTrust Lutheran Project), Series of 2019 (the "Bonds"), (iii) a term loan in the principal amount of $5,500,000 (the "2019 Term Loan"), (iv) a line of credit in the maximum principal amount of $5,500,000 (the "STL LOC"), for which all three Debtors (SpiriTrust, HCH, and LIFE) are co-borrowers, (v) a line of credit in the maximum principal amount of $1,000,000 (the "HCH LOC"), (vi) a purchasing card facility (the "Purchasing Card"), (vii) various vehicle loans in the aggregate original principal amount of $115,078 (the "Vehicle Loans"), and various treasury management services and automated clearing services provided by the Pre-Petition Lender to the Debtors (collectively, the "Treasury Management Services").

6.      The Pre-Petition Obligations are evidenced by those certain agreements, documents, and instruments, executed by and between the Debtors and the Pre-Petition Lender, as amended from time to time (collectively, as amended, the "Pre-Petition Credit Agreements").

7.      The Debtors' obligations to the Pre-Petition Lender under and in respect of the Pre-Petition Obligations and the Pre-Petition Credit Agreements are secured by first-priority security interests and liens in and on almost all of the Debtors' assets, including, without limitation:

a. Mortgage liens encumbering certain parcels of real property located in the Township of West Manheim, York County, Pennsylvania, the Township of Manchester, York County, Pennsylvania, the Township of Shrewsbury, York County, Pennsylvania, the City of York, York County, Pennsylvania, the Borough of Shrewsbury, York County, Pennsylvania, the Township of Straban, Adams County, Pennsylvania, and the Township of Greene, Franklin County,

Pennsylvania (collectively, the "Properties"), pursuant to (i) that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), dated as of June 16, 2014, effective as of June 26, 2014; (ii) that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), dated December 15, 2019, effective December 18, 2019; (iii) that certain Open-End Mortgage and Security Agreement (for Series C of 2019 Master Note), dated December 15, 2019, effective December 18, 2019; and (iv) that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), dated December 15, 2019, effective December 18, 2019 (collectively, the "Mortgages")[2];

b. With respect to the Properties, a security interest in "[a]ll furniture, furnishings, goods, chattels, appliances, apparatus, inventory, machinery and equipment of any nature whatsoever and all other tangible personal property now or at any time hereafter owned by [SpiriTrust] and installed in, attached to or situated in or at the Sites or used or intended to be used in connection with the operation of the Facilities, or in the operation of any buildings and improvements now or hereafter erected which comprise a part of the Sites or the Facilities, including replacements and substitutions thereof, whether or not the personal property is or shall be affixed thereto," pursuant to the Mortgages;

---

[2] Based upon the description of that certain parcel of real property commonly known as 0 Old Harrisburg Road, Gettysburg, Adam County, Pennsylvania, being Tax Parcel Number 38G11-0050-000 (the "0 Old Harrisburg Road Parcel"), provided to the Pre-Petition Lender by the SpiriTrust Lutheran, the 0 Old Harrisburg Road Parcel may not be included in the lien of the "Mortgages."

c. With respect to the Properties, an assignment of and security interest in "[a]ll the rents, issues and profits of any of the foregoing and all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards relating to the Sites, the Facilities and the improvements thereon erected or to be erected thereon," pursuant to the Mortgages;

d. A security interest in the Gross Revenues of SpiriTrust, defined in that certain Master Trust Indenture, dated May 15, 2005, as "all operating and nonoperating revenues, received by or on behalf of [SpiriTrust], and all rights to receive the same, whether in the form of accounts, contract rights, accounts receivable, general intangibles, chattel paper, documents, instruments or money, whether now owned or hereafter acquired, all as defined in the Uniform Commercial Code, and all the proceeds thereof, and any insurance proceeds or condemnation awards, excluding, however, any revenues securing Non- Recourse or any gifts, grants, bequests, funds, donations and contributions, and income therefrom, to the extent specifically restricted by the donor, settlor or grantor to a particular purpose inconsistent with the use for the payment of principal of, redemption premium and interest on Master Notes or Master Guaranties," pursuant to (i) that certain Master Trust Indenture, dated May 15, 2005; and (ii) the Mortgages;

e. A security interest in all assets of all three Debtors (SpiriTrust, HCH, and LIFE), pursuant to that certain Amendment to Loan Documents Agreement, dated as of November 22, 2022, that certain Specific Security Agreement, dated as of November 22, 2022, that certain Forbearance and Amendment to Loan

Documents Agreement, dated as of August 21, 2025, and that certain General Security Agreement, dated August 21, 2025;

f.  A pledge of and security interest in certain investment property maintained with BNY Mellon, N.A., and all proceeds thereof, pursuant to that certain Pledge of Securities, dated December 11, 2014, Amendment to Loan Documents Agreement, dated as of November 22, 2022, that certain Specific Security Agreement, dated as of November 22, 2022, that certain Forbearance and Amendment to Loan Documents Agreement, dated as of August 21,2025, and that certain General Security Agreement, dated August 21, 2025; and

g.  A pledge of, assignment of, and security interest in that certain deposit account maintained with the Pre-Petition Lender, being Deposit Account #9893703703, titled SpiriTrust Lutheran - M&T Bank as Secured Party, pursuant to that certain Pledge and Assignment of Deposit Account, dated as of August 21, 2025.

h.  The Pre-Petition Lender has a blanket security interest in all assets of the Debtors.

## THE DEBTORS' URGENT NEED FOR POST-PETITION FINANCING

8.  As a consequence of the factors described in Paragraph 4 above, the Debtors have insufficient cash to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.

9.  Given the encumbrances upon substantially all of the Debtors' assets and the severely restricted borrowing base under the Pre-Petition Credit Agreements, the Debtors urgently need credit and additional capital to continue their businesses and operations. Absent

immediate availability of new credit, the Debtors will be forced to cease operations and the going-concern value of their business will be lost.

10.    Accordingly, the Debtors require the availability of working capital from the DIP Lender and the use of cash collateral. The DIP financing will provide more than just cash for the Debtors to operate their business, the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders. The Debtors' critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

11.    In sum, without the immediate access to post-petition financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the continued operation of their business before the Final Hearing on the DIP Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lenders. The Debtors' ability to remain viable and preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the DIP Motion.

## **SUMMARY OF THE DEBTORS' PROPOSED DIP FINANCING**[3]

1.    The Debtors have determined, in the exercise of their sound business judgment, that to meet their working capital needs they require a post-petition credit facility in substantially the form described herein. Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Term Sheet with the Administrative Agent.

---

[3]    The summaries and descriptions of the terms and conditions of the DIP Term Sheet and the proposed Interim Order set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Term Sheet and the Interim Order. In the event there is a conflict between the DIP Motion and the DIP Term Sheet or the Interim Order, the DIP Term Sheet or the Interim Order, as applicable, shall control in all respects.

2.      The terms of the DIP financing are more specifically set forth in the DIP Term Sheet attached to the Interim Order as **Exhibit "A"**. The key provisions of the DIP Term Sheet are as follows:

| | |
|---|---|
| **Borrowers:** | SpiriTrust Lutheran, SpiriTrust Lutheran Home Care and Hospice, Inc., and SpiriTrust Lutheran LIFE. |
| **Lender:** | The "Lender" under the Forbearance and Amendment to Loan Documents Agreement (the "Forbearance Agreement"), dated as of August 21, 2025, by and between M&T Bank (the "Pre-Petition Lender"), and the Borrowers, and those certain Existing Loan Documents (as defined in the Forbearance Agreement) (collectively, the "Pre-Petition Credit Agreements") (the "DIP Lender"). |
| **Loan Facility:** | |
| Facility Amount: | Senior secured super-priority debtor-in-possession financing in the form of a term credit facility (the "DIP Facility") of up to an aggregate principal amount of Twelve Million Two Hundred Thousand Dollars ($12,200,000.00), comprised of Six Million Seven Hundred Thousand Dollars ($6,700,000.00) of new borrowings, plus availability under the SpiriTrust line of credit in the maximum principal amount of Five Million Five Hundred Thousand Dollars ($5,500,000.00) (the "DIP Loans"). The DIP Lender will advance up to Two Million One Hundred Thousand Dollars ($2,100,000.00) (the "Interim Commitment") upon entry of the Interim Order, provided that the Interim Order shall be satisfactory in form and substance to the DIP Lender (as defined herein) and the Pre-Petition Lender in its sole discretion. |
| Budget: | A copy of the Budget is attached hereto as **Exhibit B**. |
| **Interest Rates:** | Twelve percent (12.0%). |
| | Payable monthly in cash in arrears on the last business day of each calendar month (subject to the Lender's option to capitalize such as interest set forth below). Interest to be calculated on the basis of the actual days elapsed in a year of 360 days. |
| | At the Lender's option (in its sole discretion), interest, and fees, accruing under the DIP Credit Agreement may be capitalized by adding such interest or fees (as the case may be) to the principal amount of the DIP Loans on the relevant payment date therefore in lieu of receiving payment of the same in cash and said interest and fees will be treated as if principal amounts of the DIP Financing and have the same superpriority status and priming lien status as the DIP Financing. |
| **Default Interest:** | Default rate of interest shall equal the then applicable rate plus five percent (5%). |

| | |
|---|---|
| **Term:** | The DIP Loans shall be repaid in full at the earliest of (i) the stated maturity, which shall be 5 days after the Closing Date of sale of the six Properties (as defined in Schedule 3 annexed to the DIP Term Sheet), (ii) the Termination Date (as defined below), or (iii) March 31, 2026 (the "Maturity Date"). |
| **Termination:** | Upon the occurrence of any event of default, the DIP and Prepetition Lender may immediately terminate the DIP Facility and cancel the DIP and Prepetition Lender's commitment thereunder (the date of any such termination, the "Termination Date"), declare the obligations in respect of the DIP Facility to be immediately due and payable under the DIP Documentation and the Interim Order or the Final Order, as applicable. |
| **Fees:** | A facility fee (the "Facility Fee") equal to three percent (3.0%) of the $6,700,000.00 in new money commitments under the DIP Facility. The Facility Fee will be deemed earned in full on the Closing Date (as defined below) and will be payable in full on the Closing Date. <br><br> The Facility Fee is non-refundable. |
| **Expenses:** | The Borrowers shall pay (i) all reasonable out-of-pocket expenses of the DIP Lender associated with the negotiation, preparation, execution, delivery and administration of the Cases and the DIP Documents and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsel), and (ii) all reasonable out-of-pocket expenses of the DIP Lender (including the fees, disbursements and other charges of counsel) in connection with Cases, including the exercise and enforcement of the rights and remedies of the DIP Lender under the DIP Documents and applicable law. The DIP Lender, or its counsel, shall provide copies of their Invoices (as defined in the DIP Term Sheet) to the Debtors before payment of same shall be made. |
| **Collateral:** | All of the Debtors' right, title and interest in, to and under all of the following property: (a) all of the Debtors' "accounts", as that term is defined in the UCC, including, without limitation, all accounts receivable of the Debtors and all rights of the Debtors to payment for goods sold or leased or for services rendered; (b) all of the Debtors' right, title and interest in all inventory of whatever kind, nature or description; (c) all real estate, (d) all other assets, and (e) all "proceeds" as that term is defined under the UCC of any of the foregoing (the "DIP Collateral"). |
| **Use of Proceeds:** | The DIP Loans shall be available (a) to repay the outstanding amounts, as of the Petition Date, under the Debtors' lines of credit, credit/purchase cards, and cash management/ACH fees owed to the Prepetition Lender; (b) to fund working capital requirements of the Debtors, operating expenses of the Debtors, and other line items in accordance with the terms of the Budget; (c) to fund the payment of cash-pay interest accrued on the DIP Loans; (d) to fund payments to critical vendors, if approved by the Bankruptcy Court; (e) to pay fees and expenses of the DIP Lender related to the DIP Facility and the Debtors' chapter 11 cases (the "Cases"), including reasonable attorneys' fees; (f) to pay the fees and expenses of the Pre-Petition Bank Lender relating to the Cases, including reasonable attorneys' fees; and (g) subject to the entry of the Final Order, to pay the fees and expenses of the Pre-Petition Lender under the Pre- |

Petition Credit Agreement, including any and all documents executed in connection therewith or relating thereto, and applicable law prior to the commencement of the Cases.

Neither the proceeds of the DIP Loans nor the Pre-Petition Lender's cash collateral shall be transferred to or used by any entity other than a Debtor, except as permitted by the DIP Lender or as set forth in the Budget.

No portion of the DIP Loans, the Carve-Out (as defined in the DIP Term Sheet) or any cash collateral of the Pre-Petition Lender or the DIP Lender shall be used to assert any claim or cause of action or make any objection against the Pre-Petition Lender, or its advisors, agents and subagents, and/or challenging any claim or lien of the Pre-Petition Lender or the validity or enforceability of the Pre-Petition Credit Agreement or any related loan document, and/or challenging any pre-petition payment or transfer to the Pre-Petition Bank Lender; provided that any DIP Loans used to pay any counsel of and financial advisor to the Committee, if any is formed, to investigate any of the foregoing shall not exceed $20,000.00 in the aggregate.

| **Loan Documentation:** | Definitive loan documentation set forth in the DIP Documents including, without limitation, the DIP Term Sheet. |

**Covenants:**

Affirmative Covenants:

The Debtors shall agree to produce and distribute the variance reports and other Budget materials required herein to the parties entitled to receive the same (including the Committee, if one is appointed). The Debtors shall agree to diligently and in good faith pursue (i) the procedures (the "Sale Procedures") for the sale of all of the Debtors' assets and (ii) the sale of the Debtors' assets pursuant thereto, including, without limiting the generality of the foregoing, by negotiating in good faith with potential purchasers of the Debtors' assets pursuant to the Sale Procedures and using their best efforts to conclude such negotiations as soon as is practicable, by executing and delivering asset purchase agreements upon conclusion of such negotiations, and by promptly filing with the Court all necessary motions with respect thereto.

Other affirmative covenants to include, without limitation: delivery of financial statements, reports, accountants' letters, projections, officers' certificates, weekly and monthly reporting packages and other information reasonably requested by the DIP and Prepetition Lender (including information required to be delivered pursuant to the Cases and reports with respect to compliance with the Budget as provided herein); maintenance of existence; maintenance of properties, notice of default, litigation and other material events; taxes; compliance with laws, governmental approvals, environmental compliance; books and records; inspections rights; use of proceeds; collateral and security interests; certain obligations respecting subsidiaries.

The Debtors shall cooperate with and permit the DIP and Prepetition Lender to have reasonable access to the Collateral and non-privileged records during normal business hours. The Debtors shall make available to the DIP and Prepetition Lender's reasonable request all documents related to the sale of the collateral granted under the Pre-Petition Credit Agreement (the "Pre-

| | |
|---|---|
| | Petition Collateral") prior to their filing with the Court. The Debtors shall immediately grant the DIP and Prepetition Lender access to the due diligence room established for bidders of the Debtors' assets (as defined below). |
| | The Debtors shall obtain the DIP and Prepetition Lender's consent prior to entering into any letter of intent or asset purchase agreement. |
| | The Debtors shall ensure that all LSM personnel are wholly walled-off from the sale process. |
| | The Debtors shall not make any payments to non-critical vendors. |
| | The Debtors shall not make payments to LSM in excess of $100,000 per month, which payments shall terminate on the date the Bankruptcy Court enters an order approving the Sale and identifies a successful purchaser. |
| | The Debtors shall not make any payments on account of prepetition indebtedness, other than to approved critical vendors and Highmark, such as bonds or term loans. |
| | The Debtors shall not make any payments to any member of the Debtors' board of directors. |
| | **Other affirmative covenants to be determined.** |
| Negative Covenants: | Limitations on: indebtedness; liens; guarantee obligations; mergers, consolidations, liquidations and dissolutions; sales of assets (other than in the ordinary course); leases; dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; optional payments and modifications of subordinated and other debt instruments; transactions with affiliates; sale and leasebacks; changes in fiscal year; negative pledges; changes in lines of business; changes in tax status; payment of Pre-Petition Date claims except to the extent authorized by the Court; the existence of any claims other than those of the Administrative Agent and the Lenders entitled to superpriority under Bankruptcy Code § 364(c)(1) (except to the extent permitted by the Interim and Final Orders). |
| | **Other negative covenants to be determined.** |

## REQUEST FOR APPROVAL OF PROPOSED DIP FINANCING

1.     As described above, it is essential to the success of these cases that the Debtors immediately obtain access to sufficient post-petition financing, without which the Debtors will be unable to operate or generate income. The Debtors' continuing viability, ability to maximize the value of their estates for the benefit of their creditors, and their ability to pursue the

Proposed Sale at the Auction thus depends heavily upon the expeditious approval of the DIP Credit Agreement and the related actions requested herein.

2.        Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code,[4] a court may authorize a debtor-in-possession to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing. Pursuant to section 364(d) of the Bankruptcy Code,[5] a court may authorize a debtor-in-possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

3.        As a condition to entering into the DIP Credit Agreement and obtaining the Debtors' needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c) and (d) of the Bankruptcy Code, (a) to grant the DIP Lender automatically perfected security interests

---

[4]        Section 364(c) of the Bankruptcy Code provides as follows:
If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
(1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3) secured by a junior lien on property of the estate that is subject to a lien.
11 U.S.C. § 364(c).

[5]        Section 364(d) of the Bankruptcy Code provides as follows:
(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
11 U.S.C. § 364(d).

Case 1:25-bk-03343-HWV    Doc 15    Filed 11/24/25    Entered 11/24/25 09:05:35    Desc
Main Document    Page 15 of 143

in and liens upon all of the DIP Collateral and (b) grant the Post-Petition Obligations allowed

superpriority administrative expense claim status in each of the Cases and any successor Cases.

### *Approval Under Section 364(c) of the Bankruptcy Code*

4.     The statutory requirement for obtaining post-petition credit under section

364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors-in-

possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the

Bankruptcy Code as an administrative expense." *See* <u>In re Garland Corp.</u>, 6 B.R. 456, 461

(B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained); <u>In re Ames Dep't Stores, Inc.</u>,

115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek

credit from every possible source, a debtor must show that it has made a reasonable effort to seek

other sources of credit available under section 364(a) & (b)"); <u>In re Crouse Group, Inc.</u>, 71 B.R.

544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the

Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section

364(b) of the Bankruptcy Code).

### *The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis under 11 U.S.C. §364(a) or (b)*

5.     As set forth in Paragraph 4 above, and as the evidence at the Final Hearing

will show, the Debtors could not have obtained a working capital facility of the type and magnitude

required in these Cases on an unsecured basis.

6.     To show that the credit required is not obtainable on an unsecured basis, a

debtor need only demonstrate "by good faith effort that credit was not available without" the

protections of section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n*

*(In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty

to seek credit from every possible lender before concluding that such credit is unavailable." *Id* at 1088; *see also Ames,* 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

7.     Other than the proposed DIP financing, there are no viable financing alternatives available to the Debtors under the circumstances. The Debtors have been exploring financial alternatives for a considerable period of time and are intimately familiar with the lack of financing available to them. In fact, the Debtors retained an investment banker to seek alternative financing and it was unable to obtain any on terms as favorable as those contained in the proposed DIP financing. For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Pre-Petition Lender on the Prepetition Collateral, the Debtors are convinced that other than the proposed DIP financing they would be entirely unable to obtain financing to address the their urgent liquidity needs.

8.     Moreover, as noted above, all of the Debtors' assets are encumbered by liens and security interests granted to the Pre-Petition Lender. Thus, even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Pre-Petition

Lender, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 cases at the outset.

### *Approval of Priming Liens*

9.      If a debtor-in-possession is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor-in-possession may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by priming liens, provides that the court, after notice and hearing, may authorize the debtor-in-possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if -

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

10.     As discussed above, the Debtors have explored financial alternatives and are aware of the lack of financing available to them. In light of that, and given the state of the credit markets, the Debtors have concluded that financing comparable to that provided by the DIP Lender under the DIP Credit Agreement is currently unobtainable without the priming of the prepetition liens of the Pre-Petition Lender. *See In re Utah 7000, L.L.C.,* 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding that the debtor unable to obtain financing without priming of prepetition liens); *In re Masello,* 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (same).

11. Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable as an unsecured basis and without granting priming liens. In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Credit Agreement is the most favorable under the circumstances and provides the Debtors necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

**_The Post-Petition Loan is Necessary to Preserve Assets of the Debtors' Estates_**

12. In cannot reasonably be disputed that the Debtors have an immediate need for access to a working capital facility. The Debtors have significant cash needs. Access to substantial credit to pay employees and to keep their business operating is critical to maintaining the value of the Debtors' assets. In the absence of immediate access to cash and credit, the Debtors' employees and suppliers may refuse to provide the materials and services required to maintain operations.

13. As stated above, the DIP Credit Agreement is also essential so that the Debtors can immediately instill their employees, suppliers and residents with confidence in the Debtors' ability meet their obligations to these important stakeholders. Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their values as a going concern.

14. The success of these Cases thus depends on the confidence of the Debtors' employees, vendors, and residents. If the DIP Motion is denied or delayed, that confidence may be destroyed, and the success of these chapter 11 cases might be irreparably damaged. In contrast, once the DIP Credit Agreement is approved, the Debtors' ability to provide their employees,

vendors, residents, and other important stakeholders with the necessary confidence will be assured. The Debtors' need for access to the DIP Loans is, therefore, immediate.

### *Application of the Business Judgment Standard*

15. After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtors, the DIP Lender, and the Pre-Petition Lender, the Debtors' management concluded that the proposed DIP financing and the use of cash collateral is the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD,* 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); *In re Simasko Prod.* Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its

cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

16.     The terms of the proposed DIP financing are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Term Sheet and obtain funds from the DIP Lender on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

### *Highlighted Provisions Under Local Bankruptcy Rule 4001-3*

17.     L.B.R. 4001-3(c) states in pertinent part that:

All… Financing Motions must:

(1)     recite whether the proposed form of order, underlying cash collateral stipulation, or loan agreement contains any provision of the type indicated below;

(2)     identify the location of any such provision in the proposed form of order, cash collateral stipulation, or loan agreement; and

(3)     state the justification for the inclusion of such provision:

(A)     Provisions that grant cross-collateralization protection - other than replacement liens or other adequate protection - to the prepetition secured creditor (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law).

(B)     Provisions or findings of fact that bind the estate or parties in interest with respect to validity, perfection, priority, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order for relief and the creditors' committee, if formed, at least sixty

(60) days from the date of its formation to investigate such matters.

(C)     Provisions that seek to waive any rights the estate may have under 11 U.S.C. § 506(c).

(D)     Provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, and 549.

(E)     Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided under 11 U.S.C. § 552(b).

(F)     Provisions that provide treatment for the professionals retained by a committee appointed by the United States trustee different from that provided for the professionals retained by the debtor with respect to a professional fee carveout, and provisions that limit the committee counsel's use of the carveout.

(G)     Provisions that prime any secured lien without the consent of the lienholder.

(H)   Provisions that release the secured creditor from lender liability.

(I)     Provisions that grant the lender expedited relief from the automatic stay under 11 U.S.C. § 362 or relief from the automatic stay without further order of court. (C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

L.B.R. 4001-3(c).

18.     Pursuant to L.B.R. 4001-3(c)(3)(A) and 4001-3(c)(3)(e), Paragraph 2 of the Interim Order and the DIP Term Sheet provide that the Debtors will request the Bankruptcy Court's authority to use the DIP Loans to pay in full the outstanding amounts under the STL LOC and the HCH LOC. While this is not technically a cross-collateralization as contemplated by the Local Rule, it nonetheless warrants highlighting here.

19.     Pursuant to Local Rule 4001-3(c)(3)(C), Paragraphs 4, and 6 of the Interim Order provides that subject to the entry of the Final Order, except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the chapter 11 Cases or any future proceedings or cases related hereto, at any time, shall be charged against the DIP Lender or the Pre-Petition Lender, their claims, or the Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender or the Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Pre-Petition Lender.

20.     Pursuant to L.B.R. 4001-3(c)(3)(G) and (I), the Interim Order provides that the Post-Petition Liens and the DIP Super-Priority Claim should be senior and prior in all respects to (a) the Post-Petition Replacement Liens (as defined in the DIP Term Sheet) and all other liens securing any Pre-Petition Collateral, in all cases, granted under the Pre-Petition Financing Documents or otherwise, and (b) the Adequate Protection Super-Priority Claims (as defined in the DIP Term Sheet), any other obligations in respect of adequate protection and all other claims held by the Pre-Petition Lender (including, without limitation any super-priority claims in addition to the Adequate Protection Super-Priority Clams), whether arising under or related to the Pre-Petition Financing Documents, the Interim Order, or otherwise.

21.     The justification for the provisions of the DIP Credit Agreement for which disclosure is required pursuant to Local Rule 4001-3 is the immediate and critical need for this financing. As discussed above, the Debtors were unable to secure postpetition financing on terms more favorable than that obtained from the DIP Lender and such financing is critical to the maximization of recoveries for the Debtors' creditors. Indeed, without this financing, the Debtors will be forced to immediately shut down and liquidate, and any significant returns for unsecured

creditors will almost certainly be eliminated. Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that require disclosure under Local Rule 4001-3, and these terms of the DIP Term Sheet should be approved.

**REQUEST FOR USE OF CASH COLLATERAL**

22.     The Debtors will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their businesses and preserve their value as going concerns. These essential items, however, constitute part of the Prepetition Collateral (the "Cash Collateral") and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code.

23.     Section 363(c)(2) of the Bankruptcy Code provides that:

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless-

> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

24.     In the instant cases, the DIP Lender has consented to the Debtors' use of Cash Collateral. Because such use is essential to the preservation of the Debtors' estates, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**APPROVAL OF ADEQUATE PROTECTION**

25.     In exchange for the Debtors' use of the Prepetition Collateral, including Cash Collateral, and the priming of the prepetition liens of the Pre-Petition Lender (the "Pre-Petition Liens"), the Pre-Petition Lender is entitled to receive adequate protection pursuant to

sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Pre-Petition Liens on the Prepetition Collateral, and the subordination to the Carve Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

### *Pre-Petition Lender's Adequate Protection*

26.    The Debtors propose to provide the Pre-Petition Lender with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code. To that end, the Debtors and the Pre-Petition Lender have negotiated, and the Debtors request the Court approve, as of the Petition Date, certain protections of the Pre-Petition Lender's interest in the Prepetition Collateral from any Diminution in Value of each of their respective interests in the Prepetition Collateral. Such adequate protection, as described more fully in the Interim Order, is summarized below.

a) Post-Petition Replacement Liens. As adequate protection for any Diminution in Value and as an inducement to the Pre-Petition Lender to permit the Debtors' use of the Cash Collateral as provided in the Interim Order, the Debtors shall grant, assign and pledge to Pre-Petition Lender post-petition replacement security interests in and liens (the "Post-Petition Replacement Liens"), subject to the Carve-Out, on all of the Collateral whether acquired before, or after the Petition Date. Upon entry of the Interim Order, the liens and security interests granted to Pre-Petition Lender as adequate protection shall be valid, perfected and enforceable against the Collateral without further filing or recording of any document or instrument or the taking of any further actions.

b) <u>Adequate Protection, Super-Priority Claim</u>. The Pre-Petition Lender shall be granted, to the extent of any Diminution in Value, a super-priority claim (the "<u>Adequate Protection Super-Priority Claim</u>") that shall have priority (except with respect to (i) the liens and super-priority claims granted to the DIP Lender in connection with the Post-Petition Financing Documents, (ii) the Post-Petition Replacement Liens granted pursuant to clause (a), above, and (iii) the Carve-Out) in each of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or name whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code. The Adequate Protection Super-Priority Claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, excluding the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code, and shall be subject and subordinate only to (i) the liens and super-priority claims granted to the DIP Lender in connection with the Post-Petition Financing Documents, (ii) the Post-Petition Replacement Liens, and (iii) the Carve-Out and not to any other claim.

c) <u>Payment of Fees, Costs and Expenses</u>. The Pre-Petition Lender shall be entitled to have the Debtors pay all reasonable out-of-pocket costs and expenses incurred by the Pre Petition Lender with respect to the Pre-Petition Obligations (including, without limitation, the reasonable fees and disbursements of counsel and other professional advisers advising the Pre-Petition Lender, including Ballard Spahr LLP, and any other professionals retained by

the Pre-Petition Lender) and in connection with the protection and enforcement of the rights and interests of the Pre-Petition Lender, whether such fees, costs, disbursements and expenses were incurred prior to, on or after the Petition Date (provided that any such fees, costs, disbursements and expenses incurred prior to the Petition Date shall be subject to entry of the Final Order), within five business days of presentation (with copies to counsel for any Committee and the United States Trustee) of an invoice therefor (which invoice may be redacted to remove privileged or case sensitive material) without the requirement of prior Court approval or compliance with guidelines applicable to retained professionals.

d) Reservation of Rights. The Pre-Petition Lender reserves the right to request additional or further adequate protection of its interests in the Pre-Petition Collateral.

e) Recognition of Pre-Petition Liens and Pre-Petition Lender Claim. Subject to certain provisions of the Interim Order, upon entry of the Interim Order, (i) the Pre-Petition Liens shall be deemed valid, perfected, binding, and enforceable, shall not be avoidable under the Bankruptcy Code, and shall not be subject to subordination under section 510 of the Bankruptcy Code, and (ii) the Pre-Petition Lender Claim (as defined in the Interim Order) shall be allowed and not subject to any offset, defense, counterclaim, right of recoupment, recharacterization, disallowance under section 502(d) of the Bankruptcy Code or subordination under section 510 of the Bankruptcy Code.

f) Adequate Protection Payments. As further adequate protection, the Debtors seek to pay the Pre-Petition Lender an amount equal to the accrued, unpaid interest on the Pre-Petition Lender Debt (as defined in the DIP Term Sheet) not previously repaid, such payments to be monthly in arrears.

## ***Conclusion***

27.     The Debtors believe that the proposed adequate protection is fair and reasonable. The Pre-Petition Lender have agreed that the adequate protection summarized above and provided for in the Interim Order is sufficient to allow the Debtors to use their Cash Collateral. Furthermore, the priming of the Pre-Petition Liens will enable the Debtors to obtain the DIP Credit Agreement. As a result, the Pre-Petition Lender consents to such priming liens and is entitled to receive adequate protection of its interest in the Prepetition Collateral.

28.     Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protections in accordance with the terms set forth in the Interim Order.

## THE DEBTORS SHOULD BE PERMITTED TO MAKE INTERIM BORROWINGS UNDER THE DIP TERM SHEET

29.     This Court is empowered to conduct a preliminary expedited hearing on the DIP Motion and authorize the Interim Order. Specifically, Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor-in-possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days it has been served. If the motion so requests, the court may conduct a preliminary hearing before that 14-day period ends.  After a preliminary hearing, the court may authorize obtaining credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2)(A).

30.     Pending a final hearing, the Debtors require $2,100,000 under the DIP Credit Agreement for, inter alia, payment of vital services and other working capital needs. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary,

post-petition operating expenses in order to preserve the value of the Debtors' estates for the benefit of all the Debtors' creditors and equity holders.

31.     Absent immediate financing for their continuing business operations, the Debtors will be unable to pay operating expenses and, therefore, unable to continue to conduct their businesses pending the Final Hearing. Consequently, if interim relief is not obtained, the Debtors, their estates, their creditors and equity holders, their businesses, their employees, and their assets will suffer immediate and irreparable harm.

32.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2)(A). The Debtors' current financial distress and acute need for post-petition liquidity provide ample evidence to support the conclusion that the Debtors will avoid immediate and irreparable harm only if the Court authorizes the relief provided for in the Interim Order.

33.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing on the Petition Date or as soon thereafter as is practical to consider the Debtors' request for authorization to obtain interim financing under the DIP Term Sheet up to a maximum in the aggregate principal amount of $2,100,000 to sustain operations and comply with terms and conditions of the DIP Term Sheet.

## **GOOD FAITH**

34.     The Debtors submit that the terms and conditions of the DIP Term Sheet, and the fees paid and to be paid thereunder, are the best available to the Debtors under the circumstances. As stated above, the Debtors, the DIP Lender, and the Pre-Petition Lender negotiated the terms and conditions of the DIP Term Sheet and the use of Cash Collateral in good

faith and at arm's length. Moreover, the Debtors decision to enter into the DIP Term Sheet was an exercise of the Debtors' prudent business judgment. Therefore, the DIP Lender, and the Pre-Petition Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Term Sheet, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

35.     The Interim Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtors to grant the adequate protection set forth herein; (b) permit the Debtors to perform such acts as the DIP Lender or the Pre-Petition Lender may request in their sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Lender and the Pre-Petition Lender under the DIP Documents, the DIP Credit Agreement, and the Interim Order; and (d) authorize the Debtors to pay and the DIP Lender and the Pre-Petition Lender to retain and apply payments made in accordance with the terms of the Interim Order.

36.     Stay modification provisions of this type are customary features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

## REQUEST TO WAIVE BANKRUPTCY RULES 6003(a), 6004(a), AND 6004(h)

37.     In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a),

the twenty-one-day stay provided for by Bankruptcy Rule 6003(a), and the fourteen-day stay provided for by Bankruptcy Rule 6004(h). The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(a), 6004(a), and 6004(h).

## REQUEST FOR FINAL HEARING

38.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Hearing that is no later than 14 days from the Petition Date.

## NOTICE

39.     Notice of the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; (iv) counsel to the Pre-Petition Lender; and (v) to the extent practicable, to any other entity or individual that has asserted a security interest in or lien on any of the DIP Collateral. The parties have made reasonable efforts to afford the best notice possible under the circumstances.

## NO PRIOR REQUEST

40.     No prior request for the relief sought in the DIP Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim Order annexed hereto as **Exhibit A**; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Respectfully submitted:

CUNNINGHAM, CHERNICOFF
& WARSHAWSKY, P.C.

By:____/s/ Robert E. Chernicoff_____
    Robert E. Chernicoff, Esquire
    Attorney I.D. No. 23380
    2320 North Second Street
    P. O. Box 60457
    Harrisburg, PA 17106-0457
    (717) 238-6570

Date: November 21, 2025

# Exhibit A

# [Form of Interim Order]

## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPIRITRUST LUTHERAN, SPIRITRUST | ) | Case No. |
| LUTHERAN HOME CARE & HOSPICE, | ) | |
| INC., AND SPIRITRUST LUTHERAN | ) | |
| LIFE | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | RE: |
| | ) | |

### INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN FIRST-PRIORITY SECURED POST-PETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL OF EXISTING SECURED LENDERS, AND PROVIDING RELATED ADEQUATE PROTECTION, AND (C) PRESCRIBING FORM AND MANNER OF NOTICE AND SETTING THE TIME FOR THE FINAL HEARING

Upon the motion (the "**Motion**"), dated November 21, 2025, of SpiriTrust Lutheran and its above-captioned affiliated debtors that have commenced chapter 11 cases (the "**Cases**") as debtors and debtors in possession (collectively, the "**Debtors**"),[1] (A) for the entry of this Interim Order and the Final Order (as hereinafter defined) authorizing the Debtors to (i) obtain post-petition financing in an aggregate amount not to exceed Twelve Million Two Hundred Thousand Dollars ($12,200,000.00), comprised of Six Million Seven Hundred Thousand Dollars ($6,700,000.00) of new borrowings, plus availability under the SpiriTrust line of credit in the maximum principal amount of Five Million Five Hundred Thousand Dollars ($5,500,000.00) (the "**DIP Financing**") pursuant to sections 363 and 364 of title 11 of the United States Code (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: SpiriTrust Lutheran (xx-6329), SpiriTrust Lutheran Home Care & Hospice, Inc. (xx-9293), and SpiriTrust Lutheran LIFE (xx-7186). Each of which has a mailing address of 1050 Pennsylvania Avenue, York, Pennsylvania.

"**Bankruptcy Code**") by entering into a term sheet (the "**DIP Term Sheet**")[2] that outlines the principal terms for a senior secured superpriority debtor-in-possession credit facility on a superpriority and priming basis, which DIP Financing shall consist of loans to fund operations, pay the Carve-Out (as defined below) and other administrative expenses (the "**DIP Loans**"), with all advances under the DIP Loans to be secured by Post-Petition Liens (as defined below) which shall automatically vest and be perfected immediately upon entry of this Interim Order (the DIP Term Sheet, as may be memorialized in a definitive credit and security agreement and related documents and instruments, as may be amended, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**"), in the form annexed hereto as **Exhibit "A**," among the Debtors, as borrowers, and M&T Bank (the "**DIP Lender**"); (ii) grant priming liens for the benefit of the DIP Lender in all Collateral (as defined herein) in accordance with the DIP Term Sheet, the Interim Order and the Final Order to secure any and all of the Debtors' obligations, indebtedness and liabilities under the DIP Term Sheet (the "**Post-Petition Obligations**"); (iii) grant superpriority claims to and on behalf of and for the benefit of the DIP Lender in all Collateral (as defined herein) in accordance with the DIP Term Sheet, the Interim Order and the Final Order to secure the Post- Petition Obligations; (iv) subject to the terms and limitations herein, use Cash Collateral (as defined below) and (v) pending a final hearing on the Motion (the "**Final Hearing**"), obtain emergency post-petition loans under the DIP Term Sheet until and including the date on which the Final Order is entered (the "**Interim Commitment**"), (B) requesting the provision of adequate protection to the Debtors' Pre-Petition Lender (as defined below); and (C) in accordance with Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

---

[2] Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the DIP Term Sheet, a copy of which is attached hereto as **Exhibit "A"**.

requesting that this Court schedule the Final Hearing and approve notice with respect thereto; and the Court having considered the Motion and the exhibits attached thereto, including, without limitation, the DIP Term Sheet; and a hearing to consider approval of the Interim Commitment having been held and concluded on November 25, 2025 (the "**Interim Hearing**"); and due and sufficient notice of the Motion and the Interim Hearing having been given; and upon all of the pleadings filed with the Court and all of the proceedings held before the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

THE DEBTORS STIPULATE AND THE COURT HEREBY FINDS, DETERMINES AND CONCLUDES:[3]

A.     On November 21, 2025 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in the management and possession of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 Cases.

B.     Consideration of this Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (O). This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     Notice of the relief sought by the Motion, and the hearing with respect thereto was served on or about November 21, 2025 via facsimile, email, and/or overnight delivery on the following parties in interest: (i) the United States Trustee; (ii) creditors holding the twenty (20) largest unsecured claims against the Debtors on a consolidated basis, as included in the Debtors'

---

[3]     Findings of fact contained herein shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

chapter 11 petitions, or their respective legal counsel, if known; (iii) any party that has filed a lien against any of the Debtors' assets; (iv) the Internal Revenue Service; and (v) any party that has requested notice and service of papers in the Cases. Given the nature of the relief sought in the Motion, such notice constitutes sufficient and adequate notice of this Interim Order pursuant to Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 4001(b), (c) and (d) and 9014 and section 102(1) of the Bankruptcy Code, as required by sections 363(b) and 364(d) of the Bankruptcy Code, and no further notice of the Motion or this Interim Order is necessary or required.

D.     The Debtors admit, stipulate, and agree (provided that no such stipulations or agreements shall limit, impair or modify in any way the rights, protections or remedies of the DIP Lender, including with respect to any default or Event of Default under any of the DIP Credit Documents (as defined in the DIP Credit Agreement)), that:

**M&T Bank Pre-Petition Credit Documents**.

i.     As of the Petition Date, the Debtors are indebted to M&T Bank (the "**Pre-Petition Lender**") in the aggregate amount of not less than $83,310,455.39 (comprised of principal in the amount of $81,740,100.17, accrued and unpaid interest in the amount of $235,564.31, and fees, costs, expenses and other charges in the amount of $1,515,553.09) (the "**Pre-Petition Obligations**"), arising under and in respect of various credit facilities, comprised of: (i) a term loan in the original principal amount of $10,000,000 (the "**2014 Term Loan**"), (ii) an irrevocable letter of credit issued by the Pre-Petition Lender for the account of SpiriTrust Lutheran in the principal amount of $67,642,465.75 (the "**LC**"), payable to the bond trustee in respect of certain Variable Rate Demand Revenue Bonds (SpiriTrust Lutheran Project), Series of 2019 (the "**Bonds**"), (iii) a term loan in the principal amount of $5,500,000 (the "**2019 Term**

Loan"), (iv) a line of credit in the maximum principal amount of $5,500,000 (the **"STL LOC"**), (v) a line of credit in the maximum principal amount of $1,000,000 (the **"HCH LOC"**), (vii) a purchasing card facility (the **"Purchasing Card"**), (vii) various vehicle loans in the aggregate original principal amount of $115,078 (the **"Vehicle Loans"**), and (viii) various treasury management services and automated clearing services provided by the Pre-Petition Lender to the Debtors (collectively, the **"Treasury Management Services"**).

ii.     The 2014 Term Loan, the LC, the SWAP Note, and the 2019 Term Loan were made under that certain Master Trust Indenture, dated as of May 15, 2005 (the **"Master Indenture"**), by and between Hanover Lutheran Retirement Village, Inc. (which subsequently merged with and into SpiriTrust Lutheran) and Manufacturers and Traders Trust Company, as Master Trustee.

iii.     ___*The 2014 Term Loan*___.  The Pre-Petition Lender made the 2014 Term Loan available to SpiriTrust Lutheran pursuant to that certain Project Financing Agreement, dated as of June 20, 2014 (the **"2014 Term Loan Agreement"**), and SpiriTrust Lutheran's obligations under and in respect of the 2014 Term Loan are evidenced by that certain Series of 2014 Master Note, dated as of June 20, 2014, in the principal amount of $10,000,000, by SpiriTrust Lutheran, f/k/a Lutheran Social Services of South Central Pennsylvania in favor of the Pre-Petition Lender, as assignee of the City of York General Authority (the **"2014 Term Loan Note"**).

iv.     The Debtors' obligations under and in respect of the 2014 Term Loan and the 2014 Term Loan Note are secured by, among other things, a mortgage lien encumbering certain parcels of real property located in York County, Pennsylvania, pursuant to that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), by SpiriTrust Lutheran in favor of the Pre-Petition Lender, dated as of June 16, 2014, effective as of June 26, 2014, recorded June

26, 2014 in the office of the York County Recorder of Deeds, as Book 2282, Page 2861, and recorded June 26, 2014 in the office of the Adams County Recorder of Deeds as Book 5945, Page 672 (the **"2014 Term Loan Mortgage"**).

v.     The 2014 Term Loan Agreement, the 2014 Term Loan Note, and the 2014 Term Loan Mortgage, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, together, collectively, the **"2014 Term Loan Documents"**.

vi.     ***The LC.*** In connection with the issuance of the Bonds, the Pre-Petition Lender issued that certain Irrevocable Transferable Letter of Credit No. SB2302210001 (the **"LC"**), for the benefit of the owners of the Bonds, pursuant that certain Letter of Credit Agreement, dated as of December 15, 2019, by and between SpiriTrust Lutheran and the Pre-Petition Lender (the **"LC Agreement"**).

vii.     SpiriTrust Lutheran's reimbursement obligations under and in respect of the LC are evidenced by that certain Series B of 2019 Master Note (letter of credit note), dated as of December 18, 2019, in the principal amount of $67,642,465.75, by SpiriTrust Lutheran in favor of the Pre-Petition Lender, as Letter of Credit Bank (the **"LC Note"**).

viii.     SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the LC and the LC Note are secured by, among other things, a mortgage lien in the lien amount of $67,642,465.75 encumbering certain parcels of real property located in Adams, Franklin, and York Counties, pursuant to that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 114), December 19, 2019 (York County, BK

2550, Page 8473), and December 19, 2019 (Franklin County, Instrument #201924086)(collectively, the **"LC Mortgage"**).

ix.     The LC Agreement, the LC Note, and the LC Mortgage, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the **"LC Documents."**

x.     Pursuant to Section 5.01(b) of the Master Indenture, all of the Master Indenture Loans are secured by, among other things, a pledge and security interest in all of the Gross Revenues[4] of SpiriTrust Lutheran.

xi.     ***The Bonds***.     In December 2019, the Cumberland County Municipal Authority issued its Variable Rate Demand Revenue Bonds (SpiriTrust Lutheran Project), Series of 2019 in the amount of $67,000,000 (the **"Bonds"**).

xii.     ***The 2019 Term Loan***.     On or about December 18, 2019, the Pre-Petition lender made a term loan available to SpiriTrust Lutheran in the principal amount of $5,500,000 (the **"2019 Term Loan"**), pursuant to that certain Credit Agreement, dated as of December 18, 2019, by and between SpiriTrust Lutheran and the Pre-Petition Lender (the "**2019 Term Loan Agreement"**).

---

4 Pursuant to Section 1.01 of the Master Indenture, "Gross Revenues" means "all operating and nonoperating revenues, received by or on behalf of any Member, and all rights to receive the same, whether in the form of accounts, contract rights, accounts receivable, general intangibles, chattel paper, documents, instruments or money, whether now owned or hereafter acquired, all as defined in the Uniform Commercial Code, and all the proceeds thereof, and any insurance proceeds or condemnation awards, excluding, however, any revenues securing Non- Recourse or any gifts, grants, bequests, funds, donations and contributions, and income therefrom, to the extent specifically restricted by the donor, settlor or grantor to a particular purpose inconsistent with the use for the payment of principal of, redemption premium and interest on Master Notes or Master Guaranties."

xiii.    SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the 2019 Term Loan are evidenced by that certain Series D of 2019 Master Note, dated as of December 18, 2019, in the principal amount of $5,500,000.00, by SpiriTrust Lutheran in favor of the Pre-Petition Lender (the **"2019 Term Loan Note"**).

xiv.    SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the 2019 Term Loan and the 2019 Term Loan Note are secured by, among other things, a mortgage lien in the lien amount of $5,500,000.00 encumbering the CCRCs, pursuant to that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 194), December 19, 2019 (York County, BK 2550, Page 8557), and December 19, 2019 (Franklin County, Instrument #201924088)(collectively, the **"2019 Term Loan Mortgage"**).

xv.    The 2019 Term Loan Agreement, the 2019 Term Loan Note, and the 2019 Term Loan Mortgage, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the **"2019 Term Loan Documents."**

xvi.    The 2019 Term Loan will mature by its terms on December 18, 2025.

xvii.    The 2014 Term Loan Documents, the LC Documents, and the 2019 Term Loan Documents are referred to hereinafter, collectively, as the **"Master Indenture Loan Documents"**.

xviii.    ***The STL Line of Credit.***  Pursuant to an Amendment to Loan Documents Agreement, dated as of November 22, 2022 (the **"STL LOC Amendment Agreement"**), by and among Pre-Petition Lender and the Debtors, an existing SpiriTrust Lutheran line of credit in the

maximum principal amount of $3,000,000 and an existing LIFE line of credit in the maximum principal amount of $2,500,000, were combined into a single demand line of credit in the maximum principal amount of $5,500,000, for which all of the Debtors are co-borrowers (the **"STL LOC"**).

xix. The Debtors' obligations to the Pre-Petition Lender under and in respect of the STL LOC are evidenced by that certain Consolidated Amended and Restated Revolving Line Note, dated November 22, 2022, in the maximum principal amount of $5,500,000, by all of the Debtors, as co-borrowers, in favor of the Pre-Petition Lender (the **"STL LOC Note"**).

xx. The Debtors' obligations to the Pre-Petition Lender under and in respect of the STL LOC and the STL LOC Note are secured by, among other things, (a) a security interest in all assets of the Debtors, pursuant to the STL LOC Amendment Agreement, and (b) a pledge of certain investment property maintained with Bank of New York Mellon, N.A., being Securities Account Nos. 10177895BN0, 10177898BN0, and 10177896BN0 (the "**STL LOC Pledged Securities**"), pursuant to that certain Pledge of Securities, dated December 11, 2014, by SpiriTrust Lutheran in favor of the Pre-Petition Lender, the STL LOC Amendment Agreement, and that certain Specific Security Agreement, dated as of November 22, 2022, by SpiriTrust Lutheran in favor of the Bank (collectively, the **"Securities Pledge Agreement"**).

xxi. The STL LOC Amendment Agreement, the STL LOC Note, and the STL LOC Securities Pledge Agreement, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the **"STL LOC Documents"**.

xxii. ***HCH Line of Credit.*** On or about May 29, 2009, the Pre-Petition Lender made a line of credit available to HCH in the original maximum principal amount of $2,500,000

(the **"HCH LOC"**), pursuant to that certain Loan Agreement, dated as of May 29, 2009, by and between HCH and the Pre-Petition Lender (the **"HCH LOC Loan Agreement"**).

  xxiii. HCH's obligations to the Pre-Petition Lender under and in respect of the HCH LOC are evidenced by that certain Daily Adjusting LIBOR Grid Note, dated as of May 29, 2009, by HCH in favor of the Pre-Petition Lender, in the maximum principal amount of $2,500,000 (the **"HCH LOC Note"**).

  xxiv. HCH's obligations to the Pre-Petition Lender under and in respect of the HCH LOC and the HCH LOC Note are secured by a security interest in all of HCH's right, title and interest in, to, and in respect of all Accounts (including Health-Care Insurance Receivables), Chattel Paper, Payment Intangibles and Supporting Obligations, and all Records of any of the collateral, and all proceeds of collateral of every kind and nature in whatever form, including, without limitation, both cash and noncash proceeds resulting or arising from the sale or other disposition by HCH of the collateral, pursuant to that certain Security Agreement, dated as of May 29, 2009, by HCH in favor of the Pre-Petition Lender (the **"HCH LOC Security Agreement"**).

  xxv. Pursuant to a certain Reservation of Rights Letter, dated December 20, 2023, by the Pre-Petition Lender to HCH (the **"December 2023 ROR Letter"**), the commitment amount under the HCH LOC was reduced to $1,000,000.

  xxvi. The HCH LOC Loan Agreement, the HCH LOC Note, the HCH LOC Securities Pledge Agreement, and the December 2023 ROR Letter, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "**HCH LOC Documents**".

  xxvii. ***The Purchasing Card.*** Pursuant to a certain VISA Charge Card Agreement for Commercial Cards, Corporate Card, and Purchasing Card Accounts, dated November 9, 2008

#4928-8365-0393 v8   10

Case 1:25-bk-03343-HWV  Doc 15  Filed 11/24/25  Entered 11/24/25 09:05:35  Desc
Main Document  Page 43 of 143

(the "**Purchasing Card Agreement**"), by and among Pre-Petition Lender and SpiriTrust Lutheran, the Pre-Petition Lender made purchasing card services available to SpiriTrust Lutheran. The Purchasing Card Agreement, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "**Purchasing Card Documents**".

xxviii. ***The Vehicle Loans***.  The Bank made various credit facilities available to SpiriTrust Lutheran for the purpose of purchasing vehicles (the **"Vehicle Loans"**).  SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the Vehicle Loans are each evidenced by a Term Note (collectively, the **"Vehicle Loan Notes"**).  The Vehicle Loans are secured by the titles to the financed vehicles.  As of November 4, 2025, the aggregate outstanding principal amount under and in respect of the Vehicle Loans is $8,211.84.

xxix.  The Vehicle Loan Notes, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "**Vehicle Loan Documents**".

xxx.  The $5.5 Million LOC Documents, the HCH LOC Documents, the Purchasing Card Documents, and the Vehicle Loan Documents are referred to hereinafter, collectively, as the **"M&T Bank Loan Documents"**.

xxxi.  Certain terms and covenants with respect to certain of the Loans were modified pursuant to a certain Continuing Covenants Agreement, dated as of December 18, 2019, by and between SpiriTrust Lutheran and the Pre-Petition Lender (the **"Continuing Covenants Agreement"**).

xxxii.  The Master Indenture Loan Documents, the M&T Bank Loan Documents, and the Continuing Covenants Agreement, together with any and all other loan documents

executed in connection with the Loans as amended, modified, extended and/or restated from time to time are hereinafter collectively referred to as the "**Existing Loan Documents**."

xxxiii. ***The Forbearance Documents.*** As a result of certain defaults and Events of Default having occurred and continuing under the Existing Loan Documents, the Debtors and the Pre-Petition Lender entered into that certain Forbearance and Amendment to Loan Documents Agreement, dated August 21, 2025 (the **"Forbearance Agreement"**), pursuant to which the Debtors and the Pre-Petition Lender, among other things, (1) amended and restated the HCH LOC to include SpiriTrust Lutheran as a co-borrower, and (2) the Debtors granted to the Pre-Petition Lender a security interest in all of the Debtors' assets, including without limitation, a pledge of the STL LOC Pledged Securities and a pledge and assignment of that certain deposit account maintained with M&T Bank, being Deposit Account #9893703703, titled SpiriTrust Lutheran - M&T Bank as Secured Party (the **"Collateral Account"**).

xxxiv. The Debtors' obligations to the Pre-Petition Lender under and in respect of the amended and restated HCH LOC are evidenced by that certain Amended and Restated Revolving Line Note, dated as of August 21, 2025, by the Debtors in favor of the Pre-Petition Lender, in the maximum principal amount of $1,000,000 (the **"Amended and Restated HCH LOC Note"**).

xxxv. The Debtors' obligations to the Pre-Petition Lender under and in respect of the Forbearance Agreement, the Loans, the Treasury Services, and the Existing Loan Documents are secured by (i) a security interest in all of the Debtors' assets pursuant to the Forbearance Agreement and that certain General Security Agreement, dated as of August 21, 2025 (the **"Forbearance Security Agreement"**), and (ii) a pledge and assignment of and security interest

in the Collateral Account, pursuant to that certain Pledge and Assignment of Deposit Account, dated as of August 21, 2025 (the **"Forbearance Pledge of Deposit Account"**).

xxxvi.   The Forbearance Agreement, the Amended and Restated HCH LOC Note, the Forbearance Security Agreement, and the Forbearance Pledge of Deposit Account, together with any and all other loan documents executed in connection therewith are hereinafter collectively referred to as the **"Forbearance Documents."**

xxxvii. The Existing Loan Documents and the Forbearance Documents are referred to herein, collectively, as the **"Pre-Petition Credit Agreements."**

xxxviii.         Pursuant to the Pre-Petition Credit Agreements, the Pre-Petition Lender holds perfected, valid, enforceable, and non-avoidable first-priority liens on and security interests (the **"Pre-Petition Liens"**) in almost all of the Debtors' now existing or hereinafter arising properties and assets, including, without limitation, cash, accounts receivable, chattel paper, contracts, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter of credit rights, commercial tort claims, real property, pledged capital stock and other pledged interests of subsidiaries and other tangible and intangible personal property, together with all proceeds, products, offspring, rents, and profits thereof, whether arising prior to, on or after the Petition Date (the **"Pre-Petition Collateral"**)5.

xxxix. The Pre-Petition Liens of the Pre-Petition Lender are (i) valid, binding, perfected, enforceable liens and, subject to section 552 of the Bankruptcy Code, all post-petition proceeds, products, offspring, rents and profits thereof, (ii) not subject to avoidance,

---

5 Based upon the description of that certain parcel of real property commonly known as 0 Old Harrisburg Road, Gettysburg, Adam County, Pennsylvania, being Tax Parcel Number 38G11-0050-000 (the "0 Old Harrisburg Road Parcel"), provided to the Pre-Petition Lender by the SpiriTrust Lutheran, the 0 Old Harrisburg Road Parcel may not be included in the term "Pre-Petition Collateral."

recharacterization, reduction, disallowance, impairment, or subordination under the Bankruptcy Code or applicable non-bankruptcy law, and (iii) subject and subordinate only to (A) the Adequate Protection Liens (as defined below), (B) the Carve-Out (as defined below and to which the Adequate Protection Liens are subject), and (C) the Liens (as defined below). The Pre-Petition Credit Agreements are valid and binding agreements and obligations of the Debtors.

xl.     The Pre-Petition Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms and no objection, offset, defense, or counterclaim of any kind or nature to the Pre-Petition Obligations exists. The Pre-Petition Obligations, and any amounts previously paid to the Pre-Petition Lender on account thereof or with respect thereto are not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors do not have, hereby forever release, and are forever barred from bringing, any claims, counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, with respect to the Pre-Petition Obligations or against any of the Pre-Petition Lender and its predecessors-in-interest, affiliates, subsidiaries, agents, officers, directors, employees, and attorneys, with respect to the Pre-Petition Obligations and the Pre-Petition Credit Agreements.

xli.     The Pre-Petition Lender perfected its security interests and Pre-Petition Liens in and on the Pre-Petition Collateral by, among other methods, the filing of UCC-1 financing statements, instruments filed in federal, state, and county offices, mortgages, and other required documents against the Debtors and such collateral with the proper federal, state, and county offices for the perfection of such security interests, Pre-Petition Liens.

E.     <u>Reasonable Terms; Good Faith.</u>

i. The terms of the proposed DIP Loans and use of Cash Collateral, as modified by this Order, are fair and reasonable, are supported by reasonably equivalent value and fair consideration, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

ii. The DIP Loans and the terms of use of the Cash Collateral has been negotiated in good faith and at arm's-length among the Debtors, the DIP Lender, and the Pre-Petition Lender.

iii. All of the Debtors' indebtedness and other obligations to the DIP Lender arising under, in respect of or in connection with (i) the DIP Credit Agreement and all related guaranty, security and other agreements, documents, notes and instruments together with all exhibits, schedules, annexes and appendices thereto, delivered pursuant hereto or thereto, or in connection herewith or therewith; and (ii) this Order (collectively, the "**Post-Petition Obligations**") shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

F. <u>Protections of Section 364(e) of the Bankruptcy Code</u>. All of the credit extended post-petition by the DIP Lender pursuant to the Post-Petition Credit Agreement (including all the Post-Petition Obligations) after entry of this Order was extended by the DIP Lender in good faith and in express reliance upon the protections afforded to post-petition lenders pursuant to section 364(e) of the Bankruptcy Code and, accordingly, all of the Post-Petition Obligations shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event this Order or any provision hereof is vacated, reversed or modified (including pursuant to a final order on the Motion (the "**Final Order**") entered after a final hearing on the Motion (the "**Final Hearing**"), whether on appeal or otherwise and upon execution and delivery of the Post-Petition Credit

Agreement, the Post-Petition Credit Agreement as modified by this Order shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of the DIP Credit Agreement, this Order, and section 364(e) of the Bankruptcy Code.

G. The Pre-Petition Lender is permitting the use of its Cash Collateral and the priming of its Pre-Petition Liens in good faith and in express reliance upon the protections afforded to post-petition lenders pursuant to section 364(e) of the Bankruptcy Code, and, accordingly, shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event this Order or any provision hereof is vacated, reversed or modified (including pursuant to a Final Order on the Motion entered after a Final Hearing on the Motion).

H. An immediate and critical need exists for the Debtors to obtain funds and use Cash Collateral (as defined below) in order to continue the operation of their businesses. The use of "cash collateral" (as defined by section 363(a) of the Bankruptcy Code and including any and all pre-petition and post-petition proceeds of the Pre-Petition Collateral (the "**Cash Collateral**")), alone would be insufficient to meet the Debtors' immediate post-petition liquidity needs. The Debtors are unable to obtain the required funds (i) in the forms of (a) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (b) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (c) unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code or (d) debt secured as described in section 364(c)(2) or (3) of the Bankruptcy Code or (ii) on terms more favorable than those offered by the DIP Lender under the DIP Term Sheet, this Interim Order, and all other agreements, documents, notes or instruments executed and delivered pursuant hereto or thereto or in connection herewith or therewith (collectively, the DIP Term Sheet, the DIP Credit Agreement, this Interim Order, the

Final Order and any other agreements, documents, notes or instruments executed and delivered pursuant to the Final Order, the "**Post-Petition Financing Documents**").

I.       The Debtors have requested that, pursuant to the terms of the Post-Petition Financing Documents, the DIP Lender make loans and advances and provide other financial accommodations to the Debtors. The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing and using such Cash Collateral. The DIP Lender is willing to make such loans and advances and provide such other financial accommodations only on a superpriority and priming first-priority secured basis, as more particularly described herein, pursuant to the terms and conditions of the Post-Petition Financing Documents. Accordingly, the relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, and is in the best interests of the Debtors, their estates and creditors.

J.       It is in the best interests of the Debtors' estates that they be allowed to finance their operations and use Cash Collateral under the terms and conditions set forth herein and in the Post-Petition Financing Documents. The relief requested by the Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Interim Order.

K.       The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain the consent or non-objection of parties.

L.     The interim relief sought in the Motion is necessary and in the best interests of the Debtors' estates in order to prevent immediate and irreparable harm to the Debtors' estates that would otherwise result if the Debtors were prevented from using the Pre-Petition Lender's Cash Collateral on an interim basis in order to maintain their operations, preserve and maximize the value of the assets of their estates, and provide an opportunity to sell the Debtors' assets. Based on the record presented to the Court by the Debtors and the Pre-Petition Lender, it appears that the Pre-Petition Lender is entitled to adequate protection of its interests in the Pre-Petition Collateral pursuant to sections 361 and 363(e) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.     **Granting of Motion**. The Motion is granted in its entirety subject to the provisions hereof. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits. This Interim Order shall become effective immediately upon its entry.

2.     **Authorization to Borrow**. The Debtors are hereby authorized (i) to enter into the DIP Term Sheet, substantially in the form filed with the Court, with such modifications as permitted by this Interim Order, and the other Post-Petition Financing Documents, and (ii) to borrow funds, incur debt, reimbursement obligations and other obligations, grant liens, make deposits, provide guaranties and indemnities and perform their obligations solely in accordance with the terms and conditions of the Post-Petition Financing Documents. The Post-Petition Financing Documents may be amended, modified, supplemented or the provisions thereof waived in accordance with their terms, without further order of this Court; provided, however, that any such amendment, modification, supplement or waiver that would render the Post-Petition Financing Documents materially more onerous or burdensome to the Debtors shall be effective

only upon order of the Court. The DIP Lender, through its counsel, shall provide a copy of the proposed DIP Credit Agreement to the Committee's counsel, if any, and the United States Trustee as soon as practicable prior to the Final Hearing once the DIP Lender and the Debtors have reached agreement concerning the terms and provisions of same.

3. **Authorization to Use Cash Collateral**. Subject to the terms and conditions set forth in this Interim Order, the Debtors are authorized, pursuant to section 363(c)(2) of the Bankruptcy Code, to use the Cash Collateral of the Pre-Petition Lender. The Debtors will provide to the DIP Lender, and counsel to the Committee, if any, a weekly report for each week setting forth the Debtors' use of Cash Collateral, including collections, revenues and expenses during the week and the amount of variance, if any, from the corresponding amounts set forth in the Budget (as defined in the DIP Term Sheet). The weekly variance report shall encompass the period of each week, ending on the close of business on Friday, for every week until the Termination Date (as defined herein), and shall be delivered to the DIP Lender, and counsel to the Committee, if any, by 5:00 p.m., Eastern time, on Tuesday of the following week.

4. **Adequate Protection to Pre-Petition Lender**. Subject in all respects to paragraph 27 hereof and the Post-Petition Obligations, the Post-Petition Liens (which at all times shall rank senior and prior to the Pre-Petition Liens, the Post-Petition Replacement Liens (as defined herein), the Adequate Protection Super-Priority Claims (as defined herein) and the rights of the Pre-Petition Lender under this Interim Order), and the Carve-Out, the Pre-Petition Lender is hereby provided with the following forms of adequate protection (which the DIP Lender acknowledges as acceptable to it) pursuant to sections 361, 363(c), 363(e) and 364(d) of the Bankruptcy Code for any diminution in value of their respective interests in the Pre-Petition Collateral (including Cash Collateral) for any reason resulting from (a) the Debtors' use, sale or lease of such Collateral, (b)

the imposition of the automatic stay, (c) the priming of the Pre-Petition Liens, and (d) the subordination to the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "**Diminution in Value**"):

(a) <u>**Post-Petition Replacement Liens**</u>. As adequate protection for any Diminution in Value and as an inducement to the Pre-Petition Bank Lender to permit the Debtors' use of the Cash Collateral as provided in this Interim Order, the Debtors hereby grant, assign and pledge to Pre-Petition Lender, post-petition replacement security interests in and liens (the "**Post-Petition Replacement Liens**"), subject to the Carve-Out, on all of the Collateral whether acquired before, or after the Petition Date, whether existing or hereafter acquired, created or arising, and all products and proceeds thereof, including all accessions thereto, substitutions and replacements therefor, wherever located, including accounts receivables. Upon entry of this Interim Order, the liens and security interests granted hereunder to Pre-Petition Lender as adequate protection shall be valid, perfected and enforceable against the Collateral without further filing or recording of any document or instrument or the taking of any further actions.

(b) <u>**Adequate Protection, Super-Priority Claim**</u>. The Pre-Petition Lender is hereby granted, to the extent of any Diminution in Value, a super-priority administrative claim (the "**Adequate Protection Super-Priority Claim**") that shall have priority (except with respect to the DIP Super-Priority Claims (defined below)) in each of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or name whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy

Code; provided, however, that the Adequate Protection Super-Priority Claim shall not be payable from the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code.

(c) **Payment of Monthly Payments Cash-Pay Interest of Accrued Unpaid Post-Petition Interest**. The Pre-Petition Lender shall be entitled to receive monthly payments of cash-pay interest of accrued, unpaid post-petition interest on the Pre-Petition Obligations.

(d) **Payment of Fees, Costs and Expenses**. The Pre-Petition Lender shall be entitled to have the Debtors pay all reasonable out-of-pocket costs and expenses incurred by the Pre-Petition Lender with respect to the Pre-Petition Obligations (including, without limitation, the reasonable fees and disbursements of counsel and other professional advisers advising the Pre-Petition Lender, including Ballard Spahr LLP, and any other professionals retained by the Pre-Petition Lender) and in connection with the protection and enforcement of the rights and interests of the Pre-Petition Lender, with respect to such fees, costs, disbursements and expenses incurred on or after the Petition Date, within five (5) business days of presentation (with copies to counsel for any Committee and the United States Trustee) of an invoice therefor (which invoice may be redacted to remove privileged or case sensitive material) without the requirement of prior Court approval or compliance with guidelines applicable to retained professionals.

(e) **Reservation of Rights**. The Pre-Petition Lender reserves the right to request additional or further adequate protection of their interests in the Pre-Petition Collateral. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair (a) any of the rights of the Pre-Petition Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of Pre-Petition Lender to seek (i) the appointment of a trustee under section 1104 of the Bankruptcy Code, (ii) relief from

the automatic stay under section 362(d) of the Bankruptcy Code, (iii) dismissal or conversion of the Cases under section 1112 of the Bankruptcy Code, (iv) to terminate the period during which the Debtors have the exclusive right to propose and/or obtain confirmation of a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or (v) any other relief that the Pre-Petition Lender, in their sole discretion, may deem appropriate.

(f)     **Recognition of Pre-Petition Liens**. Subject to the provisions of paragraph 27 of this Interim Order, upon entry of this Interim Order, (i) the Pre-Petition Liens shall be and hereby are deemed valid, perfected, binding, and enforceable, shall not be avoidable under the Bankruptcy Code, and shall not be subject to subordination under section 510 of the Bankruptcy Code, and (ii) the Pre-Petition Lender Claim (as defined herein) for under the Pre-Petition Credit Agreements in the aggregate amount of not less than $83,310,455.39, as of the Petition Date (comprised of principal in the amount of $81,740,100.17, accrued and unpaid interest in the amount of $235,564.31, and fees, costs, expenses and other charges in the amount of $1,334,790.91) hereby are allowed and are not subject to any offset, defense, counterclaim, right of recoupment, recharacterization, disallowance under section 502(d) of the Bankruptcy Code or subordination under section 510 of the Bankruptcy Code (the claims of the Pre-Petition Lender described herein being referred to, collectively, in this Interim Order as the "**Pre-Petition Lender Claim**").

(g)     **Release by Debtors of Pre-Petition Bank Lender**. Subject to paragraph 27 of this Interim Order, each of the Debtors on its own behalf and on behalf of each of its past, present and future predecessors, successors, heirs, subsidiaries, assigns, and entities or individuals claiming or acting by, through, under or in concert with any such entity or individual (collectively, the "**Borrower Party Releasors**") hereby, to the maximum extent permitted by applicable law,

unconditionally, irrevocably and fully and forever releases, remises, acquits, relinquishes, irrevocably waives and discharges the Pre-Petition Lender, together with its past, present and future predecessors, successors, heirs, executors, administrators, personal representatives, subsidiaries, parent entities, assigns, participants, shareholders, partners, members, owners, other principals, affiliates, managers, and, with respect to each of the foregoing entities and individuals, each of their respective predecessors, successors, heirs, executors, administrators, personal representatives, assigns, participants and past and present shareholders, partners, members, owners, other principals, affiliates, managers, employees, officers, directors, attorneys, agents, contractors, other representatives, insurers and any other individuals and/or entities claiming or acting by, through, under or in concert with each such entity or individual (collectively, the "**Finance Party Releasees**"), from, against or with respect to any and all actions and causes of action, suits, judgments, executions, disputes, claims, demands, debts, obligations, liabilities, damages, offset rights, counterclaims, cross-complaints, defenses (including defenses to payment), rights (including rights of indemnity or contribution), choses in action, sums of money, compensation, expenses, costs and losses, and all remedies in respect of the foregoing, of any type, kind, nature, description or character, whatsoever, whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, matured or unmatured, and whether in contract, in tort or under any state or federal law or otherwise, at law or in equity, including, without limitation, any claims or defenses as to the amount, extent, validity, priority or perfection of the Pre-Petition Liens, the Pre-Petition Obligations, "lender liability" claims and causes of action, any causes of action, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims and causes of action and any resulting subordination or recharacterization of any payments made to the Pre-

Petition Lender prior to the Petition Date or pursuant to this Interim Order or otherwise which any Borrower Party Releasor has had, now has or may hereafter have against any one or more of the Finance Party Releasees for or by reason of any act or omissions (including any misfeasance or malfeasance), matter, cause or thing whatsoever accruing or arising prior to or on the date of this Agreement or which does, could, might or may be claimed to exist on the date of this Interim Order or at any time prior thereto, including any of the same accruing or arising, directly or indirectly, in any manner from, in respect of and/or relating to (a) the Debtors, (b) the Pre-Petition Credit Agreements, (c) the transactions contemplated therein or any payments made with respect thereto, (d) the assertion or enforcement of any rights or remedies under the Pre-Petition Credit Agreements or applicable law, and (h) any fact, matter, transaction, omission, or event relating thereto, in each case as though fully set forth herein at length.

5.     **<u>Binding Effect of Post-Petition Financing Documents; Borrowing Limit</u>**. Upon execution and delivery of the Post-Petition Financing Documents, they shall constitute valid and binding obligations of the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in the Cases or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**") enforceable against them in accordance with their terms; <u>provided</u>, <u>however</u>, that notwithstanding any other provision of this Interim Order or of the other Post-Petition Financing Documents, the Debtors shall not, prior to entry of the Final Order approving the Post-Petition Financing Documents or such other and further orders as this Court may enter, incur Post-Petition Obligations in the aggregate principal amount of more than $2,100,000.00, in compliance with the DIP Budget.

6.      **Limited Consent to Payment of Expenses**. The Debtors are authorized to use Cash Collateral and the loans or advances made under or in connection with the Post-Petition Financing Documents (including any letters of credit) solely as provided in this Interim Order, the DIP Term Sheet, the Budget and in the other Post-Petition Financing Documents. The amounts loaned and advanced under or in connection with the Post-Petition Financing Documents and all proceeds of the Collateral, including, without limitation, all of the Debtors' existing or future cash and Cash Collateral (collectively, "**Post-Petition DIP Funds**"), shall be disbursed in accordance with the Budget (subject to a 10% variance as set forth in the Post-Petition Financing Documents), this Order and the Post-Petition Financing Documents. Subject to entry of the Final Order, except for the Carve-Out, no administrative claims, including, without limitation, fees and expenses of professionals, shall be assessed against or attributed to the DIP Lender, the Pre-Petition Lender or their interests in the Collateral and/or the Pre-Petition Collateral, as applicable, pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise by, through or on behalf of the Debtors, without the prior written consent of the Pre-Petition Lender and the DIP Lender, and no such consent shall be implied from any action, inaction or acquiescence by, either with or without notice to, the Pre-Petition Lender or the DIP Lender, or otherwise. Except as set forth in the DIP Term Sheet and this Interim Order, the DIP Lender has not consented or agreed to the use of DIP Lender funds (the "**DIP Lender Funds**").

7.      **Authority to Enter Into Additional Agreements**. The Debtors are hereby authorized to enter into any additional agreements providing for the establishment of lock boxes, blocked accounts or similar arrangements reasonably required or requested the by DIP Lender for the benefit and in favor of the DIP Lender for purposes of facilitating cash collections from the Debtors in accordance with and subject to the terms of the Post-Petition Financing Documents.

8. **Interest**. Interest on the Post-Petition Obligations shall accrue at the rates (including any applicable default rates) and shall be paid at the times as provided in the DIP Term Sheet.

9. **Authorization to Pay Fees**. Any and all fees paid or required to be paid in connection with the Post-Petition Financing Documents (including, but not limited to, the fees and expenses of the DIP Lender) are hereby authorized and may be paid as set forth in the DIP Term Sheet or contained in the Post-Petition Financing Documents filed with the Court.

10. **DIP Super-Priority Claim**. Subject to the Carve-Out (as defined herein), all Post-Petition Obligations hereby constitute allowed superpriority administrative expense claims (collectively, the "**DIP Super-Priority Claim**") under section 364(c)(1) of the Bankruptcy Code against the Debtors, having priority over all administrative expense claims against the Debtors or their estates at any time existing or arising, of any kind or nature, including, without limitation, administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, or otherwise (whether incurred in the Cases or any Successor Cases), which DIP Super-Priority Claim shall be payable from and have recourse to proceeds of all property of the Debtors, excluding the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code**;**

11. **Post-Petition Liens**.

(a) **Grant of Post-Petition Liens**. As security for the Post-Petition Obligations, the DIP Lender is granted pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code valid, binding, continuing, enforceable, non-avoidable and automatically and properly perfected

(i) first-priority priming liens (the "**Post-Petition Liens**") in the Collateral, which liens are subject only to the Carve-Out (as defined below), and (ii) junior liens (the "**Post-Petition Junior Liens**") in the Collateral which is subject to valid and perfected pre-petition security interests and liens. All advances made under the DIP Loans are automatically vested and secured by the Post-Petition Liens. Notwithstanding anything to the contrary herein or in any other Post-Petition Financing Documents, or in the Pre-Petition Credit Agreements or any related documents, the Post-Petition Liens and the DIP Super-Priority Claim granted to the DIP Lender hereunder and under the other Post- Petition Financing Documents are and shall be at all times (including, without limitation, after the occurrence of an Event of Default) senior and prior in all respects to (a) the Post-Petition Replacement Liens (as defined below) and all other liens securing any Pre-Petition Collateral, in all cases, granted under the Pre-Petition Financing Documents or otherwise, and (b) the Adequate Protection Super-Priority Claims (as defined below), any other obligations in respect of adequate protection and all other claims held by the Pre-Petition Lender (including, without limitation any super-priority claims in addition to the Adequate Protection Super-Priority Clams), in each case, whether arising under or related to the Pre-Petition Financing Documents, this Interim Order or otherwise.

        (b)    **Collateral**. As used herein, the term "**Collateral**" shall include all tangible and intangible property of the Debtors and their estates, now existing or hereafter acquired, including, without limitation, Cash Collateral, accounts and other receivables for goods sold or leased or services rendered, whether or not earned ("**Receivables**"), inventory, machinery, equipment, leases and real property (whether owned or leased)6, instruments, chattel paper and

---

6 Based upon the description of that certain parcel of real property commonly known as 0 Old Harrisburg Road, Gettysburg, Adam County, Pennsylvania, being Tax Parcel Number 38G11-0050-000 (the "0 Old Harrisburg Road Parcel"), provided to the Pre-Petition Lender by the

other contracts evidencing, or substitute for, any Receivable, all guarantees, letters of credit, security and other credit enhancements for the Receivables, all documents of title for any inventory, all claims and causes of action in any way relating to any of the Receivables or inventory, all bank accounts into which any proceeds of Receivables or inventory are deposited (including all cash and other funds on deposit therein), all proceeds of leases and leased real property, all books and records relating to any of the foregoing, general intangibles (including, without limitation, patents, trade names and trademarks and licenses thereof), books and records of the Debtors, tax refunds, excess proceeds returned to the Debtors from letter of credit beneficiaries, and all cash and all proceeds of the foregoing, but excluding the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code.

12. **Carve-Out**.

(a) **Carve-Out Amount**. Subject to the terms and conditions contained in this paragraph 12, the Post-Petition Liens, the Post-Petition Junior Liens, the Post-Petition Replacement liens (as defined below), the DIP Super-Priority Claim, and the Adequate Protection Super-Priority Claim (as defined below), shall be subordinate to the following fees and expenses (collectively, the "**Carve-Out**"):

(i) all fees required to be paid to the Clerk of the Bankruptcy Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a);

(ii) (A) all allowed compensation for services actually rendered or expenses actually incurred prior to the occurrence of an Event of Default (as defined in this Interim

---

SpiriTrust Lutheran, the 0 Old Harrisburg Road Parcel may not be included in the term "Collateral."

Order or, upon entry of Final Order, as defined in the DIP Credit Agreement) (whether paid or unpaid) by the Debtors or the Committee's professionals, if any, retained by final order of the Court pursuant to Sections 327 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**") not to exceed the amounts set forth in the Budget in respect of which the Carve-Out is invoked, to the extent that such compensation or expenses, as the case may be, were previously or are subsequently allowed by the Bankruptcy Court and (B) the amount of any allowed expenses incurred by the Committee members, if any, in the performance of their duties prior to the occurrence of an Event of Default not to exceed the amounts set forth in the Budget in respect of which the Carve-Out is invoked (but excluding fees and expenses of third-party professionals employed by such members) not to exceed the amounts set forth in the Budget (the matters described in clauses (A) and (B) of this clause (ii), collectively, the "**Pre-Default Carve- Out Amount**"); and

(iii)     after the occurrence and during the continuance of an Event of Default (as defined in the Interim Order or, upon entry of the Final Order, as defined in the DIP Credit Agreement), an amount not exceeding the lesser of the remaining availability under the DIP Loans (calculated as if there had been no default) or $400,000.00 in the aggregate, which amount may be used subject to the terms of this Interim Order or the Final Order, as the case may be, to pay any allowed fees or expenses incurred by the Case Professionals for service rendered and expenses incurred subsequent to the occurrence of the Event of Default in respect of which the Carve-Out is invoked (the "**Post-Default Carve-Out Amount**"); provided, however, (A) that such dollar limitation on fees and disbursements described in this clause (iii) shall not be reduced by (1) the Pre-Default Carve-Out Amount and (2) any fees, expenses, indemnities or other amounts paid to the DIP Lender, the Pre-Petition Lender, and their respective attorneys and advisers under the Post-Petition Financing Documents or otherwise, and (B) that nothing herein shall be construed to

impair or prejudice the right of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (ii) and (iii) of this Paragraph 12(a). For the avoidance of doubt, (i) any compensation paid for services rendered and expenses incurred after the occurrence of an Event of Default in respect of which the Carve-Out is invoked shall permanently reduce the Post-Default Carve-Out Amount on a dollar-for-dollar basis and (ii) notwithstanding anything to the contrary contained in this Interim Order, nothing herein shall be construed to allow a Case Professional to be paid amounts for fees and expenses in excess of the amounts of fees and expenses set forth in the Budget for such Case Professional for the relevant time period.

(b) **Use of DIP Loans to Fund Carve-Out Payments; Lien on Unencumbered Assets**. Any extension of credit under the Post-Petition Financing Documents that is used to fund the Carve-Out shall be added to and made a part of the Post-Petition Obligations and shall be secured by the Post-Petition Liens and otherwise entitled to the protections granted under this Interim Order, the Final Order, the Post-Petition Financing Documents, the Bankruptcy Code, and applicable law. Before any proceeds of the DIP Loans shall be used to fund the Carve-Out, the Debtors shall be required to use the proceeds of unencumbered assets of the Debtors' estates then on hand (collectively, the "**Unencumbered Assets**") for such purpose. In the event that, at the time when Allowed Fees are required to be paid (and the amounts paid would reduce the Carve-Out hereunder), there exist no proceeds of Unencumbered Assets such that proceeds of the DIP Loans are required to be used to fund, in whole or in part, such payment, the Post-Petition Obligations thereby created shall be entitled to be repaid from the next proceeds of Unencumbered Assets realized by the Debtors. Notwithstanding anything herein to the contrary, no amount paid in respect of allowed fees and expenses for a particular Case Professional shall exceed, in the

aggregate, the line item amounts budgeted for such Case Professional in the Budget for the relevant time period.

13.    Limitations on the Use of the DIP Loans, the Post-Petition Collateral, the Cash Collateral, the DIP Lender Funds, and the Carve-Out. The DIP Loans, the Post- Petition Collateral, the Cash Collateral, the DIP Lender Funds, and the Carve-Out shall not be used in connection with initiating, commencing or prosecuting any claims, defenses, objections, causes of action, adversary proceedings, contested matters, contests, or other litigation against the Pre-Petition Lender and/or the DIP Lender, including, without limitation, (i) contesting, objecting to, or challenging the validity, amount, extent, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the Pre-Petition Obligations, the Pre-Petition Liens, the Post-Petition Obligations and/or the Post-Petition Liens, or any other rights or interests of any of the Pre-Petition Lender and/or the DIP Lender, and (ii) asserting, commencing or prosecuting any claims, defenses or causes of action, including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code, against the Pre-Petition Lender and/or the DIP Lender; provided, however, that, subject to the provisions of paragraph 27 hereof, the Cash Collateral and/or advances under the DIP Term Sheet in an amount not to exceed $20,000 in the aggregate may be used by the Committee for allowed fees and expenses incurred solely by the Committee, if one is appointed, to conduct the investigations set forth in paragraph 27 hereof to investigate the validity, amount, extent, perfection, priority, enforceability or avoidability of the Pre-Petition Liens, the Pre-Petition Obligations, the Pre-Petition Lender Claim (as defined herein) and the Pre-Petition Collateral of the Pre-Petition Lender.

14. **Use of Proceeds; Bank Accounts**.

(a) Unless otherwise directed by an order of this Court, the Debtors shall use the proceeds of the loans obtained under the Post-Petition Financing Documents solely in accordance with and subject to the conditions set forth in this Order, the Post-Petition Financing Documents as modified by this Order and the continued effectiveness of the Pre-Petition Credit Documents, and the Budget. Nothing in this Order shall be construed to require the DIP Lender to make advances or extensions of credit or other financial accommodations to permit the Debtors to make any payments, except to the extent expressly provided for in this Order and the Post-Petition Financing Documents as modified by this Order.

(b) Unless otherwise directed by an order of this Court, any proceeds of the sale, lease or other disposition of the Collateral shall be used in accordance with the provisions of this Order and the Post-Petition Financing Documents as modified by this Order and the continued effectiveness of the Pre-Petition Credit Documents.

15. **Preservation of Rights Granted Under This Order**.

(a) Unless all the Post-Petition Obligations shall have been indefeasibly paid in full, it shall constitute an Event of Default if there are entered any modifications or extensions of this Order without the prior written consent of the DIP Lender and the Pre-Petition Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender or the Pre-Petition Lender.

(b) The DIP Lender and the Pre-Petition Lender shall be entitled to all the rights, remedies, privileges and benefits granted by section 364(e) of the Bankruptcy Code, this Order and pursuant to the Post-Petition Financing Documents with respect to all Post-Petition Obligations and Adequate Protection Obligations.

(c)     Except as expressly provided in this Order or in the Post-Petition Financing Documents or as agreed in writing by the DIP Lender or the Pre-Petition Lender, the Liens, the Adequate Protection Liens, the Super-Priority Claim, the Cash Collateral Super-Priority Claim and all other rights and remedies of any of the DIP Lender and the Pre-Petition Lender granted by the provisions of this Order and the Post-Petition Financing Documents as modified by this Order shall survive, and shall not be modified, impaired or discharged by (i) the conversion of the chapter 11 Cases, (ii) the dismissal of any of the Chapter 11 Cases, or (iii) the entry of an order confirming a chapter 11 plan in the Case. The terms and provisions of this Order and the Post-Petition Financing Documents as modified by this Order shall continue in the Chapter 11 Cases, in any successor cases if any of the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Liens, the Adequate Protection Liens, the Super-Priority Claim, Cash Collateral Super-Priority Claim and all other rights and remedies of the DIP Lender and the Pre-Petition Lender granted by the provisions of this Order and the Post-Petition Financing Documents shall continue in full force and effect until the Post-Petition Obligations are indefeasibly paid in full.

16.     **Rights Reserved**. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of expressly or implicitly, or otherwise impair (a) any of the rights, claims, privileges, objections or defenses (whether legal, equitable or otherwise) of the Pre-Petition Lender and the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the DIP Lender to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Cases, conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner (including an examiner with expanded powers),

or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans or (b) any other rights, claims or privileges (whether legal, equitable or otherwise) of the Pre-Petition Bank Lender and DIP Lender.

17. **Automatic Stay; Remedies**.

(a) Upon the occurrence of an Event of Default under the Post-Petition Financing Documents, all stays and injunctions in this Case, including, but not limited to, the automatic stay arising under section 362(a) of the Bankruptcy Code will be modified automatically as to the DIP Lender and the Pre-Petition Lender thereby permitting the DIP Lender and the Pre-Petition Lender, as applicable, *inter alia*, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order to:

(i) Declare the DIP Loans to be terminated, whereupon the same shall forthwith terminate;

(ii) Declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Debtors hereby expressly waive;

(iii) Declare the Debtors' right to use Cash Collateral to be terminated, whereupon the same shall forthwith terminate; provided that, (a) with the written agreement of the DIP Lender or (b) pursuant to an order of the Court upon notice to the DIP Lender (which may be filed by the Debtors or the Committee, if one is appointed), the Debtors may use only that amount of Cash Collateral necessary to preserve and protect the Collateral, which may include ongoing operations for a period not to exceed thirty (30) days or such additional period of time to which the DIP Lender agree, in its sole discretion; and

(iv) Charge the default rate of interest on all Obligations.

(b) Notwithstanding anything herein to the contrary, and notwithstanding the applicability of section 362 of the Bankruptcy Code (to the extent necessary to exercise such remedies, relief from automatic stay shall be deemed granted), upon notice of an Event of Default to the Debtors and the Debtors' failure to cure any such Event of Default after five (5) business days of receipt of such notice, the DIP Lender and the Pre-Petition Lender shall also be entitled to immediately exercise any of the following rights and remedies without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order:

(i) DIP Lender may apply any and all money owing by the DIP Lender to the Debtors to the payment of the Obligations, in the DIP Lender's sole discretion, subject to the Carve-Out;

(ii) The DIP Lender may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process, and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties);

(iii) The DIP Lender may exercise and enforce its rights and remedies under the Post-Petition Financing Documents;

(iv) The DIP Lender may exercise any other rights and remedies available to it by law or agreement; and/or

(v) If the DIP Lender sells any of the Collateral on credit, the Post-Petition Obligations will be reduced by the full amount of the sale price. If the purchaser fails to

pay for the Collateral, the DIP Lender may resell the Collateral and shall apply any proceeds actually received to the Post-Petition Obligations.

(c)     The automatic stay imposed by section 362 of the Bankruptcy is hereby modified to the extent necessary to permit or effectuate the terms of this Interim Order and the documents evidencing the DIP Loans, including, without limitation, to permit the execution and recordation of documents in the DIP Lender's and Pre-Petition Lender's, as applicable, discretion to evidence the creation and perfection of the DIP Lender's and Pre-Petition Lender's liens on the Collateral; provided, however, that nothing herein shall prevent the Debtors, the United States Trustee, or the Committee, if one is appointed, from seeking an emergency hearing.

18.     **Enforcement Against Collateral; Application of Collateral Proceeds**. If, upon an Event of Default, and in compliance with the preceding paragraph, the DIP Lender shall at any time exercise any of its rights and remedies hereunder, under the other Post-Petition Financing Documents, or under applicable law in order to effect payment or satisfaction of the Post-Petition Obligations or to receive any amounts or remittances due hereunder or under the other Post-Petition Financing Documents, including without limitation, by foreclosing upon and selling all or a portion of the Collateral, the DIP Lender shall have the right without any further action or approval of this Court to exercise such rights and remedies as to all or such part of the Collateral as the DIP Lender shall elect in its sole discretion. Upon entry of the Final Order, no holder of a lien primed by this Interim Order or granted by the Debtors as adequate protection shall be entitled to object on the basis of the existence of any such lien to the exercise by the DIP Lender of its rights and remedies under the Post-Petition Financing Documents or under applicable law to effect satisfaction of the Post-Petition Obligations or to receive any amounts or remittances due hereunder or under the other Post-Petition Financing Documents, the DIP Lender shall be entitled

to apply the payments or proceeds of the Collateral in accordance with the provisions of this Interim Order and the other Post-Petition Financing Documents, and, upon entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral or otherwise.

19. **Non-Waiver of Rights**. The failure or delay by the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order or any other Post-Petition Financing Documents shall not constitute a waiver of any of the rights of the DIP Lender hereunder, thereunder or otherwise, and any single or partial exercise of such rights and remedies against any party or Collateral shall not be construed to limit any further exercise of such rights and remedies against any or all of the other party and/or Collateral.

20. **Automatic Perfection of Liens**. By virtue of and pursuant to this Interim Order, all liens granted or authorized pursuant to this Interim Order to or for the benefit of the DIP Lender and the Pre-Petition Lender shall be, and they hereby are, valid, enforceable and perfected, and (notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be required to effect such perfection, and all liens that may be created upon any designated accounts and any other deposit accounts or securities accounts shall be, and they hereby are, deemed to confer "control" for purposes of sections 8-106, 9-104, 9-105, 9-106, 9-107 and 9-314 of the Pennsylvania Uniform Commercial Code as in effect as of the date hereof in favor of the DIP Lender, provided, however, that if the DIP Lender and the Pre-Petition Lender shall, in their sole discretion, choose to require the execution of and/or file (as applicable) such mortgages, financing statements, notices of liens and other similar instruments and documents, all such mortgages, financing statements, notices of liens or other similar instruments and documents shall

be deemed to have been executed, filed and/or recorded *nunc pro tunc* as of the date hereof. Each and every federal, state and local government agency or department is hereby authorized to accept the entry by this Court of this Interim Order as evidence of the validity, enforceability and perfection on the Petition Date of the liens granted or authorized pursuant to this Interim Order to or for the benefit of the Pre-Petition Lender and the DIP Lender.

21. **Validity, etc. of Post-Petition Liens**. The validity, enforceability, priority or amount of any of the claims and liens granted to or for the benefit of the DIP Lender under this Interim Order or any other Post-Petition Financing Documents with respect to the Post-Petition Obligations (and with respect to the roll-up, subject to the investigation period set forth in paragraph 27 hereof) shall not be affected by any finding or order of this Court or any other court regarding any Pre-Petition Liens.

22. **Debtors Authorized and Directed to Execute Documents and Pay Fees**. The Debtors are authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary, to (a) do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the Post-Petition Financing Documents and such additional security agreements, pledge agreements, control agreements, mortgages and financing statements and other documents and instruments as may be necessary or appropriate to better evidence and perfect the DIP Facility), (b) pay all principal, interest, fees and expenses and other amounts described in the DIP Term Sheet as such become due and without the need for further Court approval, including, without limitation, facility fees, administration fees, and the fees and expenses of the attorneys, advisers, and consultants engaged or to be engaged by the DIP Lender and the Pre-Petition Lender, all to the extent provided in the DIP Term Sheet. The Debtors are hereby authorized to indemnify the DIP Lender, exclusively in its capacity as such,

from and against any liability arising in connection with the Post-Petition Financing Documents to the extent provided in and subject to the Post-Petition Financing Documents. All such fees and expenses and the obligation to indemnify the DIP Lender shall constitute Post-Petition Obligations and shall be secured by the Post-Petition Liens and afforded all of the priorities and protections afforded to the Post-Petition Obligations under this Interim Order and the other Post-Petition Financing Documents.

23. **Post-Petition Obligations Not Subject to Setoff, etc.** Subject to the provisions of paragraph 27 hereof, the Obligations of the Debtors in respect of the Post-Petition Obligations, and the claims and liens granted to or for the benefit of the DIP Lender pursuant to this Interim Order and the other Post-Petition Financing Documents, are not subject to any setoff, reduction or disallowance of any kind, including, without limitation, under section 502(d) of the Bankruptcy Code.

24. **Dismissal of Cases.** Unless otherwise directed by an order of this Court, in the event of an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise (i) the claims and liens granted pursuant to this Interim Order to or for the benefit of the DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations in respect thereof shall have been indefeasibly paid in full in cash and satisfied in the manner provided in the Post-Petition Financing Documents (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the claims and liens granted pursuant to this Interim Order to or for the benefit of the Pre-Petition Lender shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (iii) prior to dismissal, the Debtors shall deliver

to the DIP Lender and record, at the Debtors' cost, such financing statements, mortgages and other documentation evidencing perfected liens in the Collateral as the DIP Lender shall reasonably request, and (iv) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and liens.

25. **Cash Management System; Control Over Debtors' Accounts**. Unless otherwise ordered by this Court, each of the Debtors shall maintain their existing cash management system unless the DIP Lender consents in writing to any proposed modification to such cash management system.

26. **Proof of Claim**. The DIP Lender and the Pre-Petition Lender shall not be required to file a proof of claim in the Cases on behalf of the DIP Lender and the Pre-Petition Lender setting forth the Pre-Petition Lender Claim, the Post-Petition Obligations or any portion thereof, allowed in this Interim Order. Notwithstanding any provision to the contrary in any order entered, or to be entered, by the Court concerning the establishment of a bar date in any of the Cases or the Successor Cases, the Pre-Petition Lender is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it deems appropriate) one or more a proofs of claim in each of the Cases or the Successor Cases for any claim allowed herein. Any order entered, or to be entered, by the Court concerning the establishment of a bar date in any of the Cases or the Successor Cases shall not apply to the DIP Lender and the Pre-Petition Lender. Subject to paragraph 27, any and all payments made to the Pre-Petition Lenders, whether pre-petition or post-petition, in connection with the Pre-Petition Lender Claim or this Interim Order are final and not subject to avoidance or recovery by the Debtors or any other entity under chapter 5 of the Bankruptcy Code or otherwise.

27. **Pre-Petition Lender Obligation and Lien Review Period**.

(a)     Notwithstanding anything contained herein to the contrary, the extent, validity, priority, perfection, and enforceability of the Pre-Petition Lender Obligations, the Pre-Petition Liens, and all acknowledgments, admissions, and confirmations of the Debtors and their affiliates above, are for all purposes subject to the rights of any party in interest (including any trustee appointed or elected or Committee appointed in these Cases (which Committee shall have standing to file a complaint as described below in this paragraph)), other than any Debtor or any of its respective affiliates, to file a complaint pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate, or otherwise challenge (collectively, the "**Challenges**") the Pre-Petition Lender Obligations or the Pre-Petition Liens; provided, however, that any such complaint must be filed in this Court within the later of sixty (60) days after appointment of the Committee (but in no event later than seventy-five (75) days after entry of this Order) or any subsequent date that may be agreed to in writing by the Pre-Petition Lender with respect to the time to file any such complaint relating to the Pre-Petition Lender Obligations and/or the Pre-Petition Liens. If no such complaint is filed within such time period, then any and all Challenges shall be, without further notice to or order of the Court, deemed to have been forever relinquished, released, and waived as to such Committee and other person or entity, and if such complaint is timely filed on or before such date, any and all Claims and Defenses against any of the Pre-Petition Lender shall be deemed, immediately and without further action, to have been forever relinquished, released, and waived as to such Committee and other person or entity, except with respect to Claims and Defenses that are expressly asserted in such complaint, unless such claims in accordance with the Federal Rules of Civil Procedure relate back to the date the complaint was filed.

(b)     If no such complaint as to the Pre-Petition Lender Obligations or Pre-Petition Liens is filed within such time period, or such timely filed complaint does not result in a final and non-appealable order of this Court that is inconsistent with this paragraph, then, without the requirement or need to file any proof of claim with respect thereto, (i) the Pre-Petition Lender Obligations shall constitute allowed secured claims for all purposes in the Chapter 11 Cases and any subsequent cases or proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if any Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code (each, a "**Successor Case**"), (ii) the Pre-Petition Liens shall be deemed legal, valid, binding, enforceable, perfected liens not subject to recharacterization, subordination (except as expressly specified in this Order as to the Carve-Out, the Liens and the Adequate Protection Liens) or avoidance for all purposes in the Chapter 11 Cases and any Successor Case, and (iii) the Pre-Petition Lender Obligations, the Pre-Petition Liens, and prior payments on account of or with respect to the Pre-Petition Lender Obligations shall not be subject to any other or further claims, cause of action, recharacterization, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor. For the avoidance of doubt, any trustee appointed or elected in these Cases shall, until the expiration of the period provided herein for asserting Challenges and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph 27 (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Interim Order.

28.  **Good Faith Under Section 364(e)**. The terms of this Interim Order were negotiated in good faith and at arm's length by and among all of such parties between the Debtors, the Pre-Petition Lender, and the DIP Lender. The Pre-Petition Lender and the DIP Lender shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

29.  **Interim Order Effective Immediately**. This Interim Order is hereby deemed effective immediately pursuant to Bankruptcy Rule 6004(h).

30.  **Survival**. The provisions of this Interim Order, including the grant of claims and the Post-Petition Liens and the Post-Petition Replacement Liens to or for the benefit of Pre-Petition Lender and the DIP Lender, and any action taken pursuant hereto shall survive the entry of any order that may be entered (a) confirming any plan of reorganization in any of the Cases, (b) converting any of these Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing any of the Cases or the Successor Cases, or (d) pursuant to which this Court abstains from hearing any of the Cases or the Successor Cases.

31.  **Events of Default**. The post-petition occurrence of any of the following shall constitute an Event of Default:

(a)  A final DIP Credit Agreement has not been entered into with the DIP Lender, in form and substance satisfactory to the DIP Lender in its sole and absolute discretion by _____ __, 2026;

(b)  Violation of any of the terms of this Interim Order;

(c)  The occurrence of any default, Event of Default or violation of any of the terms of the DIP Term Sheet, the DIP Credit Agreement and/or any of the Post-Petition Financing Documents;

(d)     The Debtors' failure to pay any monthly payment of cash-pay interest of accrued, unpaid post-petition interest with respect to the Pre-Petition Lender Debt;

(e)     The Debtors' failure to comply with the reporting requirements contained in the Pre-Petition Credit Agreements and Post-Petition Financing Documents, including the failure to provide weekly cash-flow statements to the Pre-Petition Lender and the DIP Lender listing the ending cash balance by Debtors as of the date provided, within five (5) days after receiving notice of such failure from the Pre-Petition Lender and the DIP Lender;

(f)     The Debtors' failure to comply with the Budget as set forth in the DIP Term Sheet;

(g)     Conversion of any of the Debtors' Cases to cases under chapter 7 of the Bankruptcy Code;

(h)     The appointment of a Trustee pursuant to § 1104(a)(1) or (a)(2) of the Bankruptcy Code in any of the Cases;

(i)     The appointment of an examiner with expanded powers in any of the Cases, other than a fee examiner;

(j)     Dismissal of any of the Debtors' Cases or any subsequent chapter 7 cases without the express written consent of the DIP Lender in its sole and absolute discretion;

(k)     The entry of any order materially modifying, reversing, revoking, staying, rescinding, vacating, or amending this Interim Order without the express prior written consent of the DIP Lender in its sole and absolute discretion;

(l)     Kevin Neuman, as Chief Restructuring Officer (who shall report directly to the Board of Directors for the Debtors), for any reason, no longer provides daily leadership to the Debtors on operational, financial, restructuring/bankruptcy process and sale-related business

matters and all transactions concerning the bankruptcy during the pendency of the Chapter 11 Cases as provided in the Order Approving the Debtors' Application for an Order Authorizing the Employment and Retention of (i) Novo Advisors to Perform Restructuring Services for the Debtors and (ii) Kevin Neuman as Chief restructuring Officer of the Debtors Pursuant to Bankruptcy Code 363 and engagement letters attached thereto (together, the "**CRO Order**"); provided, however, that it shall not be an Event of Default hereunder if Kevin Neuman's engagement terminates as a result of either the death or incapacity of Kevin Neuman, and the Debtors, within five (5) days of such death or incapacity, engage a replacement CRO acceptable to the DIP Lender. For purposes of this paragraph 31(m), "incapacity" shall mean any physical or mental illness, disability or impairment that prevents or may reasonably be expected to prevent Kevin Neuman from continuing the performance of his normal duties and responsibilities as CRO for a period in excess of ninety (90) days;

(m)      The resignation, suspension or termination of Kevin Neuman's employment as Chief Restructuring Officer of the Debtors or any other action by the Debtors that would reduce, limit or contravene Mr. Neuman's duties or responsibilities as set forth in the CRO Order;

(n)      The failure of the Debtors to execute and deliver all Post-Petition Financing Documents requested by the DIP Lender in respect of the DIP Facility reflecting the terms and conditions set forth in the DIP Term Sheet and otherwise in form and substance satisfactory in all respects to the DIP Lender in its sole and absolute discretion;

(o)      The failure by the Debtors to file by December 5, 2025, a motion to approve bidding procedures, scheduling a time for auction and requesting time for sale approval hearing in a form and substance satisfactory to the DIP Lender;

(p)     An order approving the employment of Novo Advisors and Kevin Neuman as Debtors' Chief Restructuring Officer has not been entered by December 9, 2025, in form and substance satisfactory to the DIP Lender, in its sole and absolute discretion;

(q)     An order approving the employment of Senior Living Investment Brokers ("SLIB") as Broker to the Debtors has not been entered by December 9, 2025, in form and substance satisfactory to the DIP Lender, in its sole and absolute discretion;

(r)     The resignation, suspension or termination of SLIB's engagement as the Debtors' Broker;

(s)     An order approving the bidding procedures, scheduling auction and obtain sale hearing date has not been entered by December 5, 2025, in form and substance satisfactory to the DIP Lender, in its sole and absolute discretion;

(t)     The failure of the Debtors to obtain the DIP Lender's consent to any letter of intent or asset purchase agreement with any potential purchaser of the Debtors' assets;

(u)     The Debtors make any payment to LSM in excess of $100,000 per month, which payments shall terminate on the date the Bankruptcy Court enters an order approving the Sale and identifies a successful purchaser.

(v)     The Debtors make any payment to any member of the Debtors' boards of directors;

(w)     The failure of the Debtors to ensure that all LSM personnel are wholly walled-off from the sale process;

(x)     The failure by the Debtors to have entered into by December 5, 2025, one or more binding asset purchase agreements or other similar agreements for the purchase and sale

of substantially all of the Debtors' assets (collectively, the **"Sale"**), in form and substance satisfactory to the DIP Lender, in its sole and absolute discretion;

(y)     The failure by the Debtors to conduct the Court-approved auction by January 9, 2026;

(z)     The Debtors' request for approval of the Sale is heard by the Court later than January 13, 2026;

(aa)     One or more final orders of the Bankruptcy Court satisfactory to the DIP Lender in its sole and absolute discretion, approving the Sale, has not been entered by January 15, 2026;

(bb)     The failure by the Debtors to pay the net proceeds of sale from substantially all of the Debtors' assets which are sold at the closing thereof by March 31, 2026;

(cc)     The failure by the Debtors to close the sale transaction by March 31, 2026;

(dd)     Default in the payment of any amount owed by the Debtors to the DIP Lender as and when due hereunder;

(ee)     The rendering against the Debtors of an arbitration award, a final judgment, decree or order, in each case requiring the post-petition payment of money in excess of $25,000 in the aggregate or a post-petition lien on any of the Collateral, and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of thirty (30) consecutive days; provided, however, that this paragraph 31(ii) shall not apply to unsecured claims;

(ff)     The filing by any of the Debtors of any motion or proceeding that could reasonably be expected to result in material impairment of the DIP Lender's rights under the Post-Petition Financing Documents, as modified by this Interim Order, including any motion to

surcharge the DIP Lender, the DIP Loans or the Collateral under section 506(c) of the Bankruptcy Code or otherwise;

(gg)    the filing of a motion by any of the Debtors for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the DIP Lender's or the Pre-Petition Lender's Liens or otherwise commencing any cause of action against the DIP Lender or the Pre-Petition Lender;

(hh)    The Debtors (except following the DIP Lender's prior written request or with the DIP Lender's express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending this Interim Order or the Final Order or any of the Post-Petition Financing Documents as modified by this Interim Order or the Final Order, without the DIP Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lender);

(ii)    The Debtors shall file, or any other person shall obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that does not comply with the Pos-Petition Financing Documents;

(jj)    The Debtors shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Lender under this Interim Order, the Final Order or the Post-Petition Financing Documents, as modified by this Interim Order or the Final Order, or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Interim Order or the Final Order;

(kk)     The Interim Order or the Final Order shall cease to be in full force and effect at any time after the date of entry thereof by the Bankruptcy Court;

(ll)     Entry of an order in any of the chapter 11 Cases appointing a chapter 11 trustee or appointing an examiner with the power to take any action other than to investigate and report;

(mm)     Expiration or termination of the Debtors' exclusive periods to file and confirm a Plan of Reorganization;

(nn)     Entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Lender, prior to full and indefeasible repayment of the Obligations and the Adequate Protection Obligations (as defined in this Interim Order);

(oo)     Default in the performance, or breach, of any covenant or agreement of the Debtors contained in any of the Post-Petition Financing Documents, as modified by this Interim Order or the Final Order, or any term or condition of either of this Interim Order or the Final Order;

(pp)     Any Debtor shall fail to comply in any material respect with the Budget (after accounting for any variances permitted under the Post-Petition Financing Documents);

(qq)     The entry of an order (a) which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code with respect to any material contract, lease, or obligation or against any critical vendor; (b) allowing a third party to proceed against any material assets or contracts of the Debtors; (c) staying or otherwise prohibiting the prosecution of any Enforcement Action; (d) otherwise materially adversely affecting the DIP Lender's or Pre-Petition Lender's Liens;

(rr)     With the exception of the termination or suspension of operations contemplated by the Budget, any of the Debtors shall liquidate, dissolve, terminate or suspend its

business operation or otherwise fail to operate its business in the ordinary course or merge with another Person unless such Debtor is the surviving entity or the Debtors consummate a sale of all or a material portion of such Debtor's assets without paying the aggregate amount of the Obligations due to the DIP Lender, unless the DIP Lender has consented or the Debtors have otherwise satisfied the provisions of 11 U.S.C. §363(f) or the Court has determined that an alternative bid for such Debtor's assets is the highest and/or best bid;

(ss)     Any representation or warranty made by the Debtors in the DIP Credit Agreement, or by the Debtors (or any of their Officers) in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with the DIP Credit Agreement shall prove to have been incorrect in any material respect when deemed to be effective;

(tt)     The DIP Lender believes in good faith that the prospect of payment in full of any part of the Obligations, or that full performance by the Debtors under the Post-Petition Financing Documents, is impaired, or that there has occurred any Material Adverse Effect in the business or financial condition of the Debtors, provided that the Court shall have power to determine whether such belief is objectively reasonable upon motion by any party in interest, filed within five (5) business days of such DIP Lender's filing and service of notice, rendering any non-reasonable belief ineffective;

(uu)     If any creditor of the Debtors receives any adequate protection payment, other than as provided herein;

(vv)     A Change in Control occurs with respect to any Debtor;

(ww)     The Debtors' failure to pay any post-petition obligation when due, unless otherwise ordered by this Court;

(xx)    Any material impairment of the Collateral or the termination of any state or federal license or authorization or material contract; or

(yy)    The Debtors fail to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Debtors in connection herewith (provided that the Court's determination of appropriate sale procedures shall not be a default).

32.    **Termination**. The agreement by the DIP Lender to make any post-petition financing available to the Debtors under the Post-Petition Financing Documents, as modified by this Interim Order, and to allow the use of cash collateral pursuant to the terms of this Interim Order shall continue until the earlier of (i) the conclusion of the Final Hearing, (ii) _____ __, 2026, if the Final Order has not been entered by that date, which date may be extended solely at the option of the DIP Lender and the Debtors in writing, without the need for any further Court approval or as otherwise set forth in the Post-Petition Financing Documents, (iii) the date of the acceleration of any outstanding extensions of credit under the Post-Petition Financing Documents, or (iv) the occurrence of an Event of Default under the Post-Petition Financing Documents (hereinafter, the "**Termination Date**").

33.    **No Third Party Rights**. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

34.    **Joint and Several Liability**. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the Post-Petition Financing Documents.

35.    **Discharge Waiver**. The Post-Petition Obligations and the Pre-Petition Obligations shall not be discharged by the entry of an order (a) confirming a chapter 11 plan in any of the Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive such discharge) or (b) converting these Cases to cases under chapter 7 of the Bankruptcy Code. Under no circumstances shall any chapter 11 plan in these Cases be confirmed or become effective unless such plan provides that the Post-Petition Obligations shall be indefeasibly paid in full in cash and satisfied in the manner provided in the Post-Petition Financing Documents on or before the effective date of such plan.

36.    **Interim Order Governs**. In the event that any term or provision of this Interim Order conflicts with any term or provision of the other Post-Petition Financing Documents, the terms and provisions of this Interim Order shall govern.

37.    **Binding Effect of Interim Order**. Immediately upon execution by this Court, the provisions of this Interim Order shall be valid and binding upon and inure to the benefit of the Pre-Petition Lender, the DIP Lender, the Debtors, all other creditors of any of the Debtors, the Committee, if any is appointed, and all other parties in interest and their respective successors and assigns (including any chapter 7 trustee or other trustee or fiduciary hereafter appointed as a legal representative of the Debtors, or with respect to the property of the Debtors' estates, in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

38.    **No Prejudice**. This Interim Order shall not prejudice the Pre-Petition Lender's rights in connection with any of the Pre-Petition Financing Documents, including any third party guarantees.

39. **No Marshalling**. In no event shall the DIP Lender be subject to the equitable doctrine of marshalling or any similar doctrine with respect to the Post-Petition Obligations or any of the property comprising the Collateral.

40. **Limits on the DIP Lender's Liability**. Nothing in this Interim Order or in any of the Post-Petition Financing Documents or any other documents related to the financing transactions authorized hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the pre-petition or post-petition activities by any of the Debtors in the operation of its business, or in connection with its restructuring efforts. Subject to entry of a Final Order, the DIP Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

41. **Lenders' Right to Credit Bid**. The DIP Lender or the Pre-Petition Lender shall have the right to credit bid with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a Plan of Reorganization, the amount, (i) with respect to a DIP Lender, such respective DIP Lender advanced under the DIP Loans, and (ii) with respect to a Pre-Petition Lender, the Pre-Petition Lender Obligations, which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner. For the avoidance of ambiguity, no future order or plan may impair the credit bid rights of the DIP Lender or the Pre-Petition Lender, and no credit bid provisions in the Post-Petition Financing Documents, Financing Orders, sale procedure orders, or any other agreement or order shall impair or alter in any way the

rights of the Debtors Committee, if any is appointed, or any party in interest to assert or the Court to determine that an alternative bid is higher and/or better than any such credit bid of the DIP Lender or Pre-Petition Lender.

42. **Section 506(c) Waiver**. Upon entry of a final order, except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the chapter 11 Cases or any future proceedings or cases related hereto, at any time, shall be charged against the DIP Lender or the Pre-Petition Lender, their claims, or the Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender or the Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Pre-Petition Lender.

43. **Successors and Assigns**. To the fullest extent permitted by law, the Post-Petition Financing Documents, as modified by this Interim Order and the provisions of this Interim Order shall be binding upon the DIP Lender, the Pre-Petition Lender, and the Debtors, and each of their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors or any examiner appointed pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Cases or any subsequent chapter 7 case) and the Committee, if any is appointed, and shall inure to the benefit of the DIP Lender, the Pre-Petition Lender, and the Debtors and (except with respect to any trustee hereinafter appointed or elected for the estate of the Debtors) their respective successors and assigns; provided, however, that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

44. **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from this Interim Order and its implementation.

45.    **Authority**. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Loans, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Order and the Post-Petition Financing Documents.

46.    **Final Hearing**. The Final Hearing on the relief provided herein shall be held no sooner than fourteen (14) days after a form of DIP Credit Agreement is filed with the Court at _____ p.m. (Eastern Time) in the courtroom of the Honorable Henry W. Van Eck, United States Bankruptcy Court, Middle District of Pennsylvania, 1501 North Sixth Street, Harrisburg, PA 17102. Notice of the Final Hearing shall be given by the Debtors. The Debtors' counsel shall serve a copy of this Interim Order and notice of the hearing on the Final Order by regular mail on or before November 26, 2025 on the following parties: (i) the Committee, if any is appointed, (ii) the United States Trustee, (iii) creditors holding the twenty (20) largest unsecured claims against the Debtors on a consolidated basis as included in the Debtors' chapter 11 petitions, or their legal counsel, if known, (iv) any party that has filed a lien against any of the Debtors' assets, (v) all local taxing authorities, (vi) the Internal Revenue Service, and (vii) any party who has requested notice and service of papers in these Cases. Any party objecting to the entry of a final order approving the Motion shall file a written objection stating the grounds for such objection, and serve a copy of the objection on or before _:00 p.m. (Eastern Time) no later than seven (7) days prior to the Final Hearing on (i) Robert E. Chernicoff, Esq., counsel to the Debtors, Cunningham, Chernicoff& Warshawsky, PC, 2320 N.2nd St., Harrisburg, PA 17110; (ii) Ballard Spahr LLP, Attn: Diane E. Vuocolo, Esq. and Kevin P. Ray, Esq., 1735 Market Street, 51st Floor, Philadelphia, PA 19103-7599, counsel to the DIP Lender and Pre-Petition Lender; (iii) counsel to the Committee, if any is

appointed; and (iv) Office of the United States Trustee for the Middle District of Pennsylvania,

Attn: Joseph Schalk.

#4928-8365-0393 v8

**Exhibit A**

**[DIP Term Sheet]**

#4928-8365-0393 v8

**SPIRITRUST LUTHERAN, A PENNSYLVANIA NOT-FOR-PROFIT CORPORATION, SPIRITRUST LUTHERAN HOME CARE AND HOSPICE, INC., A PENNSYLVANIA NOT-FOR-PROFIT CORPORATION, AND SPIRITRUST LUTHERAN LIFE, A PENNSYLVANIA NOT-FOR-PROFIT CORPORATION**

**SENIOR SECURED DIP FINANCING**

The following are the terms and conditions on which the DIP and Prepetition Lender and is willing to provide interim post-petition financing (the "**DIP Financing**") to the debtors and debtors in possession (the "**Debtors**"), who will commence or have commenced chapter 11 cases on or before on or before November 21, 2025 (the "**Petition Date**") in the United States Bankruptcy Court for the Middle District of Pennsylvania (the "**Court**"). The following will not be binding on the parties until entry of an interim order (the "**Interim Order**") and, thereafter, a final order (the "**Final Order**") approving same. As stated herein, final approval of the proposed post-petition financing arrangement is subject to, among other things, approval of formal documentation in form and substance satisfactory to DIP and Prepetition Lender (as defined herein) in its sole discretion and obtaining internal Bank approvals for DIP Financing purposes. This Term Sheet does not include all the terms, conditions and other provisions of the Interim DIP and/or Final DIP Agreement. Until approved by the Court (as defined below), this Term Sheet does not constitute a commitment on behalf of the DIP and Prepetition Lender (each as defined blow).

*Please note that the below-listed terms and conditions are merely illustrative and not exhaustive and are subject to further revisions, additions, supplements, etc. Also subject to DIP and Prepetition Lender internal approval process.*

## SUMMARY OF TERMS AND CONDITIONS

### I. PARTIES

| | |
|---|---|
| **Borrowers** | The companies listed in **Schedule 1** attached hereto, each as debtor and debtor-in-possession (together, jointly and severally, the "**Borrowers**" or the "**Debtors**") as evidenced by their chapter 11 bankruptcy petitions filed in the United States Bankruptcy Court for the Middle District of Pennsylvania. |
| **Joint and Several Liability:** | The liability of the Debtors for the obligations, indebtedness and liabilities created under or pursuant to this term sheet (this "**Term Sheet**"), the Interim Order, the agreements, documents, notes and instruments executed and delivered to evidence the post-petition financing contemplated by this term sheet (collectively, the "**DIP Credit Agreement**" or the "**DIP Documentation**") and together with this Term Sheet, the Interim Order and the Final Order (collectively, the "**DIP Financing Documents**") shall be joint and several. |
| **DIP Lender:** | The "**Lender**" under the Forbearance and Amendment to Loan Documents Agreement (the "**Forbearance** |

**Agreement"**), dated as of August 21, 2025, by and between M&T Bank (the "**Pre-Petition Lender**"), and SpiriTrust Lutheran, a Pennsylvania not-for-profit corporation, and SpiriTrust Lutheran Home Care and Hospice, Inc., a Pennsylvania not-for-profit corporation, as borrowers, and those certain Existing Loan Documents (as defined in the Forbearance Agreement and as set forth more fully in Schedule 2 hereof) (collectively, the "**Pre-Petition Credit Agreement**").

## II.    TYPE OF DIP FACILITY

**Facility:** Senior secured super-priority debtor-in-possession financing in the form of a term credit facility (the "**DIP Facility**") of up to an aggregate principal amount of Twelve Million Two Hundred Thousand Dollars ($12,200,000.00), comprised of Six Million Seven Hundred Thousand Dollars ($6,700,000.00) of new borrowings, plus availability under the SpiriTrust line of credit in the maximum principal amount of Five Million Five Hundred Thousand Dollars ($5,500,000.00) (the "**DIP Loans**"). The DIP Lender will advance up to Two Million One Hundred Thousand Dollars ($2,100,000.00) (the "**Interim Commitment**") upon entry of the Interim Order, provided that the Interim Order shall be satisfactory in form and substance to the DIP Lender (as defined herein) and the Pre-Petition Lender in its sole discretion.

**Term:** The DIP Loans shall be repaid in full at the **earliest** of (i) the stated maturity, which shall be 5 days after the Closing Date of sale of the six Properties (as defined in Schedule 3 annexed hereto), (ii) the Termination Date (as defined below), or (iii) March 31, 2026 (the "**Maturity Date**").

**Budget:** The proceeds of the DIP Loans (and the cash collateral of the Pre-Petition Lenders) shall be used for the items and in the amounts set forth in the budget (the "**Budget**"), a copy of which is annexed hereto as **Exhibit A.** The DIP Loans shall be available to the Borrowers only after the Debtors' use of all available cash collateral authorized for expenditure under the Budget. For each rolling period of four (4) weeks during the term encompassed by the Budget, the Debtors' actual aggregate weekly expenditures set forth in the Budget shall not exceed one hundred ten percent (110%) of the cumulative amount so budgeted for such rolling four (4)-week period. The foregoing requirements are referred to herein as the "**Budget Variance.**" **In the interest of clarity, the Debtors**

2

**may make Budgeted payments at times other than shown on the Budget, provided that the category for that type of Budgeted payment is not exceeded by more than the Budget Variance Restrictions.**

The Debtors shall provide a variance report on a weekly basis each Thursday covering the weekly period through the prior Sunday reconciling actual expenditures during that week to those set forth in the Budget. Additionally, the Debtors must provide updated thirteen (13)-week cash flow projections on a weekly basis.

**Proceeds of Asset Sales:** All proceeds of any assets (including all sales, collections, etc.) conducted during the Cases shall be used to repay the DIP Loans first and, subject to the entry of the Final Order to indefeasibly repay the Pre-Petition Lender Debt (as defined in Schedule 2 annexed hereto) as provided in the Pre-Petition Credit Agreement; provided, however, that any such paydown will not reduce the amount of the commitment under the DIP Facility.

**Purpose:** The DIP Loans shall be available (a) to repay the outstanding amounts, as of the Petition Date, under the Debtors' lines of credit, credit/purchase cards, and cash management/ACH fees owed to the Pre-Petition Lender; (b) to fund working capital requirements of the Debtors, operating expenses of the Debtors, and other line items in accordance with the terms of the Budget; (c) to fund the payment of cash-pay interest accrued on the DIP Loans; (d) to fund payments to critical vendors, if approved by the Bankruptcy Court; (e) to pay fees and expenses of the DIP Lender related to the DIP Facility and the Debtors' chapter 11 cases (the "**Cases**"), including reasonable attorneys' fees; (f) to pay the fees and expenses of the Pre-Petition Bank Lender relating to the Cases, including reasonable attorneys' fees; and (g) subject to the entry of the Final Order, to pay the fees and expenses of the Pre-Petition Lender under the Pre-Petition Credit Agreement, including any and all documents executed in connection therewith or relating thereto, and applicable law prior to the commencement of the Cases.

Neither the proceeds of the DIP Loans nor the Pre-Petition Lender's cash collateral shall be transferred to or used by any entity other than a Debtor, except as permitted by the DIP Lender or as set forth in the Budget.

#4934-5110-1791 v11

No portion of the DIP Loans, the Carve-Out (as defined below) or any cash collateral of the Pre-Petition Lender or the DIP Lender shall be used to assert any claim or cause of action or make any objection against the Pre-Petition Lender, or its advisors, agents and subagents, and/or challenging any claim or lien of the Pre-Petition Lender or the validity or enforceability of the Pre-Petition Credit Agreement or any related loan document, and/or challenging any pre-petition payment or transfer to the Pre-Petition Bank Lender; provided that any DIP Loans used to pay any counsel of and financial advisor to the Committee, if any is formed, to investigate any of the foregoing shall not exceed $20,000.00 in the aggregate.

## III.   CERTAIN PAYMENT PROVISIONS

**Interest Rate:**

Twelve percent (12.0%).

Default rate of interest shall equal the then applicable rate plus five percent (5%).

Payable monthly in cash in arrears on the last business day of each calendar month (subject to the Lender's option to capitalize such as interest set forth below). Interest to be calculated on the basis of the actual days elapsed in a year of 360 days.

At the Lender's option (in its sole discretion), interest, and fees, accruing under the DIP Credit Agreement may be capitalized by adding such interest or fees (as the case may be) to the principal amount of the DIP Loans on the relevant payment date therefore in lieu of receiving payment of the same in cash and said interest and fees will be treated as if principal amounts of the DIP Financing and have the same superpriority status and priming lien status as the DIP Financing.

**Fees:**

A facility fee (the "**Facility Fee**") equal to three percent (3.0%) of the $6,700,000.00 in new money commitments under the DIP Facility. The Facility Fee will be deemed earned in full on the Closing Date (as defined below) and will be payable in full on the Closing Date.

**Insurance Proceeds and Tax Refunds:**

Net cash proceeds received in connection with insurance policies and tax refunds, if any, as the cash collateral of the DIP Lender shall be applied against the DIP Financing and shall be collateral for the DIP Financing.

4

| | |
|---|---|
| **Payment in Full:** | The DIP Loan, including, without limitation, all principal and accrued interest, costs, fees and expenses, shall be paid in full in cash on the earliest of (i) the Maturity Date and (ii) the Termination Date. |

## IV. IDENTIFICATION OF LOAN COLLATERAL

All of the Debtors' right, title and interest in, to and under all of the following property: (a) all of the Debtors' "accounts", as that term is defined in the UCC, including, without limitation, all accounts receivable of the Debtors and all rights of the Debtors to payment for goods sold or leased or for services rendered; (b) all of the Debtors' right, title and interest in all inventory of whatever kind, nature or description; (c) all real estate, (d) all other assets, and (e) all "proceeds" as that term is defined under the UCC of any of the foregoing (the "**Loan Collateral**"). *See* Schedule 3 hereof.

## V. PRIORITY AND COLLATERAL SECURITY

| | |
|---|---|
| **Priority and Collateral Security:** | All obligations of the Borrowers to the DIP Lenders, including, without limitation, all principal and accrued interest, costs, fees and expenses, shall be:

(a) (i) Claims ("**Superpriority Claims**") entitled to the benefits of Bankruptcy Code § 364(c)(1), having a superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code §§ 503(b) and 507(b), subject only to the Carve-Out; provided, however, that the Superpriority Claims shall not be payable from the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code.

(ii) As used herein, the term "**Carve-Out**" means, the following fees and expenses:

(x) all fees required to be paid to the Clerk of the Bankruptcy Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a);

(y)(A) the amount of any compensation for services actually rendered or expenses actually incurred (whether paid or unpaid) by the Debtors' or the Committee's professionals retained by final order of the Court pursuant to Sections 327 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**") prior to the occurrence of an |

5

Event of Default (as defined in the Interim Order or, upon entry of Final Order, as defined in the DIP Credit Agreement) in respect of which the Carve-Out is invoked, to the extent that such compensation or expenses, as the case may be. were previously or are subsequently allowed by the Bankruptcy Court and (B) the amount of any allowed expenses incurred by the Committee members in the performance of their duties prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked (but excluding fees and expenses of third-party professionals employed by such members) (the matters described in clauses (A) and (B) of this clause (y), collectively, the "**Pre-Default Carve-Out Amount**"); and

(z) after the occurrence and during the continuance of an Event of Default (as defined in the Interim Order or, upon entry of the Final Order, as defined in the DIP Credit Agreement), an amount not exceeding $400,000 in the aggregate, which amount may be used subject to the terms of the Interim Order or the Final Order, as the case may be, to pay any allowed fees or expenses incurred by the Case Professionals[1] for services rendered and expenses incurred subsequent to the occurrence of the Event of Default in respect of which the Carve-Out is invoked (the "**Post-Default Carve-Out Amount**"); provided, however, (i) that such dollar limitation on fees and disbursements described in this clause (z) shall not be reduced by (A) the Pre-Default Carve-Out Amount and (B) any fees, expenses, indemnities or other amounts paid to the Administrative Agent, the DIP Lenders, and the Pre-Petition Lender and their respective attorneys and advisers under the Post-Petition Financing Documents or otherwise, and (ii) that nothing herein shall be construed to impair or prejudice the right of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (y) and (z). For

---

[1] For purposes of this clause (z), the term "**Case Professionals**" shall mean Cunningham, Chernicoff & Warshawsky, PC; Polsinelli PC; Novo Advisors; Stretto; Senior Living Investment Broker; and Latsha Davis & Marshall P.C.

6

the avoidance of doubt, (i) any compensation for services rendered and expenses incurred after the occurrence of an Event of Default in respect of which the Carve-Out is invoked shall permanently reduce the Post-Default Carve-Out Amount on a dollar-for-dollar basis and (ii) notwithstanding anything to the contrary contained in this Term Sheet, nothing herein shall be construed to allow a Case Professional to be paid amounts for fees and expenses in excess of the amounts of fees and expenses set forth in the Budget for such Case Professional for the relevant time period.

(iii)    Any proceeds of the DIP Loans used to fund the Carve-Out shall be added to and made a part of the Post-Petition Obligations and shall be secured by the Post-Petition Liens (as defined herein) and otherwise entitled to the protections granted under the Post-Petition Financing Documents, the Bankruptcy Code and applicable law. Before any proceeds of the DIP Loans shall be used to fund the Carve-Out, the Debtors shall be required to use the proceeds of unencumbered assets of the Debtors' estates (collectively, the "**Unencumbered Assets**") for such purpose, excluding the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code. In the event that, at the time when Allowed Fees are required to be paid (and the amounts paid would reduce the Carve-Out hereunder), there exist no proceeds of Unencumbered Assets such that proceeds of the DIP Loans are required to be used to fund, in whole or in part, such payment, the Post-Petition Obligations thereby created shall be entitled to be repaid from the next proceeds of Unencumbered Assets realized by the Debtors. Notwithstanding anything herein to the contrary, no amount paid in respect of Allowed Fees for a particular Case Professional shall exceed, in the aggregate, the line-item amounts budgeted for such Case Professional in the Budget for the relevant time period.

(b) Secured pursuant to Bankruptcy Code § 364(c)(2), subject only to the Carve-Out, by a first-priority perfected lien on, and security interest in, all present and after acquired property of the Debtors not subject to a lien or security

7

interest on the Petition Date, but excluding claims and causes of action arising under chapter 5 of the Bankruptcy Code.

(c) Secured pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out, by a perfected junior lien on, and security interest in, all property of the Debtors that is otherwise subject to a valid and perfected lien or security interest on the Petition Date, other than the liens and security interests securing the Debtors' obligations, indebtedness and liabilities (defined in Schedule 2 as the **"Pre-Petition Lender Debt"**) under or in respect of the Pre-Petition Credit Agreement.

(d) Secured pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out, by a first-priority, senior priming perfected lien on, and security interest in, all property of the Debtors that is Loan Collateral.

(e) The property referred to in the preceding clauses (b), (c) and (d), including, without limitation, all tangible and intangible property and assets of the Debtors, including, without limitation, all personal property and real property and fixtures, the capital stock, partnership and member interests and other equity interests of and in each direct and indirect subsidiary of each Borrower, all promissory notes and other payment intangibles, including all inter-company notes and receivables, real estate, leasehold interests, all cash, investments, securities and other property contained in any account maintained by any Borrower, all intellectual property, and all proceeds of the foregoing, but excluding the proceeds of all claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code, is collectively referred to as the **"Collateral;"** the liens and security interests described in the preceding clauses (b), (c) and (d) are collectively referred to as the **"Post-Petition Liens**."

(f) Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c) (subject to entry of the Final Order), 507(b) or otherwise, and those resulting from the conversion of any of the Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or *pari passu* with, the Superpriority Claims of the Lenders arising out of the DIP Loans.

(g) The Pre-Petition Lender's liens and security interest in all Loan Collateral shall be deemed valid, perfected, binding

8

and enforceable, shall not be avoidable under the Bankruptcy Code and shall not be subject to subordination under Section 510 of the Bankruptcy Code.

## VI.   CERTAIN CONDITIONS

**Initial Conditions:**
The availability of the DIP Facility shall be conditioned upon satisfaction of, among other things, the following conditions precedent (the date upon which all conditions precedent shall be satisfied is referred to as the "**Closing Date**").

(a)  Not later than November 26, 2025, entry of the Interim Order, after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c), authorizing and approving the transactions contemplated by the DIP Facility, including, without limitation, the superpriority claim status and liens referred to above, and finding that the DIP Lenders are extending credit to the Borrowers in good faith within the meaning of Bankruptcy Code § 364(e), which Interim Order shall be in form and substance satisfactory to the Lender in its sole discretion, and, prior to the entry of the Final Order, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified.

(b)  The Debtors' Board Members are not receiving any compensation.

(c)  Lutheran Social Ministry (**"LSM"**) not to receive payments in excess of $100,000 per month, which payments shall terminate on the date the Bankruptcy Court enters an order approving the Sale and identifies a successful purchaser.

(d)  LSM personnel shall be walled off from any involvement in the sale process for the sale of the Debtors' assets.

(e)  Receipt by the DIP and Pre-Petition Lender and the Committee, if any, of the Budget in form and substance satisfactory to the DIP and Pre-Petition Lender in its sole discretion.

(f)  Such other conditions as are satisfactory to the DIP and Pre-Petition Lender in its sole discretion and is customary in the context of this type of financing.

9

(g)  The corporate status of each of the Debtors, as described in the Pre-Petition Credit Agreement, shall remain unchanged.

**Sale Milestones:**    (a) The sale of the Debtors' "Assets" does not and shall not include that certain collateral account maintained by SpiriTrust with M&T Bank, and all funds held therein, being account number #9893703703 (the **"Collateral Account"**), which collateral account and funds are exclusively M&T Bank collateral.  M&T Bank has permitted SpiriTrust to maintain funds in the Collateral Account solely for the purpose of meeting certain of SpiriTrust's regulatory obligations, and the funds in the Collateral Account are not Assets for the purpose of any Sale.

(b) The Broker shall host update calls at the request of the DIP and Pre-Petition Lender.

(c)  The Debtors shall receive, and shall share with the DIP and Pre-Petition Lender, final executed letters of intent/ commitment letters from potential purchasers not later than November 20, 2025.

(d)  The Debtors shall receive, and shall share with the DIP and Pre-Petition Lender, an executed purchase and sale agreement and ownership transfer agreement not later than December 5, 2025.

(e) The Stalking Horse Bidder shall submit a non-refundable deposit upon signing of the purchase and sale agreement, which deposit shall be refundable only if the Stalking Horse Bidder is not approved by the Bankruptcy Court as the successful buyer.

(f) The Debtors shall file the Motion to Approve the Bidding Procedures not later than December 5, 2025.

(g)  The sale approval hearing shall occur not later than January 13, 2026.

(h)  The successful Purchaser shall submit all forms necessary for Pennsylvania regulatory approvals not later than one (1) week after the Bankruptcy Court enters the order approving the sale.

10

(i) The successful Purchaser shall submit a signed ownership transfer agreement not later than one (1) week after the Bankruptcy Court enters the order approving the sale

(j) The sale of the Debtors' assets and transfer of the Properties shall close and be final not later than March 31, 2026.

**Ongoing Conditions:**                   The making of each DIP Loan shall be conditioned upon:

(a)   The accuracy of all representations and warranties in the DIP Documentation (including, without limitation, the material adverse change and litigation representations).

(b)   There being no default or event of default under the DIP Documentation in existence at the time of, or after giving effect to the making of, such DIP Loan.

(c)   The amount of such DIP Loan being authorized under the terms of (i) the Interim Order, which Interim Order shall be satisfactory to the DIP and Pre-Petition Lender in its sole discretion, shall have been entered and shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified, or (ii) the Final Order, which Final Order shall be satisfactory to the DIP and Pre-Petition Lender in its sole discretion, shall have been entered and shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified.

(d)   The payment by the Debtors, within five (5) business days of the submission by respective counsel for the DIP and Pre-Petition Lender to the Debtors, with a copy to the Creditors' Committee, if one is appointed, of Invoices (as defined below), of all reasonable fees, costs and expenses (including attorneys' fees) owing to the DIP and Pre-Petition Lender, as the case may be, in connection with the Cases, the DIP Documentation, and the entry of the Interim Order and the Final Order, including, without limitation, the protection and/or enforcement by such parties of their respective rights, interests and remedies relating to any of the foregoing. To the extent the Debtors have insufficient cash collateral to pay the attorneys' fees owing to the DIP and Pre-Petition Lender as set forth herein, the Debtors shall use the DIP Loan to make such payments. The amounts set forth in the Budget in respect of such fees, costs and expenses owing to the DIP and Pre-Petition Lender shall not govern or have any bearing on the determination of the "reasonableness" of such fees, costs

#4934-5110-1791 v11

and expenses and shall not be construed to limit in any way the Debtors' obligation to pay such fees, costs and expenses. As used herein, the term "**Invoices**" means summary invoices with respect to the services and charges of the DIP and Pre-Petition Lender, as the case may be, or invoices of such parties that are redacted to protect privileged or case sensitive material.

**Interim Advances:** Upon entry of the Interim Order, which shall be satisfactory to the DIP and Pre-Petition Lender in its sole discretion, the DIP and Pre-Petition Lender shall make the Interim Commitment available and, upon compliance by the Debtors with the conditions contained herein and in the Interim Order, make advances thereunder. If the Debtors and the DIP and Pre-Petition Lender does not finalize the terms of the DIP Financing Documentation within ten (10) days of entry of the Interim Order (unless a later date is agreed to in writing by the DIP and Pre-Petition Lender) all such extensions of credit shall be due in full at such time. If the Final Order is not entered within thirty (30) days after the date of entry of Interim Order, all such extensions of credit shall be due in full at such time.

## VII.   CERTAIN DOCUMENTATION MATTERS

The DIP Documentation shall contain representations, warranties, covenants (including, but not limited to, minimum revenues, minimum cash flow, etc.) and events of default customary for financings of this type and other terms deemed appropriate by the DIP and Pre-Petition Lender in its sole discretion, including, without, limitation:

**Representations and Warranties:** Corporate organization; qualification; power; financial condition; no material litigation; no material adverse change (excluding the commencement of the chapter 11 cases); no conflict with law or contractual obligations; authority; enforceable obligations; governmental approvals; ERISA; taxes; properties; Investment Company Act; material agreements and liens; environmental matters; capitalization; subsidiaries, investments, etc.; true and complete disclosure; restrictive agreements; collateral; security agreements; and any regulatory matters. ***Other representations and warranties to be determined.***

**Affirmative Covenants:** The Debtors shall agree to produce and distribute the variance reports and other Budget materials required herein to the parties entitled to receive the same (including the

12

Committee, if one is appointed). The Debtors shall agree to diligently and in good faith pursue (i) the procedures (the "**Sale Procedures**") for the sale of all of the Debtors' assets and (ii) the sale of the Debtors' assets pursuant thereto, including, without limiting the generality of the foregoing, by negotiating in good faith with potential purchasers of the Debtors' assets pursuant to the Sale Procedures and using their best efforts to conclude such negotiations as soon as is practicable, by executing and delivering asset purchase agreements upon conclusion of such negotiations, and by promptly filing with the Court all necessary motions with respect thereto.

Other affirmative covenants to include, without limitation: delivery of financial statements, reports, accountants' letters, projections, officers' certificates, weekly and monthly reporting packages and other information reasonably requested by the DIP and Pre-Petition Lender (including information required to be delivered pursuant to the Cases and reports with respect to compliance with the Budget as provided herein); maintenance of existence; maintenance of properties, notice of default, litigation and other material events; taxes; compliance with laws, governmental approvals, environmental compliance; books and records; inspections rights; use of proceeds; collateral and security interests; certain obligations respecting subsidiaries.

The Debtors shall cooperate with and permit the DIP and Pre-Petition Lender to have reasonable access to the Collateral and non-privileged records during normal business hours. The Debtors shall make available to the DIP and Pre-Petition Lender's reasonable request all documents related to the sale of the collateral granted under the Pre-Petition Credit Agreement (the "**Pre-Petition Collateral**") prior to their filing with the Court. The Debtors shall immediately grant the DIP and Pre-Petition Lender access to the due diligence room established for bidders of the Debtors' assets (as defined below).

The Debtors shall obtain the DIP and Pre-Petition Lender's consent prior to entering into any letter of intent or asset purchase agreement.

The Debtors shall ensure that the Collateral Account, and all funds held therein, are excluded from the sale of the Debtors' Assets.

13

#4934-5110-1791 v11

The Debtors shall ensure that all LSM personnel are wholly walled-off from the sale process.

The Debtors shall not make any payments to non-critical vendors.

The Debtors shall not make payments to LSM in excess of $100,000 per month, which payments shall terminate on the date the Bankruptcy Court enters an order approving the Sale and identifies a successful purchaser.

The Debtors shall not make any payments on account of prepetition indebtedness, other than to approved critical vendors and Highmark, such as bonds or term loans.

The Debtors shall not make any payments to any member of the Debtors' board of directors.

***Other affirmative covenants to be determined.***

| | |
|---|---|
| **Right to Credit Bid:** | The DIP Lender and/or the Pre-Petition Lender shall have the right to credit bid with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a Plan of Reorganization, the amount, (i) with respect to a DIP Lender, such respective DIP Lender advanced under the DIP Loans, and (ii) with respect to a Pre-Petition Lender, the Pre-Petition Lender Obligations, which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner. |
| **Negative Covenants:** | Limitations on: indebtedness; liens; guarantee obligations; mergers, consolidations, liquidations and dissolutions; sales of assets (other than in the ordinary course); leases; dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; optional payments and modifications of subordinated and other debt instruments; transactions with affiliates; sale and leasebacks; changes in fiscal year; negative pledges; changes in lines of business; changes in tax status; payment of Pre-Petition Date claims except to the extent authorized by the Court; the existence of any claims other than those of the Administrative Agent and the Lenders entitled to superiority under Bankruptcy Code § 364(c)(1) (except to the extent permitted by the Interim and Final Orders). ***Other negative covenants to be determined.*** |
| **Events of Default:** | Each of the following shall constitute an "**Event of Default:**" nonpayment of principal, interest or fees under the DIP |

14

#4934-5110-1791 v11

Documentation when due; nonpayment of monthly payments of accrued unpaid interest with respect to the Pre-Petition Lender Debt; nonpayment of other amounts after a grace period of three days; material inaccuracy of representations and warranties; violation of covenants; the Borrowers shall fail to continuously retain a Chief Restructuring Officer and Chief Operating Officer acceptable to the DIP and Pre-Petition Lender in its sole discretion; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee or security document; a change of control (definition to be agreed upon); the entry of an order dismissing the Case of any of the Debtors or the appointment of a chapter 11 trustee or converting any such Case to a chapter 7 case; the entry of an order granting any other superpriority claim or lien equal or superior in priority to that granted the DIP and Pre-Petition Lender; the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material asset or assets of the Borrowers: the entry of an order staying, reversing, vacating or otherwise modifying the DIP Facility, the Interim Order or the Final Order without the express prior written consent of DIP Pre-Petition Lender in its sole discretion; the entry of an order appointing an examiner in any of the Cases; any failure by the Debtors to comply with the Budget.

Restrictions; the Debtors' failure to comply with the terms of this Term Sheet, the Interim Order or the Final Order (as applicable); there shall be any material adverse change in the financial condition, business, operations, properties or performance of the Borrowers since the Petition Date; the entry of the Final Order shall not have occurred within thirty (30) days after the date of entry of the Interim Order; any Sale Process Default (defined below) or any Event of Default shall occur.

In addition, the following shall constitute Events of Default:

(i)      Kevin Neuman, as Chief Restructuring Officer (who shall report directly to the Board of Directors for the Debtors), for any reason, no longer provides daily leadership to the Debtors on operational, financial, restructuring/bankruptcy process and all business matters and all transactions concerning the bankruptcy during the pendency of the bankruptcy cases as provided in the Order Approving the Debtors' Application for an Order Authorizing the Employment and Retention of (i) Novo Advisors to Perform Restructuring Services for

15

the Debtors and (ii) Kevin Neuman as Chief Restructuring Officer of the Debtors Pursuant to Bankruptcy Code § 363 and engagement letter attached thereto (together, the "**CRO Order**"); and

(ii) The resignation, suspension or termination of Kevin Neuman's employment as Chief Restructuring Officer of the Debtors or any other action by the Debtors that would reduce, limit or contravene Mr. Neuman's duties or responsibilities as set forth in the CRO Order; provided, however, that it shall not be an Event of Default if Kevin Neuman's engagement terminates as a result of either the death or incapacity of Kevin Neuman and the Debtors, within five (5) days of such death or incapacity, engage a replacement CRO acceptable to the DIP Lender. For purposes of this provision, "incapacity" shall mean any physical or mental illness, disability or impairment that prevents or may reasonably be expected to prevent Kevin Neuman from continuing the performance of his normal duties and responsibilities as CRO for a period in excess of ninety (90) days; and

(iii) The resignation, suspension or termination of Senior Living Investment Broker's (**"SLIB"**) engagement as Broker; and

(iv) The failure of the Borrowers to obtain the DIP Lender's consent to any letter of intent or asset purchase agreement with any potential purchaser of the Borrowers' assets; and

(v) The failure of the Borrowers to make any tax payment as and when required by tax agreements; and

(vi) The failure of the Borrowers to execute and deliver all DIP Documentation in respect of the DIP Facility reflecting the terms and conditions set forth in this Term Sheet and otherwise in form and substance satisfactory in all respects to the DIP and Pre-Petition Lender in its sole discretion; and

(vii) Failure by the Debtors to file by December 5, 2025, a Motion to approve bidding procedures, scheduling time for auction and requesting time for sale approval hearing in a form and substance satisfactory to the DIP and Pre-Petition Lender; and

16

(viii) Failure by the Debtors to obtain an order approving the employment of Novo Advisors and Kevin Neuman as Debtors' Chief Restructuring Officer by December 9, 2025, in form and substance satisfactory the DIP and Pre-Petition Lender; and

(ix) Failure by the Debtors to obtain an order approving Novo Advisors as financial consultants to the Debtors in form and substance satisfactory to the DIP and Pre-Petition Lender; and

(x) Failure by the Debtors to obtain an order approving the employment of Senior Living Investment Broker (**"SLIB"**) as Broker to the Debtors by December 9, 2025, in form and substance satisfactory to the DIP and Pre-Petition Lender; and

(xi) Failure by the Debtors to obtain an order approving the bidding procedures, scheduling auction and obtain sale hearing date by December 24, 2025, in a form and substance satisfactory to the DIP and Pre-Petition Lender; and

(xii) The Debtors make payments to LSM in excess of $100,000 per month, which payments shall terminate on the date the Bankruptcy Court enters an order approving the Sale and identifies a successful purchaser; and

(xiii) the Debtors make any payments not authorized by the Budget; and

(xiv) the Debtors make any payment to any member of the Debtors' boards of directors.

***Other events of default to be determined.***

"**Sale Process Defaults**" shall mean and include:

(i) the failure of the Debtors to ensure that all LSM personnel are wholly walled-off from the sale process.

(ii) The failure of the Debtors to exclude the Collateral Account, and all funds held therein, from any purchase and sale of the Assets;

#4934-5110-1791 v11

(iii)     the failure of the Debtors to obtain the DIP and Pre-Petition Lender's consent prior to entering into any letter of intent or asset purchase agreement;

(iv)     the failure of an order being entered by the Court by December 9, 2025, satisfactory to DIP and Pre-Petition Lender in its sole discretion, approving the Debtors' retention of SLIB;

(v)     the Debtors' failure to have entered into by December 5, 2025, one or more binding asset purchase agreements or other similar agreements for all of the Debtors' assets in form and substance satisfactory to DIP and Pre-Petition Lender in their sole discretion.

(vi)     the Debtors' failure to conduct the Court-approved auction by January 9, 2026.

(vii)     the Debtors' failure to obtain a Sale Approval Date to be heard by the Court no later than on or about January 13, 2026.

(viii)     the Debtors' failure to obtain by January 15, 2026, one or more final orders of the Bankruptcy Court satisfactory to the DIP and Pre-Petition Lender in its sole discretion approving the sale of all of the Debtors' assets.

(ix)     the Debtors' failure to pay the net proceeds of sale from any of the Debtors' assets which are sold at the closing thereof;

(x)     the Debtors' failure to close any of the sale transactions by March 31, 2026.

### [MAY BE ADDITIONAL EVENTS]

The occurrence of an Event of Default (or earlier occurrence of the Maturity Date) will result in the termination of the DIP Facility and the Debtors' use of cash collateral.

**Reporting:**     Commencing on Tuesday, November 25, 2025, and each Tuesday thereafter, a report setting forth, in a form and in sufficient detail satisfactory to the DIP Lender, a comparison of actual receipts and expenses to budgeted receipts and expenses in the then-current DIP Budget for the preceding one-week period ending the prior Friday.

18

The Debtors shall provide to the DIP and Pre-Petition Lender all financial reporting required under the Forbearance Agreement.

Any and all financial information the DIP Lender may reasonably request from time to time.

As soon as possible and in any event within one Business Day after the occurrence of any Default or Event of Default, a statement of an Authorized Officer of the Debtors setting forth details of such Default or Event of Default and the action that the Debtors have taken and propose to take with respect thereto.

**Termination:**

Upon the occurrence of any event of default, the DIP and Pre-Petition Lender may immediately terminate the DIP Facility and cancel the DIP and Pre-Petition Lender's commitment thereunder (the date of any such termination, the "**Termination Date**"), declare the obligations in respect of the DIP Facility to be immediately due and payable under the DIP Documentation and the Interim Order or the Final Order, as applicable.

**Remedies:**

After five (5) business days' notice to the Debtors, the DIP and Pre-Petition Lender shall have customary remedies, including, without limitation, the right to realize on all collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the DIP Documentation, the Interim Order, the Final Order and with respect to the Collateral.

**Assignments and Participations:**

The DIP and Pre-Petition Lender shall be permitted to assign, and/or sell participations in, all or any portion of the DIP Loans and Pre-Petition Loans.

**Expenses and Indemnification:**

(a) The Borrowers shall pay (i) all reasonable out-of-pocket expenses of the DIP and Pre-Petition Lender associated with the negotiation, preparation, execution, delivery and administration of the Cases and the DIP Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsel), and (ii) all reasonable out-of-pocket expenses of the DIP and Pre-Petition Lender (including the fees, disbursements and other charges of counsel) in connection with Cases, including the exercise and enforcement of the rights and remedies of the

19

DIP and Pre-Petition Lender under the DIP Documentation and applicable law. The DIP and Pre-Petition Lender, or its respective counsel, shall provide copies of their respective Invoices to the Debtors before payment of same shall be made.

(b) The DIP and Pre-Petition Lender (and its affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless by Debtors, joint and severally, against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified Party).

|  |  |
|---|---|
| **Other Indemnities:** | Other customary and appropriate provisions relating to tax gross-ups, increased costs and other customary indemnities and related matters in a form and substance satisfactory to the DIP and Pre-Petition Lender in its sole discretion. |
| **Governing Law and Jurisdiction:** | Commonwealth of Pennsylvania, except as governed by the Bankruptcy Code. |
| **Counsel to the DIP and Pre-Petition Lender:** | Ballard Spahr LLP |

## VIII.   USE OF CASH COLLATERAL; ADEQUATE PROTECTION FOR PRE-PETITION LENDER DEBT

|  |  |
|---|---|
| **Use of Cash Collateral:** | The DIP and Pre-Petition Lender will consent to the use of its cash collateral pursuant to a cash collateral order (which may be subsumed within the Interim Order and the Final Order), in form and substance satisfactory to the DIP and Pre-Petition Lender under the DIP and Pre-Petition Credit Agreement in its sole discretion, for expenditure by the Borrowers solely in accordance with the terms of the Budget, taking into account the Budget Variance Restrictions. The DIP Facility shall not be available for direct borrowings unless the Borrowers shall at the time of drawing thereunder have first used all of such cash collateral authorized for expenditure in the Budget, taking into account the Budget Variance Restrictions. The Borrowers' use of cash collateral shall terminate from and after the Termination Date or, at the direction of the DIP and Pre-Petition Lender, on the first |

20

business day after the date of any Event of Default under the DIP Facility.

| | |
|---|---|
| **Adequate Protection:** | As adequate protection to the DIP and Pre-Petition Lender for any diminution in the value of the DIP Pre-Petition Lender's interests in the Pre-Petition Collateral resulting from (i) the priming of the Pre-Petition Lender's liens by the Liens in favor of the DIP and Pre-Petition Lender granted pursuant to the DIP Facility pursuant to Bankruptcy Code § 364(d)(1), (ii) the use of the Cash Collateral pursuant to Bankruptcy Code § 363(c), (iii) the use, sale or lease of the Pre-Petition Collateral (other than the Cash Collateral) pursuant to Bankruptcy Code § 363(c) and/or (iv) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), the DIP and Pre-Petition Lender shall: |

(a) be granted replacement liens on, and security interests in, the Loan Collateral subject only to (1) the liens on, and security interests in, the Loan Collateral granted to the DIP and Pre-Petition Lender pursuant to the DIP Facility, the Interim Order and the Final Order, as the case may be, and (2) the Carve-Out; and

(b) be granted an allowed superpriority administrative expense claim which shall have priority (except with respect to the liens and superpriority claims granted to the DIP and Pre-Petition Lender in connection with the DIP Facility, the replacement liens granted pursuant to clause (a), above, and the Carve Out), in any case of a Debtor under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code; provided, however, that the Superpriority Claims shall not be payable from the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code.

(c) with respect to the DIP and Pre-Petition Lender, be entitled to receive monthly payments of cash-pay interest of accrued, unpaid post-petition interest on the Pre-Petition Lender Debt.

21

(d) be entitled to have the Borrowers/Debtors pay all reasonable out-of-pocket costs and expenses incurred by the DIP and Pre-Petition Lender with respect to the DIP Pre-Petition Lender Debt, the Cases, and the protection and/or enforcement of the rights, interests and remedies of the DIP and Pre-Petition Lender including, without limitation, the reasonable fees and disbursements of counsel and other professional advisers advising the DIP and Pre-Petition Lender, including any other professionals retained by the DIP and Pre-Petition Lender, including an industry consultant, upon presentation of an invoice therefor (which may be redacted to remove privileged or case sensitive material) without the requirement of prior Court approval or compliance with guidelines applicable to retained professionals.

#4934-5110-1791 v11

**DIP AND PRE-PETITION LENDER:**

**M&T BANK, ALSO KNOWN AS MANUFACTURERS AND TRADERS TRUST COMPANY**

By: _____
Name:  Suzanne Crymes
Title:  Senior Vice President

**BORROWERS:**

**SPIRITRUST LUTHERAN**

By: _____
Name:  Kevin Neuman
Title:  Chief Restructuring Officer

**SPIRITRUST LUTHERAN HOME CARE AND HOSPICE, INC.**

By: _____
Name:  Kevin Neuman
Title:  Chief Restructuring Officer

**SPIRITRUST LUTHERAN LIFE**

By: _____
Name:  Kevin Neuman
Title:  Chief Restructuring Officer

23

# SCHEDULE 1

## [Names of borrowers/debtors]

SpiriTrust Lutheran, a Pennsylvania not-for-profit corporation

SpiriTrust Lutheran Home Care and Hospice, Inc., a Pennsylvania not-for-profit corporation

SpiriTrust Lutheran LIFE, a Pennsylvania not-for-profit corporation

#4934-5110-1791 v11

# SCHEDULE 2

## [Pre-Petition Credit Agreement]

The Pre-Petition Lender made certain credit facilities available to the Debtors, comprised of: (i) a term loan to SpiriTrust Lutheran in the original principal amount of $10,000,000 (the **"2014 Term Loan"**), (ii) an irrevocable letter of credit for the account of the Debtors in the principal amount of $67,642,465.75 (the **"LC"**), (iii) a term loan to SpiriTrust Lutheran in the principal amount of $5,500,000 (the **"2019 Term Loan"**), (iv) a line of credit to the Borrowers in the maximum principal amount of $5,500,000 (the **"STL LOC"**), for which all three Debtors (STL, HCH, and LIFE) are co-borrowers, (v) a line of credit to HCH in the maximum principal amount of $1,000,000 (the **"HCH LOC"**), (vi) a purchasing card facility (the **"Purchasing Card"**), and (vii) various vehicle loans in the outstanding aggregate amount of $14,413.63 (as of July 31, 2025) (the **"Vehicle Loans"**).

The 2014 Term Loan, the LC, the SWAP Note, and the 2019 Term Loan are referred to hereinafter, each individually, as a **"Master Indenture Loan"**, and together, collectively, as the **"Master Indenture Loans"**.

The STL LOC, the HCH LOC, the Purchasing Card, and the Vehicle Loans are referred to hereinafter, each individually, as an **"M&T Loan"**, and together, collectively, as the **"M&T Loans"**.

The Master Indenture Loans and the M&T Loans are referred to hereinafter, collectively, as the **"Pre-Petition Lender Debt"**.

### *The Master Indenture Loans*

The Master Indenture Loans were made under and pursuant to that certain Master Trust Indenture, dated as of May 15, 2005 (the **"Master Indenture"**), by and between Hanover Lutheran Retirement Village, Inc. (which subsequently merged with and into Lutheran Social Services of South Central Pennsylvania, which changed its name to SpiriTrust Lutheran) and Manufacturers and Traders Trust Company, as Master Trustee.

Pursuant to Section 5.01(b) of the Master Indenture, all of the Master Indenture Loans are secured by, among other things, a pledge and security interest in all of the Gross Revenues[2] of SpiriTrust Lutheran.

---

[2] Pursuant to Section 1.01 of the Master Indenture, "Gross Revenues" means "all operating and nonoperating revenues, received by or on behalf of any Member, and all rights to receive the same, whether in the form of accounts, contract rights, accounts receivable, general intangibles, chattel paper, documents, instruments or money, whether now owned or hereafter acquired, all as defined in the Uniform Commercial Code, and all the proceeds thereof, and any insurance proceeds or condemnation awards, excluding, however, any revenues securing Non- Recourse or any gifts, grants, bequests, funds, donations and contributions, and income therefrom, to the extent specifically restricted by the donor, settlor or grantor to a particular purpose inconsistent with the

Moreover, pursuant to Section 5.01(h) of the Master Indenture, and each of the Mortgages described below, the lien priority and encumbrance of each Mortgage be deemed to be equal and identical to the each of the other Mortgages as if they were purchase money mortgages delivered at the same moment in time in Pennsylvania, in *pari passu*.

### (1) The 2014 Term Loan.

The Pre-Petition Lender made the 2014 Term Loan available to SpiriTrust Lutheran pursuant to that certain Project Financing Agreement, dated as of June 20, 2014, by and among City of York General Authority, SpiriTrust Lutheran, f/k/a Lutheran Social Services of South Central Pennsylvania and the Pre-Petition Lender (the **"2014 Term Loan Agreement"**).

SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the 2014 Term Loan are evidenced by that certain Series of 2014 Master Note, dated as of June 20, 2014, in the principal amount of $10,000,000, by SpiriTrust Lutheran, f/k/a Lutheran Social Services of South Central Pennsylvania in favor of the Pre-Petition Lender, as assignee of the City of York General Authority (the **"2014 Term Loan Note"**).

SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the 2014 Term Loan and the 2014 Term Loan Note are secured by, among other things, (i) the real property described on Schedule 3 hereof, (ii) furniture, furnishings, goods, chattels, appliances, apparatus, inventory, machinery and equipment of any nature whatsoever and all other tangible personal property now or at any time hereafter owned by the Debtors and installed in, attached to or situated in or at such real property or used or intended to be used in connection with the operation of the CCRCs (defined below), or in the operation of any buildings and improvements now or hereafter erected which comprise a part of the real property and/or the CCRCs, and (iii) rents, issues and profits associated with the Debtors' continuing care retirement communities (**"CCRCs"**) located in York County and Adams County, Pennsylvania, pursuant to that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), by SpiriTrust Lutheran in favor of the Pre-Petition Lender, in its capacity as Master Trustee under the Master Indenture, dated as of June 16, 2014, effective as of June 26, 2014, recorded June 26, 2014 in the office of the York County Recorder of Deeds, as Book 2282, Page 2861, and recorded June 26, 2014 in the office of the Adams County Recorder of Deeds as Book 5945, Page 672 (the **"2014 Term Loan Mortgage"**).

The 2014 Term Loan Agreement, the 2014 Term Loan Note, and the 2014 Term Loan Mortgage, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, together, collectively, the **"2014 Term Loan Documents"**.

### (2) The Series B of 2019 Master Note (Letter of Credit).

In connection with the issuance of the Cumberland County Municipal Authority Variable Rate Demand Revenue Bonds (SpiriTrust Lutheran Project), Series of 2019 (the **"Bonds"**), the Pre-Petition Lender issued that certain Irrevocable Transferable Letter of Credit No. SB2302210001 (the **"LC"**), for the benefit of the holders of the Bonds, pursuant that certain Letter of Credit

---

use for the payment of principal of, redemption premium and interest on Master Notes or Master Guaranties."

#4934-5110-1791 v11

Agreement, dated as of December 15, 2019, by and between SpiriTrust Lutheran and the Pre-Petition Lender (the **"LC Agreement"**).

SpiriTrust Lutheran's reimbursement obligations under and in respect of the LC are evidenced by that certain Series B of 2019 Master Note (letter of credit note), dated as of December 18, 2019, in the principal amount of $67,642,465.75, by SpiriTrust Lutheran in favor of the Pre-Petition Lender, as Letter of Credit Bank (the **"LC Note"**).

SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the LC and the LC Note are secured by, among other things, a mortgage lien in the lien amount of $67,642,465.75 encumbering (i) the real property described on Schedule 3 hereof, (ii) furniture, furnishings, goods, chattels, appliances, apparatus, inventory, machinery and equipment of any nature whatsoever and all other tangible personal property now or at any time hereafter owned by the Debtors and installed in, attached to or situated in or at such real property or used or intended to be used in connection with the operation of the CCRCs, or in the operation of any buildings and improvements now or hereafter erected which comprise a part of the real property and/or the CCRCs, and (iii) rents, issues and profits associated with the Debtors' CCRCs, pursuant to that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), by SpiriTrust Lutheran in favor of the Pre-Petition Lender, dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 114), December 19, 2019 (York County, BK 2550, Page 8473), and December 19, 2019 (Franklin County, Instrument #201924086)(collectively, the **"LC Mortgage"**).

The LC Agreement, the LC Note, and the LC Mortgage, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the **"LC Documents."**

### *(3) The Series D of 2019 Master Note*:
On or about December 18, 2019, the Pre-Petition Lender made a term loan available to SpiriTrust Lutheran in the principal amount of $5,500,000 (the **"2019 Term Loan"**), pursuant to that certain Credit Agreement, dated as of December 18, 2019, by and between SpiriTrust Lutheran and the Pre-Petition Lender (the "**2019 Term Loan Agreement**").

SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the 2019 Term Loan are evidenced by that certain Series D of 2019 Master Note, dated as of December 18, 2019, in the principal amount of $5,500,000.00, by SpiriTrust Lutheran in favor of the Pre-Petition Lender (the **"2019 Term Loan Note"**).

SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the 2019 Term Loan and the 2019 Term Loan Note are secured by, among other things, a mortgage lien in the lien amount of $5,500,000.00 encumbering (i) the real property described on Schedule 3 hereof, (ii) furniture, furnishings, goods, chattels, appliances, apparatus, inventory, machinery and equipment of any nature whatsoever and all other tangible personal property now or at any time hereafter owned by the Debtors and installed in, attached to or situated in or at such real property or used or intended to be used in connection with the operation of the CCRCs, or in the operation of any buildings and improvements now or hereafter erected which comprise a part of the real property and/or the CCRCs, and (iii) rents, issues and profits associated with the

Debtors' CCRCs, pursuant to that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), by SpiriTrust Lutheran in favor of the Pre-Petition Lender, dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 194), December 19, 2019 (York County, BK 2550, Page 8557), and December 19, 2019 (Franklin County, Instrument #201924088)(collectively, the **"2019 Term Loan Mortgage"**).

The 2019 Term Loan Agreement, the 2019 Term Loan Note, and the 2019 Term Loan Mortgage, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the **"2019 Term Loan Documents."**

The 2014 Term Loan Documents, the LC Documents, and the 2019 Term Loan Documents are referred to hereinafter, collectively, as the **"Master Indenture Loan Documents"**.

### **M&T Bank Loans**

*(4) The STL Line of Credit:*

Pursuant to an Amendment to Loan Documents Agreement, dated as of November 22, 2022 (the **"STL LOC Amendment Agreement"**), by and among Pre-Petition Lender and the Debtors, an existing SpiriTrust Lutheran line of credit in the maximum principal amount of $3,000,000 and an existing SpiriTrust Lutheran LIFE line of credit in the maximum principal amount of $2,500,000, were combined into a single demand line of credit in the maximum principal amount of $5,500,000, for which all of the Debtors are co-borrowers (the **"STL LOC"**).[3]

The Debtors' obligations to the Pre-Petition Lender under and in respect of the STL LOC are evidenced by that certain Consolidated Amended and Restated Revolving Line Note, dated November 22, 2022, in the maximum principal amount of $5,500,000, by Debtors, as co-borrowers, in favor of the Pre-Petition Lender (the **"STL LOC Note"**).

The Debtors' obligations to the Pre-Petition Lender under and in respect of the STL LOC and the STL LOC Note are secured by, among other things, (a) a security interest in all assets of SpiriTrust Lutheran, pursuant to the STL LOC Amendment Agreement, and (b) a pledge of certain investment property maintained with Bank of New York Mellon, N.A., being Securities Account Nos. 10177895BN0, 10177898BN0, and 10177896BN0 (the **"STL LOC Pledged Securities"**), pursuant to that certain Pledge of Securities, dated December 11, 2014, by SpiriTrust Lutheran in favor of the Pre-Petition Lender, that certain Amendment to Loan Documents Agreement, dated as of November 22, 2022, by and among the Debtors and the Pre-Petition Lender, and that certain Specific Security Agreement, dated as of November 22, 2022, by SpiriTrust Lutheran in favor of the Pre-Petition Lender (collectively, the **"Securities Pledge Agreement"**).

The STL LOC Amendment Agreement, the STL LOC Note, and the STL LOC Securities Pledge Agreement, together with all agreements, documents, and instruments executed in connection

---

[3] The assets of SpiriTrust Lutheran LIFE were sold in 2023.

therewith and/or in furtherance thereof, are referred to herein, collectively, as the **"STL LOC Documents"**.

### *(5) HCH Line of Credit:*

On or about May 29, 2009, the Pre-Petition Lender made a line of credit available to SpiriTrust Lutheran Home Care & Hospice, Inc. in the original maximum principal amount of $2,500,000 (the **"HCH LOC"**), pursuant to that certain Loan Agreement, dated as of May 29, 2009, by and between SpiriTrust Lutheran Home Care & Hospice, Inc. and the Pre-Petition Lender (the **"HCH LOC Loan Agreement"**).

HCH's obligations to the Bank under and in respect of the HCH LOC are evidenced by that certain Daily Adjusting LIBOR Grid Note, dated as of May 29, 2009, by SpiriTrust Lutheran Home Care & Hospice, Inc. in favor of the Pre-Petition Lender, in the maximum principal amount of $2,500,000 (the **"HCH LOC Note"**).

SpiriTrust Lutheran Home Care & Hospice, Inc.'s obligations to the Pre-Petition Lender under and in respect of the HCH LOC and the HCH LOC Note are secured by a security interest in all of SpiriTrust Lutheran Home Care & Hospice, Inc. right, title and interest in, to, and in respect of all Accounts (including Health-Care Insurance Receivables), Chattel Paper, Payment Intangibles and Supporting Obligations, and all Records of any of the collateral, and all proceeds of collateral of every kind and nature in whatever form, including, without limitation, both cash and noncash proceeds resulting or arising from the sale or other disposition by SpiriTrust Lutheran Home Care & Hospice, Inc. of the collateral, pursuant to that certain Security Agreement, dated as of May 29, 2009, by SpiriTrust Lutheran Home Care & Hospice, Inc. in favor of the Pre-Petition Lender (the **"HCH LOC Security Agreement"**).

Pursuant to a certain Reservation of Rights Letter, dated December 20, 2023, by the Pre-Petition Lender to SpiriTrust Lutheran Home Care & Hospice, Inc. (the **"December 2023 ROR Letter"**), the commitment amount under the HCH LOC was reduced to $1,000,000.

The HCH LOC Loan Agreement, the HCH LOC Note, the HCH LOC Securities Pledge Agreement, and the December 2023 ROR Letter, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "**HCH LOC Documents**".

### *(6) The Purchasing Card:*

Pursuant to a certain VISA Charge Card Agreement for Commercial Cards, Corporate Card, and Purchasing Card Accounts, dated November 9, 2008 (the "**Purchasing Card Agreement**"), by and among Pre-Petition Lender and the Debtors, the Pre-Petition Lender made purchasing card services available to the Debtors. The Purchasing Card Agreement, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "**Purchasing Card Documents**".

### *(7) The Vehicle Loans:*

The Pre-Petition Lender made various credit facilities available to SpiriTrust Lutheran for the purpose of purchasing vehicles (the **"Vehicle Loans"**). SpiriTrust Lutheran's obligations to the Pre-Petition Lender under and in respect of the Vehicle Loans are each evidenced by a Term

Note (collectively, the **"Vehicle Loan Notes"**). The Vehicle Loans are secured by the titles to the financed vehicles.

The Vehicle Loan Notes, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "**Vehicle Loan Documents**".

    *(8) The Treasury Services:*
The Pre-Petition Lender has provided and continues to provide the Debtors with various treasury management services and automated clearing services (collectively, the **"Treasury Management Services"**), pursuant to that certain house Master M&T Treasury Management Services Agreement, dated December 8, 2011, by and between SpiriTrust Lutheran and the Pre-Petition Lender, that certain Automated Clearing House Payments Agreement, dated November 29, 2006, by and between SpiriTrust Lutheran and the Pre-Petition Lender, each as amended, modified, and supplemented from time to time (the **"Treasury Services Documents"**). As provided in the Treasury Services Documents, the Debtors are obligated to pay certain fees to the Pre-Petition Lender from time to time (the **"Service Fees"**).

The $5.5 Million LOC Documents, the HCH LOC Documents, the Purchasing Card Documents, and the Vehicle Loan Documents are referred to hereinafter, collectively, as the **"M&T Bank Loan Documents"**.

Certain terms and covenants with respect to certain of the Loans were modified pursuant to a certain Continuing Covenants Agreement, dated as of December 18, 2019, by and between SpiriTrust Lutheran and the Pre-Petition Lender (the **"Continuing Covenants Agreement"**).

The Master Indenture Loan Documents, the M&T Bank Loan Documents, and the Continuing Covenants Agreement, together with any and all other loan documents executed in connection with the Loans as amended, modified, extended and/or restated from time to time are hereinafter collectively referred to as the "**Existing Loan Documents**."

    *(9) The Forbearance Agreement:*
As a result of certain defaults and Events of Default having occurred under the Existing Loan Documents, the Debtors and the Pre-Petition Lender entered into that certain Forbearance and Amendment to Loan Documents Agreement, dated August 21, 2025 (the **"Forbearance Agreement"**).

The Debtors' obligations to the Pre-Petition Lender under and in respect of the HCH LOC are evidenced by that certain Amended and Restated Revolving Line Note, dated as of August 21, 2025, by the Debtors in favor of the Pre-Petition Lender, in the maximum principal amount of $1,000,000 (the **"Amended and Restated HCH LOC Note"**).

The Debtors' obligations to the Pre-Petition Lender under and in respect of the Forbearance Agreement, the Loans, and the Existing Loan Documents are secured by (i) a security interest in all of the Debtors' assets pursuant to the Forbearance Agreement and that certain General Security Agreement, dated as of August 21, 2025 (the **"Forbearance Security Agreement"**), and (ii) a pledge and assignment of and security interest in deposit account maintained with M&T Bank, being Deposit Account #9893703703, titled SpiriTrust Lutheran - M&T Bank as

#4934-5110-1791 v11

Secured Party (the **"Collateral Account"**), pursuant to that certain Pledge and Assignment of Deposit Account, dated as of August 21, 2025 (the **"Forbearance Pledge of Deposit Account"**).

**<u>M&T Bank has permitted SpiriTrust to maintain funds in the Collateral Account solely for the purpose of meeting certain of SpiriTrust's regulatory obligations. The funds in the Collateral Account are not Assets for the purpose of any Sale. The Collateral Account shall be excluded from the sale of the Debtors' Assets.</u>**

The Forbearance Agreement, the Amended and Restated HCH LOC Note, the Forbearance Security Agreement, and the Forbearance Pledge of Deposit Account, together with any and all other loan documents executed in connection therewith are hereinafter collectively referred to as the **"Forbearance Documents."**

The Existing Loan Documents and the Forbearance Documents are referred to herein, collectively, as the **"Pre-Petition Credit Agreement."**

#4934-5110-1791 v11

# SCHEDULE 3

## [**Loan Collateral**]

The Pre-Petition Lender Debt is secured by:

(1) Mortgage liens encumbering certain parcels of real property located in the Township of West Manheim, York County, Pennsylvania, the Township of Manchester, York County, Pennsylvania, the Township of Shrewsbury, York County, Pennsylvania, the City of York, York County, Pennsylvania, the Borough of Shrewsbury, York County, Pennsylvania, the Township of Straban, Adams County, Pennsylvania, and the Township of Greene, Franklin County, Pennsylvania [Adams County, Pennsylvania (being parcel numbers 38012-0043---000, 38O12-0043A---000, 38012-0043---999, and 38012-0043---999/01), Franklin County, Pennsylvania (being parcel numbers 09-0C 19.-222.-000000, and 09-0C19.-222.-EX0000), and York County, Pennsylvania (being parcel numbers 52-000-BD-0044.00-0000 (Fairview Drive, West Manheim Township), 36-000-KH-0065.A0-00000 (1710 Sprenkle Drive, Manchester Township), 36-000-KH-9065.A0-00000 (Sprenkle Drive, Manchester Township), 36-000-KH-0065.E0-00000 (Sprenkle Drive, Manchester Township), 14-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.00-00000 (Kelly Drive, City of York), 14-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.00-00000 (Priority ES Road, City of York), 14-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.00-00000 (1025-1035 Carl Street, City of York), 14-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.00-00000 (716 Kelly Drive, City of York), 14-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.00-00000 (730 Kelly Drive, City of York), 14-57 5-05-0002.00-00000 (738 Kelly Drive, City of York), 14-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.00-00000 (758 Kelly Drive, City of York), 14-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.00-00000 (752-754 Kelly Drive, City of York), 45-000-BJ-0085.B0-00000 (600-719 Bollinger Drive, Shrewsbury Township), 45-000-BJ-0085.C0-00000 (300-512 W. Luther Drive, Shrewsbury Township), 45-000-BJ-0085.D0-00000 (Susquehanna Trail South, Shrewsbury Township), 45-000-BJ-0085.00-00000 (Susquehanna Trail South, Shrewsbury Township), and 84-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B.00-0000 (200 Luther Road, Shrewsbury Township))] (collectively, the **"Properties"**), pursuant to (i) that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), dated as of June 16, 2014, effective as of June 26, 2014, recorded June 26, 2014 in the office of the York County Recorder of Deeds, as Book 2282, Page 2861, and recorded June 26, 2014 in the office of the Adams County Recorder of Deeds as Book 5945, Page 672, (ii) that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 114), December 19, 2019 (York County, BK 2550, Page 8473), and December 19, 2019 (Franklin County, Instrument #201924086), (iii) that certain Open-End Mortgage and Security Agreement (for Series C of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 154), December 19, 2019 (York County, BK 2550, Page 8515), and December 19, 2019 (Franklin County, Instrument #201924087), and (iv) that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 194), December 19, 2019 (York County, BK 2550, Page 8557), and December 19, 2019 (Franklin County, Instrument #201924088).

#4934-5110-1791 v11

(2) With respect to the above-listed parcels of real property, a security interest in "[a]ll furniture, furnishings, goods, chattels, appliances, apparatus, inventory, machinery and equipment of any nature whatsoever and all other tangible personal property now or at any time hereafter owned by the Mortgagor and installed in, attached to or situated in or at the Sites or used or intended to be used in connection with the operation of the Facilities, or in the operation of any buildings and improvements now or hereafter erected which comprise a part of the Sites or the Facilities, including replacements and substitutions thereof, whether or not the personal property is or shall be affixed thereto," pursuant to (i) that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), dated as of June 16, 2014, effective as of June 26, 2014, recorded June 26, 2014 in the office of the York County Recorder of Deeds, as Book 2282, Page 2861, and recorded June 26, 2014 in the office of the Adams County Recorder of Deeds as Book 5945, Page 672, (ii) that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 114), December 19, 2019 (York County, BK 2550, Page 8473), and December 19, 2019 (Franklin County, Instrument #201924086), (iii) that certain Open-End Mortgage and Security Agreement (for Series C of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 154), December 19, 2019 (York County, BK 2550, Page 8515), and December 19, 2019 (Franklin County, Instrument #201924087), and (iv) that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 194), December 19, 2019 (York County, BK 2550, Page 8557), and December 19, 2019 (Franklin County, Instrument #201924088).

(3) With respect to the above-listed parcels of real property, an assignment of and security interest in "[a]ll the rents, issues and profits of any of the foregoing and all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards relating to the Sites, the Facilities and the improvements thereon erected or to be erected thereon," pursuant to (i) that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), dated as of June 16, 2014, effective as of June 26, 2014, recorded June 26, 2014 in the office of the York County Recorder of Deeds, as Book 2282, Page 2861, and recorded June 26, 2014 in the office of the Adams County Recorder of Deeds as Book 5945, Page 672, (ii) that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 114), December 19, 2019 (York County, BK 2550, Page 8473), and December 19, 2019 (Franklin County, Instrument #201924086), (iii) that certain Open-End Mortgage and Security Agreement (for Series C of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 154), December 19, 2019 (York County, BK 2550, Page 8515), and December 19, 2019 (Franklin County, Instrument #201924087), and (iv) that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 194), December 19, 2019 (York County, BK 2550, Page 8557), and December 19, 2019

#4934-5110-1791 v11

(Franklin County, Instrument #201924088), which security interest is also perfected by that certain UCC-1 financing statement #2021092200183, recorded September 21, 2021, in the Office of the Pennsylvania Secretary of State.

(4) A security interest in the Gross Revenues of SpiriTrust Lutheran, defined in that certain Master Trust Indenture, dated May 15, 2005, as "all operating and nonoperating revenues, received by or on behalf of [SpiriTrust Lutheran], and all rights to receive the same, whether in the form of accounts, contract rights, accounts receivable, general intangibles, chattel paper, documents, instruments or money, whether now owned or hereafter acquired, all as defined in the Uniform Commercial Code, and all the proceeds thereof, and any insurance proceeds or condemnation awards, excluding, however, any revenues securing Non- Recourse or any gifts, grants, bequests, funds, donations and contributions, and income therefrom, to the extent specifically restricted by the donor, settlor or grantor to a particular purpose inconsistent with the use for the payment of principal of, redemption premium and interest on Master Notes or Master Guaranties," pursuant to (i) that certain Master Trust Indenture, dated May 15, 2005, which security interest is perfected by that certain UCC-1 financing statement #2021091300940, recorded September 10, 2021, in the Office of the Pennsylvania Secretary of State, (ii) that certain Open-End Mortgage and Security Agreement (For Series 2014 Master Note), dated as of June 16, 2014, effective as of June 26, 2014, recorded June 26, 2014 in the office of the York County Recorder of Deeds, as Book 2282, Page 2861, and recorded June 26, 2014 in the office of the Adams County Recorder of Deeds as Book 5945, Page 672, (iii) that certain Open-End Mortgage and Security Agreement (for Series B of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 114), December 19, 2019 (York County, BK 2550, Page 8473), and December 19, 2019 (Franklin County, Instrument #201924086), (iv) that certain Open-End Mortgage and Security Agreement (for Series C of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 154), December 19, 2019 (York County, BK 2550, Page 8515), and December 19, 2019 (Franklin County, Instrument #201924087), and (v) that certain Open-End Mortgage and Security Agreement (for Series D of 2019 Master Note), dated December 15, 2019, effective December 18, 2019, rec. December 18, 2019 (Adams County, BK 6566, Page 194), December 19, 2019 (York County, BK 2550, Page 8557), and December 19, 2019 (Franklin County, Instrument #201924088).

(5) A security interest in all assets of the Debtors pursuant to that certain Amendment to Loan Documents Agreement, dated as of November 22, 2022, that certain Specific Security Agreement, dated as of November 22, 2022, , that certain Forbearance and Amendment to Loan Documents Agreement, dated as of August 21,2025, and that certain General Security Agreement, dated August 21, 2025, which security interest is perfected by that certain UCC-1 financing statement #20230328059663, recorded March 27, 2023, in the Office of the Pennsylvania Secretary of State, that certain UCC-1 financing statement #20250828244975, recorded August 28, 2025, in the Office of the Pennsylvania Secretary of State, and that certain UCC-1 financing statement #20250828244980, recorded August 28, 2025, in the Office of the Pennsylvania Secretary of State.

#4934-5110-1791 v11

(6) A pledge of and security interest in certain investment property maintained with BNY Mellon, N.A., being Securities Account Nos. 10177895BN0, 10177898BN0, and 10177896BN0, and all proceeds thereof, pursuant to that certain Pledge of Securities, dated December 11, 2014, Amendment to Loan Documents Agreement, dated as of November 22, 2022, that certain Specific Security Agreement, dated as of November 22, 2022, that certain Forbearance and Amendment to Loan Documents Agreement, dated as of August 21,2025, and that certain General Security Agreement, dated August 21, 2025, which security interest is perfected by that certain Control Agreement, June 20, 2014, by and among BNY Mellon, N.A. SpiriTrust Lutheran, and the Bank, that certain UCC-1 financing statement #33511235, recorded January 18, 2001, in the Office of the Pennsylvania Secretary of State, that certain UCC-1 financing statement #2006041804906, recorded April 18, 2006, in the Office of the Pennsylvania Secretary of State, and that certain UCC-1 financing statement #20230328059663, recorded March 27, 2023, in the Office of the Pennsylvania Secretary of State.

(7) A pledge of, assignment of, and security interest in that certain deposit account maintained with M&T Bank, being Deposit Account #9893703703, titled SpiriTrust Lutheran - M&T Bank as Secured Party, pursuant to that certain Pledge and Assignment of Deposit Account, dated as of August 21, 2025, which security interest is perfected by possession and by that certain UCC-1 financing statement #20250828244973, recorded August 28, 2025, in the Office of the Pennsylvania Secretary of State

#4934-5110-1791 v11

**Exhibit A**

**[Budget]**



**DEBTOR-IN-POSSESSION ("DIP") LIQUIDITY FORECAST**
**PERIOD THROUGH MARCH 2026**
*DATED NOVEMBER 13, 2025*

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

Case 1:25-bk-03343-HWV   Doc 15   Filed 11/24/25   Entered 11/24/25 09:05:35   Desc
Main Document      Page 127 of 143

*($s in thousands)*

| # | Section | Topic | Information / Assumption |
|---|---------|-------|--------------------------|
| 1 | General | | |
| | | Source | Forecast developed using the Company's latest operating / financial budget, current AP aging, recent actual run-rates, and conversations with SpiriTrust ("STL") representatives. |
| | | Forecast Period | Week ending November 7, 2025 through March 2026. |
| | | Collections / Billings | Receipts forecast is based on the Company's recent run-rates as well as the Company's latest operating / financial budget. Billings and deposits assume current contractual pricing rates. Q1 2026 billings assumes the Q1 2025 room & board actuals with an adjustment for realized occupancy changes in May 2025 YTD. Collections assumes a 30-day DSO assumption. |
| | | Entrance Fees | Based on the latest understanding of entrance fees, the forecast assumes that approximately $2.0m in entrance fees are collected in November 2025 through March 2026. |
| | | Resident Refunds | Following the collection of near-term entrance fees, resident refunds would be due back to previous tenants within 60-days. **Note, the DIP forecast depicts resident refunds getting paid.** |
| | | Employee Compensation | Employee salaries, wages, benefits, and taxes are based on the Company's recent run-rates as well as the SpiriTrust's latest operating / financial budget. The payroll run-rate is approximately $1.1m bi-weekly. |
| | | Disbursements | Disbursement forecast in near-term is based on the Company's recent run-rates, the latest AP aging report, and conversations with STL employees. The outer weeks/months are driven from the Company's operating / financial budget. The balances are assumed to be paid via a combination of ACH, check, and credit card. |
| 2 | Non-Operating Items | | |
| | | Repairs & Maintenance | Repairs and maintenance disbursements are based on recent run-rates as well as SpiriTrust's latest operating / financial budget. |
| | | Professional Fees | The professional schedule exhibit included in this document details the professional fees. **Note, the broker fee is not included in the forecast.** |
| | | Highmark Payment Plan | The forecast assumes payment in accordance with the contractual Highmark payment plan agreement. |
| | | Entities | The forecast is for the CCRC STL entity only and does not factor in small go-forward transfers of funds that are Foundation-related. |
| | | Debt Service | Debt service includes monthly interest of 12% on post-petition funding and a one-time 3% fee on the total DIP paid at the close. |
| | | Taxes | The forecast includes only the monthly tax payments in accordance with payment plan agreements with local municipalities. All tax payments are frozen once the Company enters into bankruptcy. |

**SpiriTrust | CCRC DIP Forecast Summary by Month**

*Dated: 11/13/2025*

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

| Forecast Week<br>Actual / Forecast<br>Date (Week Ending) | Forecast<br>November-25 | Forecast<br>December-25 | Forecast<br>January-26 | Forecast<br>February-26 | Forecast<br>March-26 | Forecast<br>Total |
|---|---|---|---|---|---|---|
| **CASH FLOW** | | | | | | |
| Room and board | 4,528,260 | 4,566,707 | 4,482,926 | 4,550,671 | 4,589,688 | 22,718,253 |
| Entrance fee receipts | 645,185 | 767,025 | - | 554,110 | - | 1,966,320 |
| Program service receipts | 21,454 | 29,570 | 26,417 | 26,417 | 26,417 | 130,274 |
| Other receipts | 70,375 | 65,517 | 90,531 | 14,530 | 14,533 | 255,487 |
| **Total Collections** | **$ 5,265,275** | **$ 5,428,819** | **$ 4,599,874** | **$ 5,145,727** | **$ 4,630,638** | **$ 25,070,333** |
| Salaries, Wages & Payroll Tax | 2,049,002 | 2,011,599 | 2,096,140 | 2,115,884 | 2,115,884 | 10,388,510 |
| Employee Benefits | 364,847 | 381,016 | 421,516 | 425,794 | 445,689 | 2,038,862 |
| **Employee Compensation** | **$ 2,413,849** | **$ 2,392,615** | **$ 2,517,657** | **$ 2,541,678** | **$ 2,561,573** | **$ 12,427,372** |
| Purchased services | 1,309,715 | 1,567,430 | 1,484,715 | 1,161,772 | 1,161,772 | 6,685,403 |
| Supplies | 277,127 | 208,652 | 272,753 | 278,203 | 278,203 | 1,314,938 |
| Leases and rentals | 1,378 | 19,500 | 20,000 | 16,000 | 16,000 | 72,878 |
| Insurance | 565,575 | 247,407 | 147,407 | 147,407 | 147,407 | 1,255,201 |
| Utilities | 304,153 | 287,398 | 368,375 | 279,986 | 323,085 | 1,562,996 |
| Other expenses | 255,455 | 310,000 | 375,000 | 325,000 | 325,000 | 1,590,455 |
| **Overhead & Operating Expenses** | **$ 2,713,402** | **$ 2,640,386** | **$ 2,668,250** | **$ 2,208,368** | **$ 2,251,466** | **$ 12,481,872** |
| **Sub-Total - Operating Cash Flow** | **$ 138,024** | **$ 395,817** | **$ (586,032)** | **$ 395,681** | **$ (182,400)** | **$ 161,090** |
| Renovations | 118,112 | 23,750 | - | - | - | 141,862 |
| Repairs and maintenance | 121,189 | 218,325 | 318,542 | 174,834 | 174,834 | 1,007,723 |
| **Capital Expenditures** | **$ 239,301** | **$ 242,075** | **$ 318,542** | **$ 174,834** | **$ 174,834** | **$ 1,149,585** |
| Taxes | 9,060 | - | - | - | - | 9,060 |
| Resident Refunds | - | 187,341 | - | 149,600 | - | 336,941 |
| Management Fees | 212,456 | 100,000 | 100,000 | 100,000 | 100,000 | 612,456 |
| CRO & Financial Advisor | 325,853 | 360,000 | 380,000 | 250,000 | 250,000 | 1,565,853 |
| Company Bankruptcy Professional Fees | 247,476 | 630,000 | 220,000 | 215,000 | 625,000 | 1,937,476 |
| Lender Bankruptcy Professional Fees | 428,680 | 110,000 | 140,000 | 110,000 | 110,000 | 898,680 |
| Highmark Insurance Payment Plan | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 750,000 |
| Debt Service | 193,284 | 76,460 | 93,878 | 100,439 | 326,663 | 790,724 |
| **Non-Operating & Bankruptcy Expenses** | **$ 1,566,809** | **$ 1,613,801** | **$ 1,083,878** | **$ 1,075,039** | **$ 1,561,663** | **$ 6,901,190** |
| **Total Disbursements** | **$ 6,933,361** | **$ 6,888,878** | **$ 6,588,326** | **$ 5,999,918** | **$ 6,549,535** | **$ 32,960,019** |
| **Net Cash Flow** | **$ (1,668,087)** | **$ (1,460,059)** | **$ (1,988,452)** | **$ (854,191)** | **$ (1,918,897)** | **$ (7,889,685)** |
| **Cumulative Net Cash Flow** | **$ (1,668,087)** | **$ (3,128,146)** | **$ (5,116,598)** | **$ (5,970,789)** | **$ (7,889,685)** | **$ (7,889,685)** |

**SpiriTrust | CCRC DIP Forecast Summary by Month**

*Dated: 11/13/2025*

|  | Forecast Week | | | | | |
|---|---|---|---|---|---|---|
|  | *Actual / Forecast* | | | | | *Forecast* |
| **Date (Week Ending)** | *Forecast*<br>**November-25** | *Forecast*<br>**December-25** | *Forecast*<br>**January-26** | *Forecast*<br>**February-26** | *Forecast*<br>**March-26** | **Total** |
| **ROLL FORWARDS** | | | | | | |
| **STL LINE OF CREDIT** | | | | | | |
| Beginning LOC Balance | $ 4,874,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 4,874,000 |
| Funding (Draw) / Paydown | (626,000) | - | - | - | - | (626,000) |
| **Ending LOC Balance** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** |
| **DIP LOAN** | | | | | | |
| Beginning DIP Balance | $ 5,500,000 | $ 5,939,306 | $ 7,399,365 | $ 9,387,817 | $ 10,242,008 | $ 5,500,000 |
| Funding (Draw) / Paydown | (439,306) | (1,460,059) | (1,988,452) | (854,191) | (1,918,897) | (6,660,905) |
| **Ending DIP Balance** | **$ 5,939,306** | **$ 7,399,365** | **$ 9,387,817** | **$ 10,242,008** | **$ 12,160,905** | **$ 12,160,905** |
| LOC / DIP Commitment | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 |
| Remaining Availability | 6,260,694 | 4,800,635 | 2,812,183 | 1,957,992 | 39,095 | 39,095 |
| **Cash Balance** | **$ 255,042** | **$ 255,042** | **$ 255,042** | **$ 255,042** | **$ 255,042** | **$ 255,042** |
| *DIP interest at 12%* | *17,818* | *76,460* | *93,878* | *95,592* | *125,663* | *$ 409,411* |
| **ACCOUNTS RECEIVABLE** | | | | | | |
| Beginning Balance | $ 186,444 | $ 258,885 | $ 420,940 | $ 884,551 | $ 968,572 | $ 186,444 |
| Billing | 4,692,531 | 4,823,850 | 5,063,485 | 4,675,638 | 4,887,931 | 24,143,435 |
| Receipts | (4,620,090) | (4,661,794) | (4,599,874) | (4,591,618) | (4,630,638) | (23,104,014) |
| **Ending Balance** | **$ 258,885** | **$ 420,940** | **$ 884,551** | **$ 968,572** | **$ 1,225,864** | **$ 1,225,864** |
| **ACCOUNTS PAYABLE** | | | | | | |
| Beginning Balance | $ 13,585,737 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,585,737 |
| Purchases | 3,278,882 | 3,032,461 | 3,136,791 | 2,533,201 | 2,576,300 | 14,557,635 |
| Disbursements | (2,952,703) | (3,032,461) | (3,136,791) | (2,533,201) | (2,576,300) | (14,231,457) |
| **Ending Balance** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** |

**SpiriTrust | CCRC DIP 13-Week Forecast**

*Dated: 11/13/2025*

CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE

| Forecast Week | 1 | 2 | **Filing Week** 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Actuals | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Date (Week Ending) | 11/7/2025 | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 13-Week Period |
| **CASH FLOW** | | | | | | | | | | | | | | |
| Room and board | 363,431 | 508,441 | 2,346,103 | 1,310,285 | 324,171 | 648,341 | 1,120,854 | 2,473,341 | 323,293 | 567,951 | 801,927 | 2,366,463 | 423,293 | 13,577,894 |
| Entrance fee receipts | 111,418 | 341,488 | 87,700 | 104,580 | - | 421,860 | - | 345,165 | - | - | - | - | - | 1,412,210 |
| Program service receipts | - | 3,360 | 6,462 | 11,632 | 5,170 | 5,170 | 12,924 | 6,306 | 2,113 | 3,170 | 5,283 | 9,246 | 6,604 | 77,441 |
| Other receipts | 10,099 | 13,103 | 32,759 | 14,414 | 6,552 | 13,103 | 32,759 | 13,103 | 56,897 | 3,438 | 3,948 | 20,447 | 5,801 | 226,423 |
| **Total Collections** | $ 484,947 | $ 866,392 | $ 2,473,024 | $ 1,440,911 | $ 335,892 | $ 1,088,475 | $ 1,166,537 | $ 2,837,916 | $ 382,303 | $ 574,559 | $ 811,158 | $ 2,396,156 | $ 435,698 | $ 15,293,968 |
| Salaries, Wages & Payroll Tax | 58,118 | 992,483 | | 998,401 | | 998,401 | | 1,013,198 | | 1,013,198 | | 1,022,942 | 60,000 | 6,156,742 |
| Employee Benefits | 45,201 | 14,646 | 295,500 | 9,500 | 66,516 | 9,500 | 295,500 | 9,500 | 40,500 | 35,516 | 40,500 | 264,500 | 40,500 | 1,167,380 |
| **Employee Compensation** | $ 103,320 | $ 1,007,129 | $ 295,500 | $ 1,007,901 | $ 66,516 | $ 1,007,901 | $ 295,500 | $ 1,022,698 | $ 40,500 | $ 1,048,715 | $ 40,500 | $ 1,287,442 | $ 100,500 | $ 7,324,121 |
| Purchased services | 232,708 | 88,652 | 561,443 | 426,912 | 463,601 | 347,943 | 407,943 | 347,943 | 272,943 | 332,943 | 272,943 | 272,943 | 332,943 | 4,361,859 |
| Supplies | 49,346 | - | 152,781 | 75,000 | 45,000 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 758,533 |
| Leases and rentals | 360 | - | 509 | 509 | 7,500 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 40,878 |
| Insurance | - | 382,739 | 182,835 | - | 106,672 | 140,735 | - | - | - | 147,407 | - | - | - | 960,388 |
| Utilities | 57,528 | 51,148 | 148,484 | 46,993 | 61,978 | 59,579 | 79,060 | 86,782 | 73,675 | 73,675 | 73,675 | 73,675 | 73,675 | 959,925 |
| Other expenses | 66,440 | 29,283 | 97,231 | 62,500 | 85,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 940,455 |
| **Overhead & Operating Expenses** | $ 406,383 | $ 551,823 | $ 1,143,283 | $ 611,914 | $ 769,750 | $ 681,807 | $ 620,553 | $ 568,276 | $ 480,169 | $ 687,575 | $ 480,169 | $ 480,169 | $ 540,169 | $ 8,022,038 |
| **Sub-Total - Operating Cash Flow** | $ (24,755) | $ (692,559) | $ 1,034,241 | $ (178,904) | $ (500,374) | $ (601,233) | $ 250,483 | $ 1,246,942 | $ (138,366) | $ (1,161,731) | $ 290,489 | $ 628,545 | $ (204,971) | $ (52,191) |
| Renovations | 19,751 | 52,756 | 21,180 | 24,425 | 9,250 | 14,500 | - | - | - | - | - | - | - | 141,862 |
| Repairs and maintenance | 6,410 | 35,029 | 47,000 | 32,750 | 37,200 | 43,708 | 43,708 | 93,708 | 43,708 | 43,708 | 43,708 | 43,708 | 143,708 | 658,056 |
| **Capital Expenditures** | $ 26,161 | $ 87,785 | $ 68,180 | $ 57,175 | $ 46,450 | $ 58,208 | $ 43,708 | $ 93,708 | $ 43,708 | $ 43,708 | $ 43,708 | $ 43,708 | $ 143,708 | $ 799,918 |
| Taxes | 9,060 | | | | | | | | | | | | | 9,060 |
| Resident Refunds | - | - | - | - | 56,127 | - | - | 131,214 | - | - | - | - | - | 187,341 |
| Management Fees | - | 106,228 | 70,819 | 35,409 | - | 50,000 | - | 50,000 | - | 50,000 | - | 50,000 | - | 412,456 |
| CRO & Financial Advisor | 67,740 | 78,113 | 180,000 | - | 90,000 | 90,000 | 90,000 | 90,000 | 55,000 | 55,000 | 90,000 | 90,000 | 90,000 | 1,065,853 |
| Company Bankruptcy Professional Fees | - | 137,476 | 110,000 | - | 55,000 | 55,000 | 55,000 | 465,000 | 27,500 | 27,500 | 55,000 | 55,000 | 55,000 | 1,097,476 |
| Lender Bankruptcy Professional Fees | - | - | 428,680 | - | 55,000 | - | 55,000 | - | 30,000 | - | 55,000 | - | - | 678,680 |
| Highmark Insurance Payment Plan | - | - | - | 150,000 | - | - | - | 150,000 | - | - | - | - | 150,000 | 450,000 |
| Debt Service | 175,467 | - | - | 17,818 | - | - | - | 76,460 | - | - | - | - | 93,878 | 363,623 |
| **Non-Operating & Bankruptcy Expenses** | $ 252,267 | $ 321,817 | $ 789,499 | $ 203,227 | $ 256,127 | $ 195,000 | $ 200,000 | $ 962,674 | $ 112,500 | $ 132,500 | $ 200,000 | $ 195,000 | $ 443,878 | $ 4,264,489 |
| **Total Disbursements** | $ 788,130 | $ 1,968,553 | $ 2,296,461 | $ 1,880,217 | $ 1,138,844 | $ 1,942,916 | $ 1,159,762 | $ 2,647,356 | $ 676,877 | $ 1,912,498 | $ 764,377 | $ 2,006,319 | $ 1,228,255 | $ 20,410,566 |
| **Net Cash Flow** | $ (303,183) | $ (1,102,161) | $ 176,563 | $ (439,306) | $ (802,951) | $ (854,442) | $ 6,775 | $ 190,559 | $ (294,574) | $ (1,337,939) | $ 46,781 | $ 389,837 | $ (792,557) | $ (5,116,598) |
| **Cumulative Net Cash Flow** | $ (303,183) | $ (1,405,343) | $ (1,228,781) | $ (1,668,087) | $ (2,471,038) | $ (3,325,480) | $ (3,318,705) | $ (3,128,146) | $ (3,422,720) | $ (4,760,658) | $ (4,713,878) | $ (4,324,041) | $ (5,116,598) | $ (5,116,598) |

| Forecast Week | 1 | 2 | 3 Filing Week | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Actuals | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Date (Week Ending) | 11/7/2025 | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 13-Week Period |
| **ROLL FORWARDS** | | | | | | | | | | | | | | |
| **STL LINE OF CREDIT** | | | | | | | | | | | | | | |
| Beginning LOC Balance | 4,874,000 | 4,874,000 | 5,500,000 | - | - | - | - | - | - | - | - | - | - | 4,874,000 |
| Funding (Draw) / Paydown | - | (626,000) | - | - | - | - | - | - | - | - | - | - | - | (626,000) |
| **Ending LOC Balance** | $ 4,874,000 | $ 5,500,000 | $ 5,500,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 5,500,000 |
| **DIP LOAN** | | | | | | | | | | | | | | |
| Beginning DIP Balance | $ - | $ - | $ - | 5,500,000 | 5,500,000 | 5,939,306 | 6,742,257 | 7,596,699 | 7,589,924 | 7,399,365 | 7,693,939 | 9,031,878 | 8,985,097 | 8,595,260 | 5,500,000 |
| Funding (Draw) / Paydown | - | - | - | - | 439,306 | (802,951) | (854,442) | 6,775 | 190,559 | (294,574) | (1,337,939) | 46,781 | 389,837 | (792,557) | (3,887,817) |
| **Ending DIP Balance** | $ - | $ - | $ 5,500,000 | 5,939,306 | 6,742,257 | 7,596,699 | 7,589,924 | 7,399,365 | 7,693,939 | 9,031,878 | 8,985,097 | 8,595,260 | 9,387,817 | 9,387,817 |
| LOC / DIP Commitment | 5,500,000 | 5,500,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 |
| Remaining Availability | 626,000 | - | 6,700,000 | 6,260,694 | 5,457,743 | 4,603,301 | 4,610,076 | 4,800,635 | 4,506,061 | 3,168,122 | 3,214,903 | 3,604,740 | 2,812,183 | 2,812,183 |
| **Cash Balance** | $ 554,640 | $ 78,479 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | $ 255,042 | 255,042 |
| *DIP interest at 12%* | $ - | $ - | $ - | $ 17,818 | $ - | $ - | $ - | $ 76,460 | $ - | $ - | $ - | $ - | $ 93,878 | $ 188,156 |
| **ACCOUNTS RECEIVABLE** | | | | | | | | | | | | | | |
| Beginning Balance | $ 186,444 | $ 4,462,716 | $ 3,952,054 | $ 1,580,973 | $ 258,885 | $ 4,702,171 | $ 4,050,447 | $ 2,898,801 | $ 420,940 | $ 5,042,561 | $ 4,482,892 | $ 3,686,625 | $ 1,305,359 | 186,444 |
| Billing | 4,649,802 | 14,243 | 14,243 | 14,243 | 4,779,179 | 14,890 | 14,890 | 14,890 | 5,003,924 | 14,890 | 14,890 | 14,890 | 14,890 | 14,579,865 |
| Receipts | (373,530) | (524,905) | (2,385,324) | (1,336,331) | (335,892) | (666,615) | (1,166,537) | (2,492,751) | (382,303) | (574,559) | (811,158) | (2,396,156) | (435,698) | (13,881,758) |
| **Ending Balance** | $ 4,462,716 | $ 3,952,054 | $ 1,580,973 | $ 258,885 | $ 4,702,171 | $ 4,050,447 | $ 2,898,801 | $ 420,940 | $ 5,042,561 | $ 4,482,892 | $ 3,686,625 | $ 1,305,359 | $ 884,551 | 884,551 |
| **ACCOUNTS PAYABLE** | | | | | | | | | | | | | | |
| Beginning Balance | $ 13,585,737 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | 13,585,737 |
| Purchases | 758,722 | 639,608 | 1,211,463 | 669,089 | 816,200 | 740,016 | 664,262 | 661,984 | 523,877 | 731,284 | 523,877 | 523,877 | 683,877 | 9,148,134 |
| Disbursements | (432,543) | (639,608) | (1,211,463) | (669,089) | (816,200) | (740,016) | (664,262) | (661,984) | (523,877) | (731,284) | (523,877) | (523,877) | (683,877) | (8,821,956) |
| **Ending Balance** | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | 13,911,916 |

**SpiriTrust | DIP Professional Fee Forecast**

*Dated: 11/13/2025*

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

| | 1 Actual 11/7/2025 | 2 Forecast 11/14/2025 | 3 File Week Forecast 11/21/2025 | 4 Forecast 11/28/2025 | 5 Forecast 12/5/2025 | 6 Forecast 12/12/2025 | 7 Forecast 12/19/2025 | 8 Forecast 12/26/2025 | 9 Forecast 1/2/2026 | 10 Forecast 1/9/2026 | 11 Forecast 1/16/2026 | 12 Forecast 1/23/2026 | 13 Forecast 1/30/2026 | 13-Weeks | Feb-26 | Mar-26 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company Counsel (Chernicoff & Polsinelli) | - | 137,476 | 110,000 | - | 55,000 | 55,000 | 55,000 | 55,000 | 27,500 | 27,500 | 55,000 | 55,000 | 55,000 | 687,476 | 215,000 | 215,000 | 1,117,476 |
| Company Advisor (Novo) | 67,740 | 78,113 | 180,000 | - | 90,000 | 90,000 | 90,000 | 90,000 | 55,000 | 55,000 | 90,000 | 90,000 | 90,000 | 1,065,853 | 250,000 | 250,000 | 1,565,853 |
| Bank Counsel | - | - | 428,680 | - | 55,000 | - | 55,000 | - | 30,000 | - | 55,000 | - | 55,000 | 678,680 | 110,000 | 110,000 | 898,680 |
| **Sub-Total: Base Professional Fees** | $ 67,740 | $ 215,589 | $ 718,680 | $ - | $ 200,000 | $ 145,000 | $ 200,000 | $ 145,000 | $ 112,500 | $ 82,500 | $ 200,000 | $ 145,000 | $ 200,000 | $ 2,432,009 | $ 575,000 | $ 575,000 | $ 3,582,009 |
| Ombudsman | - | - | - | - | - | - | - | 10,000 | - | - | - | - | - | 10,000 | - | 10,000 | 20,000 |
| Claims Agent & Mailings | - | - | - | - | - | - | - | 150,000 | - | - | - | - | - | 150,000 | - | 150,000 | 300,000 |
| US Trustee Fees | - | - | - | - | - | - | - | 250,000 | - | - | - | - | - | 250,000 | - | 250,000 | 500,000 |
| **Sub-Total: Bankruptcy-Related Fees** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 410,000 | $ - | $ - | $ - | $ - | $ - | $ 410,000 | $ - | $ 410,000 | $ 820,000 |
| **Total Professional Fees** | $ 67,740 | $ 215,589 | $ 718,680 | $ - | $ 200,000 | $ 145,000 | $ 200,000 | $ 555,000 | $ 112,500 | $ 82,500 | $ 200,000 | $ 145,000 | $ 200,000 | $ 2,842,009 | $ 575,000 | $ 985,000 | $ 4,402,009 |

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

| Category | Amount | Notes |
|---|---|---|
| **Total DIP Loan** | **$ 12,200,000** | *Entire DIP Loan Balance + $5.5m LOC paydown* |
| Current LOC Balance | 5,500,000 | *Current Balance of LOC as of 11/13/2025* |
| Incremental Pre-Petition Borrowing | - | *Current LOC availability and incremental LOC funding pre-petition* |
| **LOC Commitment Balance** | **$ 5,500,000** | |
| **Incremental DIP Funding** | **$ 6,700,000** | *Funding from filing date through March 2026* |

**Exhibit B**

**[Budget]**



**DEBTOR-IN-POSSESSION ("DIP") LIQUIDITY FORECAST**
**PERIOD THROUGH MARCH 2026**
*DATED NOVEMBER 13, 2025*

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE

($s in thousands)

| # | Section | Topic | Information / Assumption |
|---|---------|-------|--------------------------|
| 1 | General | | |
| | | Source | Forecast developed using the Company's latest operating / financial budget, current AP aging, recent actual run-rates, and conversations with SpiriTrust ("STL") representatives. |
| | | Forecast Period | Week ending November 7, 2025 through March 2026. |
| | | Collections / Billings | Receipts forecast is based on the Company's recent run-rates as well as the Company's latest operating / financial budget. Billings and deposits assume current contractual pricing rates. Q1 2026 billings assumes the Q1 2025 room & board actuals with an adjustment for realized occupancy changes in May 2025 YTD. Collections assumes a 30-day DSO assumption. |
| | | Entrance Fees | Based on the latest understanding of entrance fees, the forecast assumes that approximately $2.0m in entrance fees are collected in November 2025 through March 2026. |
| | | Resident Refunds | Following the collection of near-term entrance fees, resident refunds would be due back to previous tenants within 60-days. **Note, the DIP forecast depicts resident refunds getting paid.** |
| | | Employee Compensation | Employee salaries, wages, benefits, and taxes are based on the Company's recent run-rates as well as the SpiriTrust's latest operating / financial budget. The payroll run-rate is approximately $1.1m bi-weekly. |
| | | Disbursements | Disbursement forecast in near-term is based on the Company's recent run-rates, the latest AP aging report, and conversations with STL employees. The outer weeks/months are driven from the Company's operating / financial budget. The balances are assumed to be paid via a combination of ACH, check, and credit card. |
| 2 | Non-Operating Items | | |
| | | Repairs & Maintenance | Repairs and maintenance disbursements are based on recent run-rates as well as SpiriTrust's latest operating / financial budget. |
| | | Professional Fees | The professional schedule exhibit included in this document details the professional fees. **Note, the broker fee is not included in the forecast.** |
| | | Highmark Payment Plan | The forecast assumes payment in accordance with the contractual Highmark payment plan agreement. |
| | | Entities | The forecast is for the CCRC STL entity only and does not factor in small go-forward transfers of funds that are Foundation-related. |
| | | Debt Service | Debt service includes monthly interest of 12% on post-petition funding and a one-time 3% fee on the total DIP paid at the close. |
| | | Taxes | The forecast includes only the monthly tax payments in accordance with payment plan agreements with local municipalities. All tax payments are frozen once the Company enters into bankruptcy. |

**SpiriTrust | CCRC DIP Forecast Summary by Month**
*Dated: 11/13/2025*

| Forecast Week<br>Actual / Forecast<br>Date (Week Ending) | Forecast<br>November-25 | Forecast<br>December-25 | Forecast<br>January-26 | Forecast<br>February-26 | Forecast<br>March-26 | Forecast<br>Total |
|---|---|---|---|---|---|---|
| **CASH FLOW** | | | | | | |
| Room and board | 4,528,260 | 4,566,707 | 4,482,926 | 4,550,671 | 4,589,688 | 22,718,253 |
| Entrance fee receipts | 645,185 | 767,025 | - | 554,110 | - | 1,966,320 |
| Program service receipts | 21,454 | 29,570 | 26,417 | 26,417 | 26,417 | 130,274 |
| Other receipts | 70,375 | 65,517 | 90,531 | 14,530 | 14,533 | 255,487 |
| **Total Collections** | **$ 5,265,275** | **$ 5,428,819** | **$ 4,599,874** | **$ 5,145,727** | **$ 4,630,638** | **$ 25,070,333** |
| Salaries, Wages & Payroll Tax | 2,049,002 | 2,011,599 | 2,096,140 | 2,115,884 | 2,115,884 | 10,388,510 |
| Employee Benefits | 364,847 | 381,016 | 421,516 | 425,794 | 445,689 | 2,038,862 |
| **Employee Compensation** | **$ 2,413,849** | **$ 2,392,615** | **$ 2,517,657** | **$ 2,541,678** | **$ 2,561,573** | **$ 12,427,372** |
| Purchased services | 1,309,715 | 1,567,430 | 1,484,715 | 1,161,772 | 1,161,772 | 6,685,403 |
| Supplies | 277,127 | 208,652 | 272,753 | 278,203 | 278,203 | 1,314,938 |
| Leases and rentals | 1,378 | 19,500 | 20,000 | 16,000 | 16,000 | 72,878 |
| Insurance | 565,575 | 247,407 | 147,407 | 147,407 | 147,407 | 1,255,201 |
| Utilities | 304,153 | 287,398 | 368,375 | 279,986 | 323,085 | 1,562,996 |
| Other expenses | 255,455 | 310,000 | 375,000 | 325,000 | 325,000 | 1,590,455 |
| **Overhead & Operating Expenses** | **$ 2,713,402** | **$ 2,640,386** | **$ 2,668,250** | **$ 2,208,368** | **$ 2,251,466** | **$ 12,481,872** |
| **Sub-Total - Operating Cash Flow** | **$ 138,024** | **$ 395,817** | **$ (586,032)** | **$ 395,681** | **$ (182,400)** | **$ 161,090** |
| Renovations | 118,112 | 23,750 | - | - | - | 141,862 |
| Repairs and maintenance | 121,189 | 218,325 | 318,542 | 174,834 | 174,834 | 1,007,723 |
| **Capital Expenditures** | **$ 239,301** | **$ 242,075** | **$ 318,542** | **$ 174,834** | **$ 174,834** | **$ 1,149,585** |
| Taxes | 9,060 | - | - | - | - | 9,060 |
| Resident Refunds | - | 187,341 | - | 149,600 | - | 336,941 |
| Management Fees | 212,456 | 100,000 | 100,000 | 100,000 | 100,000 | 612,456 |
| CRO & Financial Advisor | 325,853 | 360,000 | 380,000 | 250,000 | 250,000 | 1,565,853 |
| Company Bankruptcy Professional Fees | 247,476 | 630,000 | 220,000 | 215,000 | 625,000 | 1,937,476 |
| Lender Bankruptcy Professional Fees | 428,680 | 110,000 | 140,000 | 110,000 | 110,000 | 898,680 |
| Highmark Insurance Payment Plan | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 750,000 |
| Debt Service | 193,284 | 76,460 | 93,878 | 100,439 | 326,663 | 790,724 |
| **Non-Operating & Bankruptcy Expenses** | **$ 1,566,809** | **$ 1,613,801** | **$ 1,083,878** | **$ 1,075,039** | **$ 1,561,663** | **$ 6,901,190** |
| **Total Disbursements** | **$ 6,933,361** | **$ 6,888,878** | **$ 6,588,326** | **$ 5,999,918** | **$ 6,549,535** | **$ 32,960,019** |
| **Net Cash Flow** | **$ (1,668,087)** | **$ (1,460,059)** | **$ (1,988,452)** | **$ (854,191)** | **$ (1,918,897)** | **$ (7,889,685)** |
| **Cumulative Net Cash Flow** | **$ (1,668,087)** | **$ (3,128,146)** | **$ (5,116,598)** | **$ (5,970,789)** | **$ (7,889,685)** | **$ (7,889,685)** |

**SpiriTrust | CCRC DIP Forecast Summary by Month**

*Dated: 11/13/2025*

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

| Forecast Week<br>*Actual / Forecast*<br>Date (Week Ending) | *Forecast*<br>**November-25** | *Forecast*<br>**December-25** | *Forecast*<br>**January-26** | *Forecast*<br>**February-26** | *Forecast*<br>**March-26** | *Forecast*<br>**Total** |
|---|---|---|---|---|---|---|
| **ROLL FORWARDS** | | | | | | |
| **STL LINE OF CREDIT** | | | | | | |
| Beginning LOC Balance | $ 4,874,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 | $ 4,874,000 |
| Funding (Draw) / Paydown | (626,000) | - | - | - | - | (626,000) |
| **Ending LOC Balance** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** | **$ 5,500,000** |
| **DIP LOAN** | | | | | | |
| Beginning DIP Balance | $ 5,500,000 | $ 5,939,306 | $ 7,399,365 | $ 9,387,817 | $ 10,242,008 | $ 5,500,000 |
| Funding (Draw) / Paydown | (439,306) | (1,460,059) | (1,988,452) | (854,191) | (1,918,897) | (6,660,905) |
| **Ending DIP Balance** | **$ 5,939,306** | **$ 7,399,365** | **$ 9,387,817** | **$ 10,242,008** | **$ 12,160,905** | **$ 12,160,905** |
| LOC / DIP Commitment | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 | $ 12,200,000 |
| Remaining Availability | 6,260,694 | 4,800,635 | 2,812,183 | 1,957,992 | 39,095 | 39,095 |
| **Cash Balance** | **$ 255,042** | **$ 255,042** | **$ 255,042** | **$ 255,042** | **$ 255,042** | **$ 255,042** |
| *DIP interest at 12%* | *17,818* | *76,460* | *93,878* | *95,592* | *125,663* | *$ 409,411* |
| **ACCOUNTS RECEIVABLE** | | | | | | |
| Beginning Balance | $ 186,444 | $ 258,885 | $ 420,940 | $ 884,551 | $ 968,572 | $ 186,444 |
| Billing | 4,692,531 | 4,823,850 | 5,063,485 | 4,675,638 | 4,887,931 | 24,143,435 |
| Receipts | (4,620,090) | (4,661,794) | (4,599,874) | (4,591,618) | (4,630,638) | (23,104,014) |
| **Ending Balance** | **$ 258,885** | **$ 420,940** | **$ 884,551** | **$ 968,572** | **$ 1,225,864** | **$ 1,225,864** |
| **ACCOUNTS PAYABLE** | | | | | | |
| Beginning Balance | $ 13,585,737 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,585,737 |
| Purchases | 3,278,882 | 3,032,461 | 3,136,791 | 2,533,201 | 2,576,300 | 14,557,635 |
| Disbursements | (2,952,703) | (3,032,461) | (3,136,791) | (2,533,201) | (2,576,300) | (14,231,457) |
| **Ending Balance** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** | **$ 13,911,916** |

SpiriTrust | CCRC DIP 13-Week Forecast

*Dated: 11/13/2025*

CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE

| Forecast Week | 1 | 2 | **Filing Week** 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Actuals | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Date (Week Ending) | 11/7/2025 | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 13-Week Period |
| **CASH FLOW** | | | | | | | | | | | | | | |
| Room and board | 363,431 | 508,441 | 2,346,103 | 1,310,285 | 324,171 | 648,341 | 1,120,854 | 2,473,341 | 323,293 | 567,951 | 801,927 | 2,366,463 | 423,293 | 13,577,894 |
| Entrance fee receipts | 111,418 | 341,488 | 87,700 | 104,580 | - | 421,860 | - | 345,165 | - | - | - | - | - | 1,412,210 |
| Program service receipts | - | 3,360 | 6,462 | 11,632 | 5,170 | 5,170 | 12,924 | 6,306 | 2,113 | 3,170 | 5,283 | 9,246 | 6,604 | 77,441 |
| Other receipts | 10,099 | 13,103 | 32,759 | 14,414 | 6,552 | 13,103 | 32,759 | 13,103 | 56,897 | 3,438 | 3,948 | 20,447 | 5,801 | 226,423 |
| **Total Collections** | $ 484,947 | $ 866,392 | $ 2,473,024 | $ 1,440,911 | $ 335,892 | $ 1,088,475 | $ 1,166,537 | $ 2,837,916 | $ 382,303 | $ 574,559 | $ 811,158 | $ 2,396,156 | $ 435,698 | $ 15,293,968 |
| Salaries, Wages & Payroll Tax | 58,118 | 992,483 | | 998,401 | | 998,401 | | 1,013,198 | | 1,013,198 | | 1,022,942 | 60,000 | 6,156,742 |
| Employee Benefits | 45,201 | 14,646 | 295,500 | 9,500 | 66,516 | 9,500 | 295,500 | 9,500 | 40,500 | 35,516 | 40,500 | 264,500 | 40,500 | 1,167,380 |
| **Employee Compensation** | $ 103,320 | $ 1,007,129 | $ 295,500 | $ 1,007,901 | $ 66,516 | $ 1,007,901 | $ 295,500 | $ 1,022,698 | $ 40,500 | $ 1,048,715 | $ 40,500 | $ 1,287,442 | $ 100,500 | $ 7,324,121 |
| Purchased services | 232,708 | 88,652 | 561,443 | 426,912 | 463,601 | 347,943 | 407,943 | 347,943 | 272,943 | 332,943 | 272,943 | 272,943 | 332,943 | 4,361,859 |
| Supplies | 49,346 | - | 152,781 | 75,000 | 45,000 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 54,551 | 758,533 |
| Leases and rentals | 360 | - | 509 | 509 | 7,500 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 40,878 |
| Insurance | - | 382,739 | 182,835 | - | 106,672 | 140,735 | - | - | - | 147,407 | - | - | - | 960,388 |
| Utilities | 57,528 | 51,148 | 148,484 | 46,993 | 61,978 | 59,579 | 79,060 | 86,782 | 73,675 | 73,675 | 73,675 | 73,675 | 73,675 | 959,925 |
| Other expenses | 66,440 | 29,283 | 97,231 | 62,500 | 85,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 940,455 |
| **Overhead & Operating Expenses** | $ 406,383 | $ 551,823 | $ 1,143,283 | $ 611,914 | $ 769,750 | $ 681,807 | $ 620,553 | $ 568,276 | $ 480,169 | $ 687,575 | $ 480,169 | $ 480,169 | $ 540,169 | $ 8,022,038 |
| **Sub-Total - Operating Cash Flow** | $ (24,755) | $ (692,559) | $ 1,034,241 | $ (178,904) | $ (500,374) | $ (601,233) | $ 250,483 | $ 1,246,942 | $ (138,366) | $ (1,161,731) | $ 290,489 | $ 628,545 | $ (204,971) | $ (52,191) |
| Renovations | 19,751 | 52,756 | 21,180 | 24,425 | 9,250 | 14,500 | - | - | - | - | - | - | - | 141,862 |
| Repairs and maintenance | 6,410 | 35,029 | 47,000 | 32,750 | 37,200 | 43,708 | 43,708 | 93,708 | 43,708 | 43,708 | 43,708 | 43,708 | 143,708 | 658,056 |
| **Capital Expenditures** | $ 26,161 | $ 87,785 | $ 68,180 | $ 57,175 | $ 46,450 | $ 58,208 | $ 43,708 | $ 93,708 | $ 43,708 | $ 43,708 | $ 43,708 | $ 43,708 | $ 143,708 | $ 799,918 |
| Taxes | 9,060 | - | - | - | - | - | - | - | - | - | - | - | - | 9,060 |
| Resident Refunds | - | - | - | - | 56,127 | - | - | 131,214 | - | - | - | - | - | 187,341 |
| Management Fees | - | 106,228 | 70,819 | 35,409 | - | 50,000 | - | 50,000 | - | 50,000 | - | 50,000 | - | 412,456 |
| CRO & Financial Advisor | 67,740 | 78,113 | 180,000 | - | 90,000 | 90,000 | 90,000 | 90,000 | 55,000 | 55,000 | 90,000 | 90,000 | 90,000 | 1,065,853 |
| Company Bankruptcy Professional Fees | - | 137,476 | 110,000 | - | 55,000 | 55,000 | 55,000 | 465,000 | 27,500 | 27,500 | 55,000 | 55,000 | 55,000 | 1,097,476 |
| Lender Bankruptcy Professional Fees | - | - | 428,680 | - | 55,000 | - | 55,000 | - | 30,000 | - | 55,000 | - | 55,000 | 678,680 |
| Highmark Insurance Payment Plan | - | - | - | 150,000 | - | - | - | 150,000 | - | - | - | - | 150,000 | 450,000 |
| Debt Service | 175,467 | - | - | 17,818 | - | - | - | 76,460 | - | - | - | - | 93,878 | 363,623 |
| **Non-Operating & Bankruptcy Expenses** | $ 252,267 | $ 321,817 | $ 789,499 | $ 203,227 | $ 256,127 | $ 195,000 | $ 200,000 | $ 962,674 | $ 112,500 | $ 132,500 | $ 200,000 | $ 195,000 | $ 443,878 | $ 4,264,489 |
| **Total Disbursements** | $ 788,130 | $ 1,968,553 | $ 2,296,461 | $ 1,880,217 | $ 1,138,844 | $ 1,942,916 | $ 1,159,762 | $ 2,647,356 | $ 676,877 | $ 1,912,498 | $ 764,377 | $ 2,006,319 | $ 1,228,255 | $ 20,410,566 |
| **Net Cash Flow** | $ (303,183) | $ (1,102,161) | $ 176,563 | $ (439,306) | $ (802,951) | $ (854,442) | $ 6,775 | $ 190,559 | $ (294,574) | $ (1,337,939) | $ 46,781 | $ 389,837 | $ (792,557) | $ (5,116,598) |
| **Cumulative Net Cash Flow** | $ (303,183) | $ (1,405,343) | $ (1,228,781) | $ (1,668,087) | $ (2,471,038) | $ (3,325,480) | $ (3,318,705) | $ (3,128,146) | $ (3,422,720) | $ (4,760,658) | $ (4,713,878) | $ (4,324,041) | $ (5,116,598) | $ (5,116,598) |

Page 5 of 9

Case 1:25-bk-03343-HWV   Doc 15   Filed 11/24/25   Entered 11/24/25 09:05:35   Desc
Main Document      Page 140 of 143

**SpiritTrust | CCRC DIP 13-Week Forecast**

*Dated: 11/13/2025*

CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE

| Forecast Week | 1 | 2 | Filing Week 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Actuals | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 13-Week Period |
| Date (Week Ending) | 11/7/2025 | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 13-Week Period |
| **ROLL FORWARDS** | | | | | | | | | | | | | | |
| **STL LINE OF CREDIT** | | | | | | | | | | | | | | |
| Beginning LOC Balance | 4,874,000 | 4,874,000 | 5,500,000 | - | - | - | - | - | - | - | - | - | - | 4,874,000 |
| Funding (Draw) / Paydown | - | (626,000) | - | - | - | - | - | - | - | - | - | - | - | (626,000) |
| **Ending LOC Balance** | $ 4,874,000 | $ 5,500,000 | $ 5,500,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 5,500,000 |
| **DIP LOAN** | | | | | | | | | | | | | | |
| Beginning DIP Balance | $ - | $ - | $ 5,500,000 | $ 5,500,000 | $ 5,939,306 | $ 6,742,257 | $ 7,596,699 | $ 7,589,924 | $ 7,399,365 | $ 7,693,939 | $ 9,031,878 | $ 8,985,097 | $ 8,595,260 | 5,500,000 |
| Funding (Draw) / Paydown | - | - | - | (439,306) | (802,951) | (854,442) | 6,775 | 190,559 | (294,574) | (1,337,939) | 46,781 | 389,837 | (792,557) | (3,887,817) |
| **Ending DIP Balance** | $ - | $ - | $ 5,500,000 | $ 5,939,306 | $ 6,742,257 | $ 7,596,699 | $ 7,589,924 | $ 7,399,365 | $ 7,693,939 | $ 9,031,878 | $ 8,985,097 | $ 8,595,260 | $ 9,387,817 | 9,387,817 |
| LOC / DIP Commitment | 5,500,000 | 5,500,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 | 12,200,000 |
| Remaining Availability | 626,000 | - | 6,700,000 | 6,260,694 | 5,457,743 | 4,603,301 | 4,610,076 | 4,800,635 | 4,506,061 | 3,168,122 | 3,214,903 | 3,604,740 | 2,812,183 | 2,812,183 |
| **Cash Balance** | 554,640 | 78,479 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 | 255,042 |
| *DIP interest at 12%* | $ - | $ - | $ - | $ 17,818 | $ - | $ - | $ - | $ 76,460 | $ - | $ - | $ - | $ - | $ 93,878 | 188,156 |
| **ACCOUNTS RECEIVABLE** | | | | | | | | | | | | | | |
| Beginning Balance | $ 186,444 | $ 4,462,716 | $ 3,952,054 | $ 1,580,973 | $ 258,885 | $ 4,702,171 | $ 4,050,447 | $ 2,898,801 | $ 420,940 | $ 5,042,561 | $ 4,482,892 | $ 3,686,625 | $ 1,305,359 | 186,444 |
| Billing | 4,649,802 | 14,243 | 14,243 | 14,243 | 4,779,179 | 14,890 | 14,890 | 14,890 | 5,003,924 | 14,890 | 14,890 | 14,890 | 14,890 | 14,579,865 |
| Receipts | (373,530) | (524,905) | (2,385,324) | (1,336,331) | (335,892) | (666,615) | (1,166,537) | (2,492,751) | (382,303) | (574,559) | (811,158) | (2,396,156) | (435,698) | (13,881,758) |
| **Ending Balance** | $ 4,462,716 | $ 3,952,054 | $ 1,580,973 | $ 258,885 | $ 4,702,171 | $ 4,050,447 | $ 2,898,801 | $ 420,940 | $ 5,042,561 | $ 4,482,892 | $ 3,686,625 | $ 1,305,359 | $ 884,551 | 884,551 |
| **ACCOUNTS PAYABLE** | | | | | | | | | | | | | | |
| Beginning Balance | $ 13,585,737 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | 13,585,737 |
| Purchases | 758,722 | 639,608 | 1,211,463 | 669,089 | 816,200 | 740,016 | 664,262 | 661,984 | 523,877 | 731,284 | 523,877 | 523,877 | 683,877 | 9,148,134 |
| Disbursements | (432,543) | (639,608) | (1,211,463) | (669,089) | (816,200) | (740,016) | (664,262) | (661,984) | (523,877) | (731,284) | (523,877) | (523,877) | (683,877) | (8,821,956) |
| **Ending Balance** | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | $ 13,911,916 | 13,911,916 |

| | 1 Actual 11/7/2025 | 2 Forecast 11/14/2025 | 3 File Week Forecast 11/21/2025 | 4 Forecast 11/28/2025 | 5 Forecast 12/5/2025 | 6 Forecast 12/12/2025 | 7 Forecast 12/19/2025 | 8 Forecast 12/26/2025 | 9 Forecast 1/2/2026 | 10 Forecast 1/9/2026 | 11 Forecast 1/16/2026 | 12 Forecast 1/23/2026 | 13 Forecast 1/30/2026 | 13-Weeks | Feb-26 | Mar-26 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company Counsel (Chernicoff & Polsinelli) | - | 137,476 | 110,000 | - | 55,000 | 55,000 | 55,000 | 55,000 | 27,500 | 27,500 | 55,000 | 55,000 | 55,000 | 687,476 | 215,000 | 215,000 | 1,117,476 |
| Company Advisor (Novo) | 67,740 | 78,113 | 180,000 | - | 90,000 | 90,000 | 90,000 | 90,000 | 55,000 | 55,000 | 90,000 | 90,000 | 90,000 | 1,065,853 | 250,000 | 250,000 | 1,565,853 |
| Bank Counsel | - | - | 428,680 | - | 55,000 | - | 55,000 | 30,000 | - | - | 55,000 | - | 55,000 | 678,680 | 110,000 | 110,000 | 898,680 |
| **Sub-Total: Base Professional Fees** | $ 67,740 | $ 215,589 | $ 718,680 | $ - | $ 200,000 | $ 145,000 | $ 200,000 | $ 145,000 | $ 112,500 | $ 82,500 | $ 200,000 | $ 145,000 | $ 200,000 | $ 2,432,009 | $ 575,000 | $ 575,000 | $ 3,582,009 |
| Ombudsman | - | - | - | - | - | - | - | 10,000 | - | - | - | - | - | 10,000 | - | 10,000 | 20,000 |
| Claims Agent & Mailings | - | - | - | - | - | - | - | 150,000 | - | - | - | - | - | 150,000 | - | 150,000 | 300,000 |
| US Trustee Fees | - | - | - | - | - | - | - | 250,000 | - | - | - | - | - | 250,000 | - | 250,000 | 500,000 |
| **Sub-Total: Bankruptcy-Related Fees** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 410,000 | $ - | $ - | $ - | $ - | $ - | $ 410,000 | $ - | $ 410,000 | $ 820,000 |
| **Total Professional Fees** | $ 67,740 | $ 215,589 | $ 718,680 | $ - | $ 200,000 | $ 145,000 | $ 200,000 | $ 555,000 | $ 112,500 | $ 82,500 | $ 200,000 | $ 145,000 | $ 200,000 | $ 2,842,009 | $ 575,000 | $ 985,000 | $ 4,402,009 |

*CONFIDENTIAL INFORMATION - SUBJECT TO CHANGE*

| Category | Amount | Notes |
|---|---|---|
| **Total DIP Loan** | **$ 12,200,000** | *Entire DIP Loan Balance + $5.5m LOC paydown* |
| Current LOC Balance | 5,500,000 | *Current Balance of LOC as of 11/13/2025* |
| Incremental Pre-Petition Borrowing | - | *Current LOC availability and incremental LOC funding pre-petition* |
| **LOC Commitment Balance** | **$ 5,500,000** | |
| **Incremental DIP Funding** | **$ 6,700,000** | *Funding from filing date through March 2026* |